Michael P. McCloskey, Esq. (SBN 106051)
Sean M. Monks, Esq. (SBN 326301)
Anne E. Swenson, Esq. (SBN 323693)
**WILSON, ELSER, MOSKOWITZ,**
  **EDELMAN & DICKER LLP**
401 West A Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 321-6200
Facsimile: (619) 321-6201
E-mail: michael.mccloskey@wilsonelser.com
          sean.monks@wilsonelser.com

Attorneys for Defendants BEN WYNNE, CHRIS TANNER, JAMIE ETCHESON, ROBERT MUELLER, IVAN CHOUSAL, and INTREPID AUTOMATION

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 3D SYSTEMS, INC., a California Corporation;<br><br>        Plaintiff,<br><br>v.<br><br>BEN WYNNE, an individual; CHRIS TANNER, an individual; JAMIE ETCHESON, an individual; ROBERT MUELLER, an individual; IVAN CHOUSAL, an individual; INTREPID AUTOMATION, a California Corporation; and DOES 1 through 20, inclusive,<br><br>        Defendants. | CASE NO. 3:21-cv-01141-LAB-DDL<br><br>**DEFENDANTS' *AMENDED* ANSWER AND INTREPID AUTOMATION'S *AMENDED* ANSWER AND COUNTERCLAIM/THIRD PARTY CLAIM** |
| INTREPID AUTOMATION,<br><br>        Counter-Claimant,<br><br>v.<br><br>3D SYSTEMS        Counter-Defendant. | Judge:        Hon. Larry A. Burns<br>Dept.        14A<br>Complaint Filed: May 19, 2021<br><br>[Removed from the Superior Court of the State of California for the County of San Diego, Case No. 37-2021-00022139] |
| INTREPID AUTOMATION,<br><br>        Third Party Claimant,<br><br>v.<br><br>EVAN KUESTER<br><br>        Third Party Defendant. | |

Defendants Ben Wynne, Chris Tanner, Jamie Etcheson, Robert Mueller, Ivan Chousal, and Intrepid Automation ("Intrepid") (together "Defendants") hereby amend their answer to the First Amended Complaint ("FAC") by denying all allegations set forth in the FAC not specifically admitted herein, and otherwise responds as follows:

## INTRODUCTION

1.      Answering Paragraph 1 of the FAC, Defendants deny the allegations in the first sentence. Further, Defendants lack knowledge sufficient to form a belief about the truth of the remaining allegations and deny on that basis.

2.      Answering Paragraph 2 of the FAC, Defendants Wynne, Tanner, Chousal, and Mueller admit their previous place of employment before joining Plaintiff was Hewlett Packard (HP). Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 2.

3.      Answering Paragraph 3 of the FAC, Defendants admit Plaintiff filed patent applications with some of the Independent Experts listed as inventors. Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 3.

4.      Answering Paragraph 4 of the FAC, Defendants admit they formed Intrepid. Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 4.

5.      Answering Paragraph 5 of the FAC, Defendants admit they formed Intrepid after they left Plaintiff's employ. Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 5.

6.      Answering Paragraph 6 of the FAC, Intrepid admits it has hired two employees immediately after those employees left Plaintiff's employ. Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 6.

7.    Answering Paragraph 7 of the FAC, Defendants deny each and every allegation in the Paragraph.

8.    Answering Paragraph 8 of the FAC, Defendants deny each and every allegation in the Paragraph.

<u>**JURISDICTION AND VENUE**</u>

9.    Paragraph 9 of the FAC states legal conclusions to which no response is required. To the extent a response is required, Defendants admit this Court has jurisdiction.

10.    Paragraph 10 of the FAC states legal conclusions to which no response is required. To the extent a response is required, Defendants admit venue is proper in this District.

<u>**THE PARTIES**</u>

11.    Answering Paragraph 11 of the FAC, Defendants lack knowledge sufficient to form a belief about the truth of this allegation and deny on that basis.

12.    Answering Paragraph 12 of the FAC, Defendants admit the allegations of fact set forth in Paragraph 12 of the FAC.

13.    Answering Paragraph 13 of the FAC, Wynne admits he resides in Escondido, California.  Wynne admits he was only a principal systems architect for a few months, and was initially hired as such. Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 13.

14.    Answering Paragraph 14 of the FAC, Tanner admits he resides in Idyllwild, California.  Tanner admits he was only a principal systems architect for a few months, and was initially hired as such. Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 14.

15.    Answering Paragraph 15 of the FAC, Etcheson admits he resides in San Diego, California.  Etcheson admits he was only a principal systems architect for a few months, and was initially hired as such. Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 15.

16.     Answering Paragraph 16 of the FAC, Mueller admits he resides in San Diego, California.  Mueller admits he was only a principal systems architect for a few months, and was initially hired as such. Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 16.

17.     Answering Paragraph 17 of the FAC, Chousal admits he resides in Chula Vista, California.  Chousal admits he was only a principal systems architect for a few months, and was initially hired as such. Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 17.

18.     Answering Paragraph 18, Defendants lack knowledge sufficient to form a belief about the truth of this allegation and deny on that basis.

## FACTUAL ALLEGATIONS

19.     Answering Paragraph 19 of the FAC, Defendants lack knowledge sufficient to form a belief about the truth of this allegation and deny on that basis.

20.     Answering Paragraph 20 of the FAC, Defendants admit the Independent Experts were only a principal systems architect for a few months, and were initially hired as such. Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 20.

21.     The allegations of Paragraph 21 refer to a written document which is the best evidence as to its contents.  Defendants deny the allegations of Paragraph 21 to the extent they misstate or mischaracterize the referenced document.  Except as expressly admitted, Defendants deny the allegations of Paragraph 21.

22.     The allegations of Paragraph 22 refer to a written document which is the best evidence as to its contents.  Defendants deny the allegations of Paragraph 22 to the extent they misstate or mischaracterize the referenced document.  Except as expressly admitted, Defendants deny the allegations of Paragraph 22.

23.     The allegations of Paragraph 23 refer to a written document which is the best evidence as to its contents.  Defendants deny the allegations of Paragraph 23 to

the extent they misstate or mischaracterize the referenced document. Except as expressly admitted, Defendants deny the allegations of Paragraph 23.

24.    The allegations of Paragraph 24 refer to a written document which is the best evidence as to its contents. Defendants deny the allegations of Paragraph 24 to the extent they misstate or mischaracterize the referenced document. Except as expressly admitted, Defendants deny the allegations of Paragraph 24.

25.    Answering Paragraph 25 of the FAC, Defendants admit they were sometimes called "Architects" because of their initial job title, and understood subsequent references to them being "architects" after their demotion to be derogatory. Defendants lack knowledge sufficient to form a belief about the truth of the remaining allegations and deny on that basis.

26.    Paragraph 26 of the FAC states simply how some 3D printers work, and thus no response is required regarding what these products do in the 3D printing process. To the extent a response is required, Defendants deny the allegations set forth in this paragraph of the FAC.

27.    Answering Paragraph 27 of the FAC, Defendants lack knowledge sufficient to form a belief about the truth of the allegations and deny on that basis.

28.    Answering Paragraph 28 of the FAC, Defendants deny each and every allegation in the Paragraph.

29.    Answering Paragraph 29 of the FAC, Defendants admit one of the collective names for their work was given the name "Enso" by Wynne and admit they performed some work on the collective project known as Enso. Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 29.

30.    Answering Paragraph 30 of the FAC, Defendants admit some patent applications were filed listing some of them as inventors while employed by Plaintiff Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 30.

31.    Answering Paragraph 31 of the FAC, Defendants deny each and every allegation in the Paragraph.

32.    Answering Paragraph 32 of the FAC, Defendants deny each and every allegation in the Paragraph.

33.    Answering Paragraph 33 of the FAC, Defendants admit in the course of regular business and over their whole employment period at Plaintiff, some emails were sent from work accounts to personal accounts, which was an acceptable and known practice at Plaintiff. Except as otherwise expressly admitted, Defendants lack knowledge sufficient to form a belief about the truth of the remainder of the allegations and deny on that basis.

34.    Answering Paragraph 34 of the FAC, Chousal admits in the course of regular business and over their whole employment period at Plaintiff, some emails were sent from work accounts to personal accounts, which was an acceptable and known practice at Plaintiff. Except as otherwise expressly admitted, Chousal denies the remainder of the allegations.

35.    Answering Paragraph 35 of the FAC, Defendants admit in the course of regular business and over their whole employment period at Plaintiff, some emails were sent from work accounts to personal accounts, which was an acceptable and known practice at Plaintiff and which was done to facilitate their work for Plaintiff. Except as otherwise expressly admitted, Defendants deny the remainder of the allegations.

36.    Answering Paragraph 36 of the FAC, Defendants deny each and every allegation in the Paragraph.

37.    Answering Paragraph 37 of the FAC, Defendants lack sufficient information as to who sent this email or why it was sent, and therefore deny the whole of this allegation on this basis.

38.    Answering Paragraph 38 of the FAC, Defendants deny having access to or using "information related to 3D Systems' customers, pricing lists and

information, supplier lists, vendor and supplier contact information, information related to materials ordered from vendors, 3D Systems' marketing strategies, and product design information."   As to the remaining allegations, Defendants lack sufficient knowledge to form a belief about the truth of the remaining allegations and deny on that basis.

39.    Answering Paragraph 39 of the FAC, Defendants admit providing two weeks notice and continuing to work to assist in the transition due to their departure. Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 39.

40.    Answering Paragraph 40 of the FAC, Defendants lack knowledge sufficient to form a belief about the truth of the remaining allegations and deny on that basis.

41.    Paragraph 41 of the FAC states legal conclusions to which no response is required. To the extent a response is required, Defendants deny each and every allegation in the Paragraph.

42.    Answering Paragraph 42 of the FAC, Defendants admit some of them returned work computers and phones to their initial settings as this was standard procedure in the industry. Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 42.

43.    Answering Paragraph 43 of the FAC, Defendants lack knowledge sufficient to form a belief about the truth of the remaining allegations and deny on that basis.

44.    Answering Paragraph 44, Defendants admit they formed Intrepid after leaving Plaintiff.   As to the website, it speaks for itself, and thus no response is required regarding the contents of the document.   Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 44.

45.    Answering Paragraph 45, Defendants lack knowledge sufficient to form a belief about what Plaintiff believes and denies the allegations on that basis. Defendants deny any remaining allegations in Paragraph 45.

46.    Answering Paragraph 46 of the FAC, Intrepid admits it has hired two employees immediately after those employees left Plaintiff's employ. Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 46.

47.    Answering Paragraph 47 of the FAC, Defendants admit Plaintiff alleges misappropriation of trade secrets. Except as otherwise expressly admitted, Defendants deny each and every allegation in the Paragraph.

48.    Answering Paragraph 48, Defendants admit Intrepid has filed patents during the alleged time window. Except as otherwise expressly admitted, Defendants deny the remaining allegations in Paragraph 48.

49.    Answering Paragraph 49 of the FAC, Defendants lack knowledge sufficient to form a belief about the truth of the allegations regarding Plaintiff's "monitoring" and deny on that basis.  Defendants deny each and every other allegation in the Paragraph.

50.    The allegations of Paragraph 50 refer to a written document which is the best evidence as to its contents.  Defendants deny the allegations of Paragraph 50 to the extent they misstate or mischaracterize the referenced document.  Except as otherwise expressly admitted, Defendants deny the allegations of Paragraph 50.

51.    The allegations of Paragraph 51 refer to a written document which is the best evidence as to its contents.  Defendants deny the allegations of Paragraph 51 to the extent they misstate or mischaracterize the referenced document.  Except as expressly admitted, Defendants deny the allegations of Paragraph 51.

52.    Answering Paragraph 52 of the FAC, Defendants deny each and every allegation in the Paragraph

53.    Answering Paragraph 53 of the FAC, Defendants deny each and every allegation in the Paragraph.

54.    The allegations of Paragraph 54 refer to a written document which is the best evidence as to its contents.  Defendants deny the allegations of Paragraph 54 to the extent they misstate or mischaracterize the referenced document.  Except as expressly admitted, Defendants deny the allegations of Paragraph 54.

55.    The allegations of Paragraph 55 refer to a written document which is the best evidence as to its contents.  Defendants deny the allegations of Paragraph 55 to the extent they misstate or mischaracterize the referenced document.  Except as expressly admitted, Defendants deny the allegations of Paragraph 55.

56.    The allegations of Paragraph 56 refer to a written document which is the best evidence as to its contents.  Defendants deny the allegations of Paragraph 56 to the extent they misstate or mischaracterize the referenced document.  Except as expressly admitted, Defendants deny the allegations of Paragraph 56.

57.    The allegations of Paragraph 57 refer to a written document which is the best evidence as to its contents.  Defendants deny the allegations of Paragraph 57 to the extent they misstate or mischaracterize the referenced document.  Except as expressly admitted, Defendants deny the allegations of Paragraph 57.

58.    Answering Paragraph 58, Defendants deny each and every allegation in this Paragraph.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

59.    Answering Paragraph 59 of the FAC, Defendants repeat and incorporate by reference its responses to Paragraphs 1 through 58 of the FAC as if set forth fully herein.

60.    Paragraph 60 of the FAC states legal conclusions to which no response is required. To the extent a response is required, Defendants deny each and every allegation in this Paragraph.

61.     Paragraph 61 of the FAC states legal conclusions to which no response is required. To the extent a response is required, Defendants lack knowledge sufficient to form a belief about the truth of the purported reasonable efforts by Plaintiff to maintain the secrecy of some of its items and deny on that basis. Defendants deny each and every other allegation in the Paragraph.

62.     Answering Paragraph 62 of the FAC, Defendants lack knowledge sufficient to form a belief about what Plaintiff believes Defendants should have known under the circumstances and deny on that basis. Defendants deny each and every other allegation in the Paragraph.

63.     Answering Paragraph 63 of the FAC, Defendants deny each and every allegation in the Paragraph.

64.     Paragraph 64 of the FAC states legal conclusions to which no response is required.  To the extent a response is required, Defendants deny each and every allegation in the Paragraph.

65.     Paragraph 65 of the FAC states legal conclusions to which no response is required.  To the extent a response is required, Defendants deny each and every allegation in the Paragraph.

66.     Paragraph 66 of the FAC states legal conclusions to which no response is required.  To the extent a response is required, Defendants deny each and every allegation in the Paragraph.

67.     Paragraph 67 of the FAC states legal conclusions to which no response is required. To the extent a response is required, Defendants deny each and every allegation in the Paragraph.

## **SECOND CAUSE OF ACTION**

68.     Answering Paragraph 68 of the FAC, Defendants repeat and incorporate by reference its responses to Paragraphs 1 through 67 of the FAC as if set forth fully herein.

69.     Paragraph 69 of the FAC states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the items alleged in the FAC are trade secrets protected by the Defense of Trade Secrets Act.

70.     Paragraph 70 of the FAC states legal conclusions to which no response is required. To the extent one is required, Defendants lack knowledge sufficient to form a belief about the truth of which of Plaintiff's products and services are used, sold, shipped, and/or ordered in or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce deny on that basis. Defendants deny each and every remaining allegation in the Paragraph.

71.     Answering Paragraph 71 of the FAC, Defendants lack knowledge sufficient to form a belief about the truth of the allegations and deny on that basis.

72.     Answering Paragraph 72 of the FAC, Defendants lack knowledge sufficient to form a belief about the truth of the allegations and deny on that basis.

73.     Answering Paragraph 73 of the FAC, Defendants deny each and every allegation in the Paragraph.

74.     Answering Paragraph 74 of the FAC, Defendants deny each and every allegation in the Paragraph.

75.     Paragraph 75 of the FAC states legal conclusions to which no response is required. To the extent a response is required, Defendants deny each and every allegation in the Paragraph.

76.     Paragraph 76 of the FAC states legal conclusions to which no response is required. To the extent a response is required, Defendants deny each and every allegation in the Paragraph.

77.     Paragraph 77 of the FAC states legal conclusions to which no response is required. To the extent a response is required, Defendants deny each and every allegation in the Paragraph.

/ / /

/ / /

## THIRD CAUSE OF ACTION

78.    Answering Paragraph 78 of the FAC, Defendants repeat and incorporate by reference its responses to Paragraphs 1 through 77 of the FAC as if set forth fully herein. As to Mueller, no response is required because this cause of action has been dismissed. To the extent a further response required, Mueller denies each and every allegation in the Paragraph.

79.    Paragraph 79 of the FAC states legal conclusions to which no response is required The allegations of Paragraph 79 refer to a written document which is the best evidence as to its contents.  Defendants deny the allegations of Paragraph 79 to the extent they misstate or mischaracterize the referenced document.  Except as expressly admitted, Defendants deny the allegations of Paragraph 79. As to Mueller, no response is required because this cause of action has been dismissed. To the extent a further response required, Mueller denies each and every allegation in the Paragraph.

80.    Paragraph 80 of the FAC states legal conclusions to which no response is required. To the extent a response is required, Defendants deny each and every allegation in the Paragraph.  As to Mueller, no response is required because this cause of action has been dismissed. To the extent a further response required, Mueller denies each and every allegation in the Paragraph.

81.    Paragraph 81 of the FAC states legal conclusions to which no response is required. To the extent a response is required, Defendants lack sufficient knowledge and information as to when these emails or actions were supposedly taken, and so also deny on that basis. Defendants deny each and every remaining allegation in the Paragraph. As to Mueller, no response is required because this cause of action has been dismissed. To the extent a further response required, Mueller denies each and every allegation in the Paragraph.

82.    Answering Paragraph 82, Defendants deny each and every allegation in the Paragraph. As to Mueller, no response is required because this cause of action has

been dismissed. To the extent a further response required, Mueller denies each and every allegation in the Paragraph.

83.    Paragraph 83 of the FAC states legal conclusions to which no response is required. To the extent a response is required, Defendants deny each and every allegation in the Paragraph. As to Mueller, no response is required because this cause of action has been dismissed. To the extent a further response required, Mueller denies each and every allegation in the Paragraph.

## FOURTH CAUSE OF ACTION

84.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

85.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

86.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

87.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

88.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

89.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

90.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

91.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

## **FIFTH CAUSE OF ACTION**

92.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

93.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

94.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

95.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

## **SIXTH CAUSE OF ACTION**

96.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

97.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

98.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

99.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

## SEVENTH CAUSE OF ACTION

100.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

101.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

102.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

103.    No response is required because this cause of action has been dismissed. To the extent a response required, Defendants deny the allegations set forth in this paragraph of the FAC.

## AFFIRMATIVE DEFENSES

Defendants hereby assert the following separate and distinct affirmative defenses to the FAC and to each and every cause of action contained therein.

## FIRST AFFIRMATIVE DEFENSE

### (FAILURE TO STATE A CLAIM)

The FAC, and each and every cause of action alleged in it, fails to state facts sufficient to constitute a cause of action upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

### (UNCLEAN HANDS)

No relief may be obtained under the FAC by reason of the doctrine of unclean hands and/or by reason of the unconscionability of Plaintiffs' acts and claims.

## THIRD AFFIRMATIVE DEFENSE

### (UNJUST ENRICHMENT)

Plaintiff would be unjustly enriched if allowed to recover on this FAC.

## FOURTH AFFIRMATIVE DEFENSE

### (APPORTIONMENT OF RESPONSIBILITY)

A third party contributed to the harm, such that all liability or a portion of the harm is properly attributed to that party, and any liability to Defendants is reduced by that sum.

## FIFTH AFFIRMATIVE DEFENSE

### (ESTOPPEL)

Plaintiff is estopped from obtaining any and all of the relief sought against Defendants by virtue of its acts, conduct, representations and/or omissions.

## SIXTH AFFIRMATIVE DEFENSE

### (WAIVER)

Any purported duty or obligation alleged in the FAC which Defendants may have owed to Plaintiffs has been waived.

## SEVENTH AFFIRMATIVE DEFENSE

### (INTERVENING AND SUPERSEDING CAUSE)

Some or all of Plaintiff's alleged injuries or damages, if any, were proximately caused by the independent and intervening conduct, actions, or omissions of Plaintiffs or persons, corporations, unincorporated associations, government bodies, or other entities, whether or not named as parties to this action.

/ / /

/ / /

## EIGHTH AFFIRMATIVE DEFENSE

### (STATUTE OF LIMITATIONS)

Each cause of action in the FAC is barred by the application of the applicable statutes of limitation.

## NINTH AFFIRMATIVE DEFENSE

### (LACHES)

Plaintiffs are barred by laches from recovery under the FAC by reason of their unreasonable delay in notifying Defendant of the claims alleged, and by reason of their unreasonable delay in seeking the recovery requested herein.

## TENTH AFFIRMATIVE DEFENSE

### (JUSTIFICATION/PRIVILEGE)

Defendants allege their conduct, as it relates to Plaintiffs' claims, was completely lawful and was justified and/or privileged under California or other applicable law.

## ELEVENTH AFFIRMATIVE DEFENSE

### (RELEASE)

Defendants alleged Plaintiff released them of liability by accepting the resignations and compliance by Defendants with all agreements with Plaintiff, and Plaintiff therefore abandoned or relinquished their claim at the time Defendants finally left Plaintiff's employ.

## TWELFTH AFFIRMATIVE DEFENSE

### (FAILURE TO MITIGATE)

Defendant is informed and believes and thereon alleges that Plaintiffs' alleged damages, if any, are the result, in whole or in part, of Plaintiffs' failure to exercise reasonable care to reduce or mitigate the damages.

/ / /

/ / /

/ / /

## THIRTEENTH AFFIRMATIVE DEFENSE

### (OFFSET)

Defendant is informed and believes and thereon alleges that Plaintiffs' alleged damages are offset by Plaintiffs' own actions and by claims Defendants have against Plaintiff.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (PERFORMANCE EXCUSED)

Defendants' obligation to perform under the purported contract alleged by Plaintiff, if any, is excused. The purported contract expressly and/or by operation of law impliedly imposed upon Plaintiff a fiduciary duty and a duty of good faith and fair dealing. Plaintiff has engaged in acts, omissions, and courses of conduct which constitute a breach of such duties, which breaches prevented or excused Defendants from performing their obligations, if any, under such contract.  Further, Plaintiff has engaged in acts, omissions, and courses of conduct which constitute breaches of the purported contract, which breaches have prevented or excused Defendants from performing their obligations, if any, under such contract.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendants pray as follows:

1.      That Plaintiff take nothing by way of its FAC;

2.      That the FAC be dismissed with prejudice;

3.      That Defendants recover the costs of suit incurred, including reasonable attorneys' fees as otherwise provided by law; and

4.      That the Court grant to Defendants such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS/THIRD PARTY CLAIMS

Defendant/Counter-Claimant/Third Party Claimant Intrepid Automation, ("Intrepid"), by and through undersigned counsel, and pursuant to the Court's May 4, 2023 Order (Dkt. 174) and Fed. R. Civ. P. 13(b) and 15 (a)(1), hereby submits its Amended Counterclaims against Plaintiff/Counter-Defendant 3D Systems Inc., a California corporation and wholly-owned subsidiary and/or affiliate of 3D Systems Corporation ("3D Systems"), and its Amended Third Party claims against Third Party Defendant Evan Kuester ("Kuester")[1] and other as of yet unnamed Parties, on information and belief formed after reasonable inquiry under the circumstances:

104.   3D Systems is a publicly traded corporation. Founded in the mid-1980s, 3D Systems was, at one time, a leader in the additive manufacturing industry. But 3D Systems' competitive edge eroded over the years as it failed to innovate new technologies to replace key patents on its core original technologies. As a result of its continued inability to innovate to maintain its competitive advantage, 3D Systems resorted to adopting a strategy of acquiring smaller competitors and gobbling up their novel and strategic technologies as its own. Such acquisitions necessitated integrating various entities, each with differing corporate cultures and business approaches, into a single 3D Systems' ecosystem. 3D Systems, however, failed to seamlessly integrate its acquisitions, leading to a toxic corporate culture infecting, among others, its executive management team.

105. In 2015, Vyomesh Joshi ("Joshi") replaced Avi Reichental as 3D Systems' President and CEO. Joshi, a prominent technology industry veteran and executive, had spent more than three decades with Hewlett Packard ("HP"), a highly respected printing technology company and emerging industry leader in 3D printing. With Joshi's hiring, 3D Systems sought to reverse years of internal technology stagnation and acquisition dysfunction by developing a new strategy of innovation,

---

[1] There is a question as to what is the proper name of the Individual Third Party Defendant.  He signed his non-disclosure agreement with Intrepid as "Evan Kuester."  Bd  his LinkedIn profile is under the name "Evan Keuster.")

organic growth and internal development. The new CEO attempted to resurrect 3D Systems and its culture by infusing a highly innovative research and development-oriented engineering culture – an approach mirroring Hewlett Packard's product development model. The goal was to reverse the slide of 3D Systems' technology and adapt to rapidly changing market forces otherwise rendering its technologies obsolete and non-competitive.

106. To facilitate its new strategy, 3D Systems identified five highly skilled master engineers with extensive experience developing new technologies and products, including 3D printers. These innovative and entrepreneurial master engineers, the majority of whom were seasoned veterans from HP, were in fact specifically identified and targeted by CEO Joshi based on his tenure as a senior executive at HP and follow on experiences working with Ben Wynne at a 3D printing startup, of which he was an investor and mentor. As a result, Ben Wynne, Chris Tanner, Jamie Etcheson, Ivan Chousal, and Robert Mueller (collectively the "Intrepid Experts") were solicited, heavily recruited and ultimately induced by 3D Systems and various executives to leave their well-paying, safe, and stable HP careers to revolutionize 3D Systems' existing moribund research and development processes. Generous promises were made to the Intrepid Experts by CEO Joshi and other 3D Systems executives to induce them to take the risk to join 3D Systems with a new approach to technology and product development of badly needed new products. The Intrepid Experts were told they would be leading a corporate paradigm shift in the industrial space and be granted bountiful resources, significant compensation, a direct link to the CEO, top notch facilities, changes in 3D Systems' customer support, and technology roll-out programs and a nurturing and supportive culture.

107. In connection with their onboarding, 3D Systems required the Intrepid Experts to execute illegal non-compete, non-solicitation, and non-disclosure agreements, titled "3D Systems California Employee Confidentiality, Non-Compete, Non-Solicitation and Arbitration Agreement" (the "Agreements"). As is apparent

from the title, the Agreements are intended to unlawfully restrict the Intrepid Experts' rights under California law to practice their chosen profession and compete with 3D Systems. The non-disclosure, non-competition, and non-solicitation provisions are illegal under California Business & Professions Code § 16600 ("Section 16600"), which declares "every contract" that restrains "anyone…from engaging in a lawful profession, trade, or business of any kind is to that extent void." Section 16600 evinces California's fundamental and well-settled policy against non-compete, non-solicitation, and no-hire provisions in favor of open competition and employee mobility. *See Edwards v. Arthur Andersen LLC*, 44 Cal. 4th 937, 945-46 (2008). 3D Systems circumvented Section 16600 by restraining employee mobility and subverting competition, but nonetheless required the Independent Experts to execute them as a condition of employment.

108. Despite regular praise for the Intrepid Experts' work product, the inducement promises were broken. Political in-fighting between CEO Joshi, on the one hand, and 3D Systems' founder and loyal henchmen, on the other, poisoned the culture and strategic direction of the company, with the latter pair engaging in conduct that marginalized the Intrepid Experts. Despite the Intrepid Expert's repeated efforts to fix the political quagmire through continued communications with Joshi, 3D Systems ultimately left the Intrepid Experts in an untenable and unsafe environment. As a result, the Intrepid Experts were forced to abandon their lucrative stock options in 3D Systems and withdraw from the toxic environment at 3D Systems in 2017. Nonetheless, the Intrepid Experts maintained their dream to transform the additive manufacturing industry, as they knew they could. So, the Intrepid Experts set out on their own to achieve just that.

109. Following their 3D Systems departure, the Intrepid Experts formed Intrepid Automation and began to look for ways to use their vast and independent experience in technology and product development to transform the use of additive manufacturing in the industrial market. The Intrepid Experts have hundreds of

patents and a combined century of experience developing new technologies and products. Rather than use any of 3D Systems' outdated and obsolete technology (which was equally useless and antagonistic to the vision), Intrepid built new technology and methods using First Principles – foundational engineering principles – from the ground up to develop new technology and products.

110.  As 3D Systems slid behind due to its continued innovation shortcomings, Intrepid rose up by developing and patenting cutting-edge technology over the course of several years. Intrepid's products were developed in-house using new techniques with novel developments to produce more accurate plastic, elastomeric, and digitally-cast metal parts than others in the industry.

111.  After nearly four years of independent development, Intrepid was on the cusp of penetrating the larger marketplace. Customer trials were successful and significant and marquee wins were near the finish line, only to vanish due to unfair business practices and tortious interference by unscrupulous and unethical employees and agents of 3D Systems at one or more Intrepid clients. Sadly, instead of competing fairly to bring better solutions to the marketplace, 3D Systems chose underhanded tactics to sabotage the development and rise of Intrepid.

112. In a brazen display of corporate espionage, 3D Systems had Evan Kuester, one of 3D Systems' Applications Engineers and a person known to the Intrepid Experts, approach Intrepid purporting to be interested in leaving 3D Systems to join the team at Intrepid.  At the very outset of the process, Kuester signed a Non-Disclosure Agreement, preventing him from disclosing any of the confidential information that Kuester gained access to during his recruitment. Believing that Kuester had a good faith interest in joining Intrepid, desirous of recruiting Kuester to join the team, and secure in the knowledge that Kuester had agreed to the NDA, Intrepid and Kuester exchanged information and undertook negotiations for a 3-week period in January through February 2021.  During that time, Kuester was given a tour of the Intrepid laboratory, observed Intrepid's in-

development 3D printers in action, learned information regarding Intrepid's confidential business plans, including third parties with whom Intrepid was actively negotiating regarding prospective business, and obtained detailed product specification and capabilities information regarding Intrepid's ground-breaking DLP multi-projector vat-based 3D Printer System, which became known as Valkyrie, which was at that time in development. But, on information and belief, Kuester was only feigning interest in Intrepid and had no intention of honoring the NDA. Upon information and belief, Kuester dutifully relayed the highly confidential Intrepid information he gained access to – including the trade secret product specification, design, and capabilities information regarding the new Valkyrie printer system – to his employer 3D Systems.

113. When 3D Systems became aware of Intrepid's DLP multi-projection vat-based 3D print system under development, 3D Systems quickly understood that this new technology was an existential threat, particularly to 3D Systems' aerospace business. 3D Systems' large format print systems – specifically the ProX800 and its latest release, the SLA-750 – would be rendered antiquated the moment that Valkyrie hit the marketplace. 3D Systems took immediate action to readjust its pricing, strategy, and product release timelines.

114. Ultimately, 3D Systems had two choices: innovate to compete with Intrepid, or commence a campaign to destroy Intrepid in the marketplace. Sadly, it chose the latter and, upon information and belief, embarked upon a strategy of unfair competition, including but not limited to casting Intrepid and its founders in a false light, including but not limited to misrepresenting and discrediting Intrepid and its founders in the marketplace to interfere with Intrepid's prospective customer relations and to stunt Intrepid's growth. Previously enthusiastic prospective customers abandoned business relationships with Intrepid in favor of 3D Systems as a result of 3D Systems' wrongful actions.

## JURISDICTION

115. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1332. 3D Systems has asserted claims against Defendants/Counter-Claimants/Third Party Claimants arising out of federal law, specifically the Defend Trade Secrets Act. This Court has supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367 because it arises out of the same transaction or occurrence that is the subject matter of 3D Systems' claims against Defendants/Counter-Claimants.

116. Venue for this action is proper in this judicial district under 28 U.S.C. § 1391 (b) because a substantial part of the events giving rise to this action allegedly occurred in this District.

117. This Court has personal jurisdiction over 3D Systems because it has already submitted itself to this Court's jurisdiction by filing the initial lawsuit. This Court also has personal jurisdiction over Kuester, an employee of 3D Systems who resides in California and engaged in some of the wrongful acts alleged in these counterclaims and third party claims in this state.

## THE PARTIES

118. Counter-Claimant and Third Party Claimant Intrepid is a corporation organized under the laws of the State of Delaware with its principal place of business at 7867 Dunbrook Rd., Suite A, San Diego, California 92126.

119. Counter-Defendant 3D Systems, Inc. is a corporation organized, existing, and doing business under the laws of the State of California. The principal place of business for 3D Systems is 16550 W. Bernardo Drive, Building 5, Suite 500, San Diego, California 92127. Plaintiff 3D Systems, Inc. is a wholly owned subsidiary of 3D Systems Corporation.

120. Third Party Defendant Evan Kuester is an employee of 3D Systems and resident of San Diego County, California.

//

## ADDITIONAL FACTUAL ALLEGATIONS

### A. 3D Systems' Employee Agreements Unlawfully Restrict Competition

121. As a condition of employment, 3D Systems required the Independent Experts to execute the "3D Systems Corporation California Employee Confidentiality, Non-Compete, Non-Solicitation and Arbitration Agreement" (the "Employee Agreement") (Exhibit A). Throughout the Employee Agreement, 3D Systems attempts and purports to unlawfully restrict competition in violation of California law by subverting the statutory right under Section 16600 to practice in one's chosen profession. 3D Systems' improper effort to circumvent California law and Section 16600 is revealed by the Employee Agreement's title in and of itself. The title indicates the agreement is specific to California employees but also notes the existence of non-compete and non-solicitation provisions despite well-settled California law holding such provisions offend Section 16600. As detailed below, the substance of the Employee Agreement only further confirms the anticompetitive provisions injected into it are irreconcilable with California law.

122. Section 2 of the Employee Agreement, titled "Trade Secrets and Confidential Business Information," is a non-disclosure provision purporting to require employees to "not, at any time, whether during or subsequent to the term of Employee's employment … directly or indirectly use, divulge, disclose, release, publish, or communicate to any person, firm or corporation confidential information … as that term is defined in this Agreement." As an initial matter, requiring employees to keep proprietary information confidential for an undefined period of time (aka, in perpetuity), is clearly offensive to Section 16600. *See Brown v. TGS Management Company, LLC*, 57 Cal. App. 5th 303, 317 (2020.) The non-disclosure provision is also problematic in that it defines "Confidential Information" so broadly it prevents employees from using their learned work experience to compete against 3D Systems. Specifically, "Confidential Information" includes:

(a) the identities, buying habits or practices of the Company's customers; (b) the Company's advertising and marketing strategies, methods, research and related data; (c) the names of the Company's vendors, resellers or suppliers; (d) the cost, type and quantity of materials and/or supplies ordered by the Company; (e) the prices at which the Company obtains or has obtained or sells or has sold its products or services; (f) the Company's manufacturing, distribution and sales costs, methods and objectives; (g) technical information including machinery and equipment designs, drawings and specifications; (h) inventions; (i) pending patent applications; (j) product information including designs, drawings, specifications, methods of quality control and formulas or equations used in connection therewith; (k) "trade secrets" as such term is defined by California law; and/or (l) current or potential customer lists, pricing lists, supplier lists or reseller lists.

123. Notably, the definition of "Confidential Information" does not require the information be learned from 3D Systems or even be a trade secret, and includes information that is known or readily available to the public or within the 3D Systems, such as patent applications, regulatory filings, and technical information. In fact, nothing is excluded from the definition of "Confidential Information." Given the provision's extreme overbreadth, Section 2 operates as a de facto non-compete provision barring the Independent Experts from ever competing with 3D Systems or even practicing in the 3D printing industry following their employment. The non-disclosure provision thus violates Section 16600. This is especially so in light of the anticompetitive and overly restrictive provisions found elsewhere in the Employee Agreement.

124. Section 4 of the Employee Agreement, titled "Solicitation or Interference of Customers," purports to unlawfully prevent employees, both during their employment and for a period of 18 months following their separation, from "directly or indirectly" soliciting or attempting "to divert or take away the business" of 3D Systems' customers. It is well-settled non-solicitation provisions are unenforceable restraints on one's ability to practice their profession notwithstanding any temporal limitation. *See Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 948 (2008).

125. Section 5 of the Employee Agreement, titled "Solicitation of Employees," is yet another unenforceable non-solicitation provision. Section 5 purports to unlawfully require employees, during their employment and for a period of 18 months following their separation, to "not, directly or indirectly, either alone or in concert with others, solicit, induce, or entice any employee of or consultant to the Company or its subsidiaries to leave the Company or its subsidiaries for any reason whatsoever, or to work for anyone in competition with the Company or its subsidiaries." Again, non-solicitation provisions, including no-hire provisions, are void under Section 16600. *See, e.g., VL Systems, Inc. v. Unisen, Inc.,* 152 Cal. App. 4th 708 (2007); *Thomas Weisel Partners LLC v. BNP Paribas*, 2010 U.S. Dist. LEXIS 11626, 2010, at *5-6 (N.D. Cal. Feb. 10, 2010)

126. For instance, even though it is well-settled that non-solicitation and non-compete provisions are illegal under California law and Section 16600, the Agreement explicitly purports to unlawfully restrict both the solicitation of customers and employees, as well as competition.

127. Sections 4 and 5 of the Agreement, titled "Solicitation or Interference of Customers" and "Solicitation of Employees," respectively, purport to unlawfully prevent the Independent Experts, for a period of 18-months following their employment with 3D Systems, from "directly or indirectly" soliciting or interfering with its customers or hiring any 3D Systems employees. These provisions are patently intended to unlawfully prevent the Independent Experts from engaging in their chosen profession after terminating their employment with 3D Systems. Indeed, 3D Systems makes explicit reference to its intention in Section 5 to prevent employees from "work[ing] for anyone in competition with the Company or its subsidiaries."

128. Section 6 of the Employee Agreement, titled "Non-Competition," purports to require the Independent Experts to not, "directly or indirectly, own any interest in, develop, manage, control, participate in, consult, render services,

organize, or in any manner engage … in any activity or enterprise providing 3D or additive manufacturing content-to-print solutions, including 3D printers, print materials, on-demand custom parts services and 3D authoring solutions for professionals and consumers (the "Business of Company") anywhere in the United States." Non-competition and non-solicitation clauses are both facially void under Section 16600 and are unenforceable as a matter of law. *See Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 948 (2008); *Dowell v. Biosense Webster, Inc.*, 179 Cal. App. 4th 562, 574-575 (2009).

**B.      Through Corporate Espionage, 3D Systems Wrongfully Obtains Trade Secret and Other Highly Confidential Information Showing that Intrepid is a Serious Threat**

129.  In January 2021, 3DS's Evan Kuester formally sought a position at Intrepid. Intrepid required Kuester to sign an NDA, which Kuester signed individually and with the title Senior Application Engineer, the title he then held at 3D Systems. A true and correct copy of the NDA signed by Kuester is attached as Exhibit B.

130.  Based on Kuester's promises of confidentiality and his representation he was genuinely interested in working for Intrepid, Kuester induced Intrepid to sign the NDA and give him access to confidential information. As a result, Intrepid gave him a tour of Intrepid's facilities, described its capabilities, and provided strategic business insight Kuester then used to harm Intrepid and benefit himself and 3D Systems. Kuester asked detailed questions during and after his tour about the specific capabilities of Intrepid's machines, which he remarked to Intrepid personnel were noticeably different and superior to 3D Systems' legacy machines.

131.  Kuester toured Intrepid's facilities on January 26, 2021, being shown for the first time unreleased products and technologies. Intrepid's technological information, as well as its prototypes and samples, are extremely confidential and only shown under protection of the NDA. No outsiders are or were allowed to see

this technology without strict secrecy protocols in place, and it was kept in Intrepid's second lab used for special visitors under signed NDAs. Intrepid does not allow phones or cameras in the lab, the area is marked as restricted and ITAR controlled, and Intrepid even covers up skylights and windows.

132. As part of the tour, Kuester viewed a test bed – i.e., a technology demonstration machine - that Intrepid considered a "proof of concept" of a DLP multi-projection print engine with six projectors projecting sub-images that are "stitched together" to form a composite image to be printed.  Kuester observed that Intrepid had successfully developed a specific implementation of edge-blending, featuring geometric correction, irradiance mask filters, and gamma adjustment mask filters referenced in its patents.  Moreover, the number of projectors and the structure of the test bed made it clear that Intrepid intended to and had the capability to deploy its multi-projection technology in large-format, vat based printer system that could be scaled to an extremely large size.  Finally, Kuester knew, as would anyone in the industry, that because the multi-projector system being tested employed DLP instead of SLA technology, the new printer would be much faster than anything 3D Systems had in the marketplace or even under development at that time.  Intrepid had kept and continued to keep this proof of concept under reasonable measures to ensure confidentiality.

133. Weeks later, Kuester followed up with Chris Tanner, one of Intrepid's founders, for specific information regarding the specs and throughput of the new large-format DLP multi-projector system in development. Three days after his tour, Kuester asked Mr. Tanner via text message, "Do you have a way to generate a rough build for that large format machine?" He followed this with another message, "Am I allowed to know an approximate mm per hour build speed?" Under the comfort provided by the NDA signed by Kuester, Mr. Tanner responded and answered his questions.

134.  Upon information and belief, 3D Systems management or members of the development team specifically requested that Kuester send these follow up messages to gain additional information regarding the specifications and capabilities so that 3D Systems could begin work on development of a competing large format DLP multi-projector printer system and/or to adjust the pricing of its existing hardware and resin solutions, including the then-under-development SLA-750 print system in anticipation of the eventual effect of Intrepid's groundbreaking new product once it launched.

135.  In addition, during his tour, Kuester also received insight into Intrepid's Epic product line. Epic is Intrepid's patented automated production system, which is essentially a factory in a box comprised of robotics, patented post-processing methods, and an instantiation of Intrepid's patented membrane-based technology. Epic is used to produce millions of parts with a high degree of automation, consistency, and quality.

136.  Kuester also received insight into other Intrepid's proprietary investment casting pattern production. Investment casting is a way of manufacturing a metal part using a sacrificial form. This new method devised by Intrepid was shown to Kuester, who then turned around to share it with 3D Systems, allowing 3D Systems to secretly pull back the curtain on 3D Systems' trade secret information while improperly giving a view into how the timing and capabilities of Intrepid are not only faster but are also only a fraction of the cost. The investment casting process works because of patented DLP technology, and is a different way of using 3D technology. For example, old technology uses a laser to trace a contour to form each layer, like a ballpoint pen drawing on paper, whereas Intrepid's innovative method uses patented modular DLP technology to project the image of the full layer at once. This difference enables up to ten times speed improvement for an exposure of a printed layer.

137.  Intrepid's investment casting technology is up to ten times faster than its peers' and cheaper than existing solutions. Kuester saw this technology demonstration, which was extremely confidential and only shown under protection of the NDA. No outsiders were allowed to see this technology without strict secrecy protocols in place, and it was kept in Intrepid's second lab used for special visitors under signed NDAs.  Intrepid does not allow phones or cameras in the lab, the area is marked as restricted and ITAR controlled, and Intrepid even covers up skylights and windows.

138. During the tour, Kuester specifically acknowledged to Intrepid representatives he had seen one of Intrepid's parts at a customer site he had visited. This customer was a major player in the aerospace industry. On information and belief, Kuester was the technical point of contact for 3D Systems and this particular customer, and was in regular contact with this customer on behalf of 3D Systems

139. After text messages were exchanged, Kuester continued his deceptive acts by negotiating compensation and a job title for a potential job with Intrepid. This negotiation was complete by February 4, 2021. About a week later, Kuester informed Mr. Tanner he was planning to leave 3D Systems.

140.  On February 15, 2021, Kuester abruptly changed course and told Mr. Tanner he would be staying at 3D Systems because he had been promised additional stock in the company. On February 16, 2021, Mr. Tanner acknowledged Kuester's declined offer and reminded him of the confidential nature of the information shared during the interview process under mutually signed NDA, which was in turn acknowledged by Mr. Kuester.

141.  On information and belief, Kuester was sent to Intrepid by 3D Systems to acquire information about Intrepid and its capabilities. Knowing Kuester had developed friendships with Intrepid founders, 3D Systems directed Kuester to use that trust to gain access to Intrepid's confidential and proprietary information.

Kuester then, under the deceptive guise of seeking a job at Intrepid, sought to obtain access to Intrepid's confidential information.

142.  In the alternative, upon information and belief, when Kuester informed 3D Systems regarding his intention to resign from 3DS and join Intrepid, 3DS offered Kuester consideration including but not limited to renumeration such as an increase in salary, title, and/or potentially lucrative stock options in order to stay at 3DS, provided that Kuester disclose to 3DS the confidential information he obtained under NDA during his tour of Intrepid facilities and in discussions with Intrepid.

143.  Regardless of whether Kuester intended to spy from the outset and signed the NDA under false pretenses or whether Kuester was induced by 3DS to breach the NDA provision, Kuester did indeed breach the NDA, allowing 3D Systems to discover Intrepid's new and revolutionary technologies, printer systems, and prospective customers.

**C. 3DS Begins to Use Trade Secret Information to Analyze and Adjust its Strategy in its Large Format Printing Systems, Including in its Aerospace Business**

144.  Kuester's intelligence regarding Intrepid's multi-projector technology and its contacts in the aerospace industry reached a subset of 3DS employees that are involved in 3DS's aerospace business.

145.  On or just prior to February 24, 2021 – just over a week after Kuester informed Tanner that he intended to stay at 3D Systems, Aaron Wood, Director of Material Sales, searched for, identified, and shared via email a number of patents that were assigned to Intrepid.  Upon review of these patents, Wood ascertained that Kuester's information regarding Intrepid's proof of concept of multi-projector technology in large format printing was, indeed, a dire threat to 3D Systems' business, particularly with respect to an important aerospace client.

146.  Wood requested immediate analysis on how Intrepid's new technology stacked up to existing 3DS equipment used for this client, stating that it is "vitally

important" that they get additional knowledge to combat the impending threat that this new technology posted.

147.  3DS's Stacie Hoche, Director of SLA Product Management, responded to Wood's email and indicated that she understood that Intrepid's products are built to order based on customer requirements such that data regarding speed, size and other attributes may vary by client and by how the product was built.  Upon information and belief, Hoche's understanding regarding Intrepid's business plan of building to customer specs was obtained directly or indirectly from Kuester's spying.  Hoche further stated that she "was at a loss on how to get hard data" on Intrepid's large format DLP printer system.

148.  Patrick Dunne, a mid-level manager at 3D Systems asked what the Intrepid patents had to do with the aerospace customer and suggested that that what Intrepid was doing was derivative of 3DS's Figure Four.  Dunne was referred to 3DS's Craig White, 3DS's Director of Sales, who could bring Dunne up to speed about the implications of the technology to the aerospace customer.

149.  Hoche disabused Dunne of his incorrect assumption that Intrepid's products were similar to 3DS's Figure Four.  Hoche told Dunne that Intrepid's new printer system was a custom built, vat-based DLP multi-projection system with a large print area.  Hoche stated that her expectation is that Intrepid's new machine was fast.

150.  Upon information and belief, Hoche's explanation to Dunne was based on information obtained directly or indirectly from Kuester.

151.  Also, on information and belief, Hoche was significantly understating her assessment of the difference between Valkyrie and 3DS's vat-based printer systems used with aerospace clients.  Hoche understood what Kuester understood during his tour of Intrepid.  3D Systems' printers used the old technology whereby a single or multiple lasers trace the outline and the surface of the layer to be printed.  Intrepid's innovative method uses patented modular DLP-based technology to project

an entire layer at a time. Hoche understood from Kuester and Intrepid's patents that the Valkyrie system would be significantly faster than 3D Systems' vat-based systems and their antiquated approach.

152. On information and belief, Kuester's improperly obtained information caused a panic inside of 3DS. Hoche, for one, was besides herself. Even months later, Kuester acknowledged that, despite all of 3DS's efforts and acquisitions in the market, Intrepid's printer systems far outstripped anything 3DS had. Kuester wrote to Scott Turner nearly a year after 3D Systems had filed this lawsuit lamenting that 3DS "bought TWO FDM companies but don't have the money to invest in just *buying Intrepid Automation and getting a machine that would actually make us money*."

153. On information and belief, 3D Systems used the wrongly acquired trade secret information provided by Kuester to (i) adjust its pricing and market position of its then-existing large format printer system, the ProX 800; (ii) to accelerate its time to market of the SLA-750, its upcoming flagship large format printer system; (iii) strategically hone its pricing and market position of the SLA-750 to account for the speed and other specifications of Intrepid's impending large format DLP printer system; and (iv) to utilize its vast economic resources to explore development of 3D Systems' own multi-projector system to eventually compete with Intrepid, using knowledge of the proof of concept, specific implementation observed by Kuester, and the specifications of the Intrepid large format DLP printer system obtained by Kuester.

154. But for 3D Systems' corporate espionage, Intrepid would have had 18 to 24 months to fully develop its large format DLP multi-projection system, obtain additional funding, and demonstrate the system's capabilities to customers under non-disclosure agreements before springing the product suddenly on the market. Intrepid would have had market exclusivity for at least two years or more while its competitors scrambled to develop their own large format DLP multi-projection

systems. 3D Systems' corporate espionage allowed it to get a jump on Intrepid and the rest of the 3D printing industry, adjusting its pricing and marketing strategies to minimize the impact of the launch of Intrepid's new system, speed the development of the SLA-750 for introduction to market before Intrepid's system, and begin development of its own large format multi-projection DLP printer system so as to lessen Intrepid's first mover advantage and minimize Intrepid's market exclusivity.

155. In addition, 3D Systems understood, based on Kuester's corporate espionage and/or induced breach of the NDA, that the superiority of Intrepid's patented technology would make it exceedingly difficult if not impossible for 3DS to fairly compete in the aerospace industry, the dental industry and elsewhere. But, 3DS and its executives such as Scott Turner knew from experience that there are two ways to compete with a fledgling company such as Intrepid. Because fair competition would result in 3D Systems being rendered an afterthought, 3DS hatched a plot to unfairly compete with Intrepid through tortious conduct separate and apart from 3D Systems acquisition of Intrepid's trade secrets and other highly confidential information.

**D. 3DS's Tortious Acts to Unfairly Compete with Intrepid and to Tortiously Interfere with Intrepid's Prospective Contractual Relations**

156. 3D Systems, along with Kuester, began a campaign to discredit Intrepid and its founders and interfere with Intrepid's abilities to obtain business from Intrepid's prospective economic relations and to otherwise poison the industry well to make it harder for Intrepid to form new prospective economic relations.

157. Intrepid is informed and believes and thereupon alleges that that as part of their duties at 3D Systems, White, Kuester, and one or more additional 3DS employees disparaged Intrepid to Ben Hester, Daniel Bach and potentially other employees at the aforementioned aerospace engineering company. These 3D Systems persons cast Intrepid in a false light, including but not limited to making statements about the capabilities of Intrepid's founders that, on information and belief, were

known to be false based upon the Independent Experts' exceptional work at 3DS, including as set forth in performance reviews produced in this case as confirmed by the deposition of Dave Tribolet in this matter.

158. Upon information and belief, the statements made by Kuester were known to be false based on his previous experience with Intrepid's founders' work at 3D Systems. Upon information and belief, Kuester further made statements about the capabilities of Intrepid's printer systems and technologies that Kuester knew to be false based upon Kuester's own observations of Intrepid's technologies during the time in which Kuester was subject to an NDA.

159. Upon information and belief, Craig White and/or additional 3DS employees made statements to the aerospace company to cast Intrepid in a false light, including by making false statements regarding the qualities, attributes and capabilities of Intrepid's printer systems and technologies. Upon information and belief, these statements were untrue based upon the information provided by Kuester to 3D Systems and additional investigation performed by 3D Systems, including with respect to Intrepid's issued patents.

160. Upon information and belief, 3D Systems' sales personnel made disparaging statements to participants in the 3D printing industry and/or potential customers that Intrepid had not yet approached. These statements were intended to cast Intrepid in a false light and included but were not limited to false statements related the capabilities of Intrepid's founders and the qualities, characteristics, and capabilities of Intrepid's printer systems and technologies. 3D Systems' personnel made these statements in order to predispose these participants and prospective customers to not want to work with Intrepid.

161. On a number of occasions, Intrepid's first contacts with a potential customer were met with immediate disdain as the customer had already formed a negative view of Intrepid, its founders, and its technology, which view was caused, upon information and belief, by 3D Systems false statements.

162.  3D Systems and its employees made these statements with the express purpose and specific intent to interfere with Intrepid's relationships with prospective customers, to disrupt Intrepid's position in the marketplace, and to unfairly protect 3DS from the threat to competition that Intrepid and its new technology posed.

## FIRST CAUSE OF ACTION

Fraudulent Inducement

(Against Evan Kuester)

163.  Intrepid re-alleges and incorporates by reference each and every allegation contained in Paragraphs 115-120, 129-154.

164.  Evan Kuester concealed his true intent when he entered into the NDA with Intrepid. (Exhibit B.) He falsely represented he would keep Intrepid's information confidential under the terms of the contract.

165.  On information and belief, Kuester knew his representations to Intrepid were false at the time he made them. He had the intent to use the information Intrepid would reveal under the NDA for his own benefit and to leverage a better position at 3D Systems. He would also use this information to make targeted attacks towards Intrepid customers and to interfere in Intrepid's business relations, thereby diverting business to 3D Systems at Intrepid's expense.

166.  On information and belief, Kuester intended to induce Intrepid's reliance and trust by utilizing his friendship with the Intrepid Experts, agreeing to sign the NDA, and operating under the guise of seeking employment with Intrepid. Intrepid justifiably relied on Kuester's representations that he would keep its information confidential. Kuester also expressed interest in joining Intrepid and avoiding the toxic politics at 3D Systems, which was one of the reasons the Intrepid Experts left 3D Systems. Intrepid fully met its obligations under the NDA it signed with Kuester.

167.  Upon signing the NDA, Kuester – with, upon information and belief, 3D Systems' direction and approval – toured Intrepid's facility and became privy to confidential information and business plans belonging to Intrepid. While purporting

to "consider" the Intrepid job offer, Kuester asked detailed questions to Intrepid about their machines' capabilities. Having no intention of ever accepting a job with Intrepid, Kuester turned down the Intrepid job offer after having acquired Intrepid confidential information.

168. Kuester was in charge of 3D Systems' business relationship with the above referenced aerospace company. Based on Kuester having gained access to Intrepid's confidential information and capabilities, Kuester knew Intrepid was a real threat to his position as the 3D Systems representative to this company and to 3D Systems as a whole. As a result, he and 3D Systems agreed to have him breach the NDA and use the information wrongfully acquired as a result to undermine Intrepid and advance his 3D Systems' business goals.

169. As a reward for his conspiratorial actions and for keeping business in the 3D Systems pipeline which otherwise would have gone to Intrepid, Kuester got promoted at 3D Systems into a position to directly compete with Intrepid's machines. Meanwhile, that same aerospace customer severed its relationship with Intrepid.

170. As a result of Kuester's fraudulent actions, Intrepid has been harmed by losing one or more customers and customer business, including the same aerospace company Kuester serves in his role at 3D Systems. Intrepid has also suffered by having its confidential information placed in 3D Systems' hands, giving 3D Systems access to a potential rival's capabilities and goals.

171. The acts of Kuester were willful, oppressive, fraudulent, and malicious and committed by him with the intent on his part to deprive Intrepid of its property or legal rights or otherwise cause injury, and were despicable conduct that subjected Intrepid to a cruel and unjust hardship and conscious disregard of its rights, so as to justify an award of punitive damages.

//

//

//

## SECOND CAUSE OF ACTION

### Breach of Written Contract

### (Against Evan Kuester)

172. Intrepid re-alleges and incorporates by reference each and every allegation contained in Paragraphs 115-120 and 129-154.

173. The NDA between Kuester and Intrepid is a valid and enforceable contract and confidentiality provisions within the NDA are valid and enforceable contractual provisions binding on Kuester. The non-disclosure and confidentiality covenants and other provisions contained in the contract signed by Kuester are reasonably necessary to protect Intrepid's legitimate protectable interests in its trade secrets, confidential information, customer relationships, work force, and goodwill and other assets as described in the NDA.

174. Intrepid has fully performed all of its obligations under the NDA except those it was excused of performing.

175. Kuester breached the NDA by using and/or disclosing to 3D Systems Intrepid's nonpublic, proprietary, or confidential information, knowledge, and data relating to Intrepid, or its businesses, which Kuester obtained during his tour of Intrepid and through conversations with Intrepid employees. Upon information and belief, Kuester also breached the NDA by using Intrepid's confidential, proprietary, and/or nonpublic information to undermine Intrepid's business opportunities with one or more prospective customers, to poison the well with other potential customers with whom Intrepid had not yet formed contractual relations and to further his own career at 3D Systems.

176. After his initial engagement with Intrepid, Kuester began a coordinated campaign to elicit further confidential knowledge and capabilities of Intrepid. Upon information and belief, he did this with the support and direction of 3D Systems.

177. As a result of Kuester's breach of the NDA, along with the anticompetitive conduct alleged above, Intrepid has been injured and faces

irreparable injury in its efforts to gain market credibility and acceptance. Intrepid is threatened with losing customers, technology, its competitive advantage, its confidential information, and goodwill in amounts to be determined at trial, presently estimated to be in excess of the jurisdictional minimum of this Court.

## **THIRD CAUSE OF ACTION**

### Tortious Interference with Contractual Relations

### (Against 3D Systems in Alternative to Count 1)

199.   Intrepid re-alleges and incorporates by reference each and every allegation contained in Paragraphs 115-120 and 129-154.

200.   The NDA between Kuester and Intrepid is a valid and enforceable contract and confidentiality provisions within the NDA are valid and enforceable contractual provisions binding on Kuester. The non-disclosure and confidentiality covenants and other provisions contained in the contract signed by Kuester are reasonably necessary to protect Intrepid's legitimate protectable interests in its trade secrets, confidential information, customer relationships, work force, and goodwill and other assets as described in the NDA.

201.   Intrepid has fully performed all of its obligations under the NDA except those it was excused of performing.

202.   During the course of his discussions with Intrepid, Kuester disclosed to 3D Systems that he was considering and/or had been offered employment at Intrepid.

203.   3D Systems provided significant consideration to Kuester, including a promotion, additional compensation, and/or valuable stock options to Kuester in exchange for and intending that Kuester disclose to 3D Systems the confidential information Kuester learned under the NDA.

204.   At the time of the offer above, 3D Systems knew that Kuester had signed a Non-Disclosure Agreement related to his potential employment with Intrepid.

205.   Kuester did, in fact, breach the NDA, disclosing to 3D Systems confidential information regarding the nature and capabilities of Intrepid's new printer systems, its materials, and its business plans and prospective customers.

206.   3DS used the confidential information obtained from Kuester to Intrepid's detriment, including without limitation by adjusting its pricing and marketing of large format printers and, upon information and belief, speeding the development of the SLA-750 printer which was then under development. 3D systems also used the confidential information targeting specific prospective customers of Intrepid's, including without limitation through the use of false statements regarding the Intrepid founders' capabilities and the qualities, characteristics and capabilities of Intrepid's printer systems, the existence of which 3D Systems only learned about from Kuester, all to the damage of Intrepid.

## **FOURTH CAUSE OF ACTION**

### Violation of the California Uniform Trade Secret Act, Civ. Code §3426, et seq.

### (Against 3D Systems and Kuester)

201.   Intrepid re-alleges and incorporates by reference each and every allegation contained in Paragraphs 115-120 and 129-154.

202.  3D Systems and Kuester wrongfully gained access to a test bed and technology demonstration that Intrepid considered a "proof of concept" of a DLP multi-projection print engine with six projectors projecting sub-images that are "stitched together" to form a composite image to be printed.  Kuester observed that Intrepid had successfully developed a specific implementation of edge-blending, featuring geometric correction, irradiance mask filters, and gamma adjustment mask filters.   The demonstration made clear that Intrepid intended to deploy this technology in connection with a large format, vat-based printer system, and obtained information regarding the specifications and speed.

203.  Intrepid's proof of concept of a DLP multi-projection print system and specifications for its in-development printer system were trade secrets as defined by the California Uniform Trade Secret Act.

204.  Intrepid kept this test bed, proof of concept and specifications for its in-development printer systems confidential and subjected the same to reasonable measures to ensure the confidentiality of the same. Such measures included limiting the number of employees who have access to them, requiring third parties to execute NDAs before Intrepid would share such trade secrets with them, using encryption on computers, compartmentalization protocols at Intrepid to keep this information confidential, refusing to let visitors see the special testing equipment and protocols, and using restricted/ITAR controlled labs.

205.  Intrepid's proof of concept and specifications for in-development printer systems had independent economic value from not being generally known or readily ascertainable by industry participants.  These trade secrets would be useful for a competitor, in that Intrepid's proof of concept disclosed that (i) a large format DLP multi-projector system was indeed possible to manufacture, incentivizing research and development efforts for others; (ii) employed and made evident Intrepid's methods and techniques for its specific implementation of edge-blending, featuring geometric correction, irradiance mask filters, and gamma adjustment mask filters; and (iii) because the machine was not in the market yet, would allow competitors to adjust marketing plans and pricing plans for competing printer systems, rush development and introduction of in-process systems, and attempt to develop new competitive machines all while Intrepid had yet to announce or publicly disclose its new printer system.

206.  Intrepid invested considerable time and resources to develop its proprietary trade secrets described above.

207.  3D Systems willfully acquired access to Intrepid's trade secrets by the improper means of Kuester's fraudulent inducement of disclosure, breach of the

NDA, which 3D Systems' wrongfully induced and the subsequent disclosure of Intrepid's trade secrets and other confidential information to others at 3D Systems.

208.  On information and belief, as a direct result of 3D Systems' acquisition of Intrepid's trade secrets by improper means, 3D Systems adjusted marketing plans and pricing plans for competing printer systems and materials, rushed development and introduction of in-process competing large-format printer systems, and attempted to develop new competitive machines, all while Intrepid had yet to announce or publicly disclose its new printer systems.

209.  As a direct and proximate result of 3D Systems' and Kuester's wrongful conduct, Intrepid is threatened with injury and has been injured in an amount that will be proven at trial.

210.  Intrepid has also incurred, and will continue to incur, additional damages, costs and expenses, including attorneys' fees, as a result of 3D Systems' and Kuester's wrongful conduct.  As a further proximate result of such wrongful conduct, 3D Systems and Kuester have been unjustly enriched.

211.  3D Systems' and Kuester's actions were willful, malicious and fraudulent.  Intrepid is therefore entitled to an award of exemplary damages.

212.  3D Systems' and Kuester's conduct constitutes transgressions of a continuing nature for which Intrepid has no adequate remedy at law.  Unless and until enjoined and restrained by order of this Court, 3D Systems and Kuester will continue to use Intrepid's trade secret information to enrich themselves and divert business from Intrepid.  Intrepid is entitled to a preliminary and permanent injunction against the misappropriation and continued threatened misappropriation of trade secrets as alleged herein and further asks the Court to restrain 3D Systems and Kuester from using all trade secret information misappropriated from Intrepid and to return all trade secret information to Intrepid.

213.  Intrepid is entitled to an award of attorneys' fees for 3D Systems' and Kuester's misappropriation of trade secrets.

# FIFTH CAUSE OF ACTION

## Violation of the Defend Trade Secrets Act, 18 U.S.C. §1836, et seq.

### (Against 3D Systems and Kuester)

214. Intrepid re-alleges and incorporates by reference each and every allegation contained in Paragraphs 115-120 and 129-154.

215. 3D Systems and Kuester wrongfully gained access to a test bed and technology demonstration that Intrepid considered a "proof of concept" of a DLP multi-projection print engine with six projectors projecting sub-images that are "stitched together" to form a composite image to be printed.  Kuester observed that Intrepid had successfully developed a specific implementation of edge-blending, featuring geometric correction, irradiance mask filters, and gamma adjustment mask filters.   The demonstration made clear that Intrepid intended to deploy this technology in connection with a large format, vat-based printer system, and obtained information regarding the specifications and speed.

216.  Intrepid's proof of concept of a DLP multi-projection print system and specifications for its in-development printer system were trade secrets as defined by and protected under the Defend Trade Secrets Act.

217.  3D Systems willfully acquired access to Intrepid's trade secrets by the improper means of Kuester's fraudulent inducement of disclosure, breach of the NDA, which 3D Systems wrongfully induced and the subsequent disclosure of Intrepid's trade secrets and other confidential information to others at 3D Systems.

218.  Intrepid kept this test bed, proof of concept and specifications for its in-development printer systems at the highest level of confidential and subjected the same to reasonable measures to ensure the confidentiality of the same. Such measures included limiting the number of employees who have access to them, requiring third parties to execute NDAs before Intrepid will share such trade secrets with them, using encryption on computers, compartmentalization protocols at

Intrepid to keep this information confidential, refusing to let visitors see the special testing equipment and protocols, and using restricted/ITAR controlled labs.

219.  Intrepid's proof of concept and specifications for in-development printer systems had independent economic value from not being generally known or readily ascertainable by industry participants.  These trade secrets would be useful for a competitor, in that Intrepid's proof of concept disclosed that (i) a large format DLP multi-projector system was indeed possible to manufacture, incentivizing research and development efforts for others; (ii) employed and made evident Intrepid's methods and techniques for its specific implementation of edge-blending, featuring geometric correction, irradiance mask filters, and gamma adjustment mask filters; and (iii) because the machine was not in the market yet, would allow competitors to adjust marketing plans and pricing plans for competing printer systems, rush development and introduction of in-process systems, and attempt to develop new competitive machines all while Intrepid had yet to announce or publicly disclose its new printer system.

220.  3D Systems acquired access to Intrepid's trade secrets by the improper means of Kuester's fraudulent inducement of disclosure, breach of the NDA, which 3D Systems' wrongfully induced and the subsequent disclosure of Intrepid's trade secrets and other confidential information to others at 3D Systems.

221.  On information and belief, as a direct result of 3D Systems' acquisition of Intrepid's trade secrets by improper means, 3D Systems adjusted marketing plans and pricing plans for competing printer systems and materials, rushed development and introduction of in-process competing large-format printer systems, and attempted to develop new competitive machines, all while Intrepid had yet to announce or publicly disclose its new printer systems.

222.  In violation of Intrepid's rights, 3D Systems and Kuester wrongfully acquired Intrepid's confidential, proprietary and trade secret information in the improper and unlawful manner as alleged herein.  Such wrongful acquisition of

Intrepid's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. 3D Systems and Kuester have attempted and continue to attempt to conceal their misappropriation.

223. Intrepid is informed and believes and hereby alleges that if 3D Systems and Kuester are not enjoined, they will continue to misuse Intrepid's trade secret information for their own benefit and to Intrepid's detriment.

224. 3D Systems' and Kuester's conduct constitutes transgressions of a continuing nature for which Intrepid has no adequate remedy at law. Unless and until enjoined and restrained by order of this Court, 3D Systems and Kuester will continue to retain and use Intrepid's trade secret information to enrich themselves and divert business from Intrepid. Intrepid is entitled to a preliminary and permanent injunction against the misappropriation and continued threatened misappropriation of trade secrets as alleged herein and further asks the Court to restrain 3D Systems and Kuester from using all trade secret information misappropriated from Intrepid and to return all trade secret information to Intrepid.

225. Intrepid has been damaged by all of the foregoing and is entitled to an award of economic, exemplary damages and attorney's fees.

## SIXTH CAUSE OF ACTION

### Violation of Cal. Bus. & Prof. Code § 17200

### (Against 3D Systems, and Kuester)

226. Intrepid re-alleges and incorporates by reference each and every allegation contained in Paragraphs 115-128 and 156-162.

227. As alleged above, Kuester and 3D Systems knowingly and willing agreed among themselves to damage Intrepid's interests by taking actions so 3D Systems could unfairly compete with Intrepid. Among other things, 3DS and Kuester knowingly cast Intrepid in a false light to the aerospace company discussed herein, with whom Intrepid had formed economic relationships as well as to other

1 participants in the 3D printing industry and potential customers with whom Intrepid
2 had not yet formed an economic relationship.

3       228.   The false statements made by 3D Systems and/or Kuester included
4 statements regarding the capabilities of Intrepid's founders and/or the qualities,
5 characteristics and capabilities of Intrepid's printer systems among other statements.

6       229.  As discussed infra at Count Seven, 3D Systems' further competed
7 unfairly by subjecting its employees to employee agreements that contain restrictions
8 that 3D Systems knows are invalid under California law. 3D System engaged in this
9 unfair competition in order to restrict employee mobility and limit the labor market
10 for employees with experience in 3D Printing.

11      230.  3D Systems' and Kuester's conduct constitutes unlawful, unfair, or
12 fraudulent business acts or practices in violation of California Business and
13 Professions Code §§ 17200, *et seq.* As the direct result of 3D Systems' and violations
14 of §§ 17200, *et seq.,* Intrepid Automation has suffered irreparable injury, including
15 but not limited to the loss of prospective customers, the loss of potential employees
16 and, on information and belief, 3DS has been unjustly enriched, including but not
17 limited to by obtaining or increasing business of at least one customer and
18 competition generally in the 3D printing market has been harmed.

19      231.  Intrepid Automation seeks damages in the amount of injuries
20 proximately caused by Defendants' unfair competition and restitution of all benefits
21 improperly received by Defendants as a result of its unfair competition and
22 permanent injunctive relief to protect its legitimate business interests.

23                    **SEVENTH CAUSE OF ACTION**
24 Declaratory Relief Pursuant to 28 U.S.C. §§ 2201, 2202, Fed. R. Civ. P. 57 Based On
25                     Cal. Bus. & Prof. Code § 16600
26                          (Against 3D Systems)
27      178.  Intrepid re-alleges and incorporates by reference each and every
28 allegation contained in Paragraphs 104-128.

179.  An actual, present, and justiciable controversy has arisen and now exists between Defendant and Plaintiff/Counter-Defendant concerning the enforceability of the "Employee Agreement" (the "3D Systems Corporation California Employee Confidentiality, Non-Compete, Non-Solicitation and Arbitration Agreement") and the non-disclosure ("Trade Secrets and Confidential Business Information"), non-solicitation ("Solicitation or Interference of Customers" and "Solicitation of Employees"), and Non-Competition provisions contained therein.

180.  California Business & Professions Code section 16600 provides: "Except as otherwise provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." As stated by the California Supreme Court, section 16600 "evinces a settled legislative policy in favor of open competition and employee mobility …. and ensures that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice." *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946 (2008); see also *Dowell v. Biosense Webster, Inc*., 179 Cal. App. 4th 564, 575 (2009) ("Section 16600 expresses California's strong public policy of protecting the right of its citizens to pursue any lawful employment and enterprise of their choice").

181.  The Independent Experts were required to sign the Employee Agreement prior to and as a condition of their employment with 3D Systems.

182. Section 2 ("Trade Secrets and Confidential Business Information"), Section 4 ("Solicitation or Interference of Customers"), Section 5 ("Solicitation of Employees"), and Section 6 ("Non-Competition") of the Employee Agreement purport to restrict the rights of the Independent Experts to pursue their chosen profession and undermine competition in violation of section 16600 and California's long-recognized and fundamental public policy against such provisions. *See Edwards*, 44 Cal. 4th at 945-46.

183. The non-competition and non-solicitation provisions in the Employee Agreement are facial violations of section 16600 and are void and unenforceable as a matter of law. *See Edwards*, 44 Cal. 4th at 948; *Dowell*, 179 Cal. App. 4th at 574-75.

184. The Employee Agreement's non-disclosure provision is void and unenforceable under section 16600 because it operates a de facto non-compete and unreasonably restrains the rights of the Independent Experts to practice in their chosen profession.

185. Unless the non-disclosure ("Trade Secrets and Confidential Business Information"), non-solicitation ("Solicitation or Interference of Customers" and "Solicitation of Employees"), and Non-Competition provisions in the Employee Agreements are invalidated, the Independent Experts will be unable to practice in their chosen profession or within the 3D printing industry because 3D Systems has sought, currently seeks, and will continue seeking to enforce the unlawful provisions of its Employee Agreement against them, and Intrepid will be foreclosed from availing itself of the Independent Experts' experience and expertise in the 3D printing industry in California.

186. 3D Systems contends the non-disclosure ("Trade Secrets and Confidential Business Information"), non-solicitation ("Solicitation or Interference of Customers" and "Solicitation of Employees"), and Non-Competition provisions in the Employee Agreements are valid and that it is entitled to enforce these provisions, which would prevent the Independent Experts from lawfully competing within the 3D printing industry.

187. A judicial declaration and judgment is necessary and appropriate at this time and under the present circumstances so that Intrepid may ascertain the Independent Experts' respective rights, duties, and future obligations under the Employee Agreements.

188. Intrepid seeks a judicial declaration and judgment from the Court as specified in the prayer.

**PRAYER**

Intrepid prays for judgment against 3D Systems and Kuester as follows:

1.    For disgorgement, damages and restitution and monetary, compensatory, consequential, punitive, and exemplary damages in an amount to be proved at trial and as permitted by law;

2.    For preliminary and permanent injunctive relief against 3D Systems and its agents, servants, assigns, and all those acting in active concert or participation with them from further misappropriating Intrepid's trade secrets and from engaging in the unfair and/or unlawful acts described above, including disclosing or misusing Intrepid's trade secret and other confidential information to unlawfully and unfairly compete with Intrepid;

3.    For a judicial declaration and judgment from this Court that the "3D SYSTEMS CORPORATION CALFIORNIA EMPLOYEE CONFIDENTIALITY, NON-COMPETE, NON-SOLICITATION AND ARBITRATION AGREEMENT" and the "Trade Secrets and Confidential Business Information," "Solicitation or Interference of Customers," "Solicitation of Employees," and "Non-Competition" provisions therein constitute unlawful restraints on trade in violation of California Business & Professions Code section 16600 and California's long-recognized and fundamental public policy favoring open competition and employee mobility, and such agreement and provisions are therefore void *ab initio*, as a matter of law.

4.    For a judicial declaration and judgment from this Court that 3D Systems is not entitled to relief, equitable or legal, to prevent Defendants/Counter-Claimants, through the use of the 3D SYSTEMS CORPORATION CALFIORNIA EMPLOYEE CONFIDENTIALITY, NON-COMPETE, NON-SOLICITATION AND ARBITRATION AGREEMENT" and the "Trade Secrets and Confidential Business Information," "Solicitation or Interference of Customers," "Solicitation of Employees," and "Non-Competition" provisions therein, from pursuing their chosen profession, including while in the employment of competitor Intrepid.

5.    For prejudgment and post-judgment interest at the rate authorized by law;

6.    For reasonable attorneys' fees;

7.    For costs of suit incurred herein; and

8.    For such other and further relief as this Court deems just and proper.

Dated:  May 18, 20232

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP

By:    /s/ Anne E. Swenson
Michael P. McCloskey, Esq.
Sean M. Monks, Esq.
Anne E. Swenson, Esq.
Attorneys for Defendants/Counter-
Claimant/Third Party Claimant,
INTREPID AUTOMATION, BEN
WYNNE, CHRIS TANNER, JAMIE
ETCHESON, ROBERT MUELLER, and
IVAN CHOUSAL

# EXHIBIT A

**THIS AGREEMENT AND EMPLOYEE'S EMPLOYMENT ARE SUBJECT TO ARBITRATION PURSUANT TO SECTION 13.5 AND EXHIBIT D HEREIN**

**3D SYSTEMS CORPORATION
CALIFORNIA EMPLOYEE CONFIDENTIALITY, NON-COMPETE,
NON-SOLICITATION AND ARBITRATION AGREEMENT**

**NOTHING IN THIS AGREEMENT SHALL CREATE AN EXPRESS OR IMPLIED CONTRACT OF EMPLOYMENT. ALL EMPLOYEES ARE EMPLOYED ON AN AT-WILL BASIS AND MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT NOTICE AND WITH OR WITHOUT CAUSE. AS AN EMPLOYEE, YOU HAVE THE SAME RIGHT TO TERMINATE YOUR EMPLOYMENT AT ANY TIME, WITH OR WITHOUT NOTICE AND WITH OR WITHOUT CAUSE.**

THIS CALIFORNIA EMPLOYEE CONFIDENTIALITY, NON-COMPETE, NON-SOLICITATION AND ARBITRATION AGREEMENT ("Agreement") is made and entered into on the date of the last signature hereto, by and between 3D SYSTEMS CORPORATION, a Delaware corporation (together with its subsidiaries, the "Company"), its successors and assigns, and _____ *BEN WYANNE* _____, an employee of the Company ("Employee").

RECITALS:

A.     During the course of Employee's employment with the Company, including subsidiaries of the Company, Employee will obtain specialized and confidential knowledge and information regarding numerous aspects of its business including specialized and confidential knowledge and information relating to its products, customers, business procedures and methods of operation.

B.     Employee desires to be employed by the Company and the Company desires to retain the services of Employee.

C.     The parties hereto desire to set forth in writing their mutual understandings and agreements regarding, among other things, the Company's trade secrets, inventions, patents, customers, and property.

D.     In consideration of Employee's offer of new or continued employment with the Company, the compensation paid to Employee, the confidential information made available to Employee as that term is defined below, the training and certification(s) provided to Employee, and the mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Rev. 8/15

## TERMS AND CONDITIONS:

1.   <u>Purpose</u>.    This Agreement does not in any way constitute, and should not be construed as, a contract of employment.  Employee's employment at the Company is "at-will," which means that Employee may resign at any time for any reason and that the Company has the same right and may terminate the employment of Employee at any time for any reason.

2.   <u>Trade Secrets and Confidential Business Information</u>.   Employee recognizes and agrees that Employee will not, at any time, whether during or subsequent to the term of Employee's employment by the Company or any of its subsidiaries, unless done so in the performance of Employee's job responsibilities as an employee of the Company or specifically previously consented to in writing by the President of the Company, directly or indirectly use, divulge, disclose, release, publish, or communicate to any person, firm or corporation confidential information belonging to the Company or any of its subsidiaries or their business, as that term is defined in this Agreement.   "Confidential Information" specifically includes: (a) the identities, buying habits or practices of the Company's customers; (b) the Company's advertising and marketing strategies, methods, research and related data; (c) the names of the Company's vendors, resellers or suppliers; (d) the cost, type and quantity of materials and/or supplies ordered by the Company; (e) the prices at which the Company obtains or has obtained or sells or has sold its products or services; (f) the Company's manufacturing, distribution and sales costs, methods and objectives; (g) technical information including machinery and equipment designs, drawings and specifications; (h) inventions; (i) pending patent applications; (j) product information including designs, drawings, specifications, methods of quality control and formulas or equations used in connection therewith; (k) "trade secrets" as such term is defined by California law; and/or (l) current or potential customer lists, pricing lists, supplier lists or reseller lists. The parties hereto agree that the foregoing items of Confidential Information are important, material, and confidential, could constitute trade secret material, affect the successful conduct of the Company's business, and its goodwill, and that a breach of any term of this <u>Section 2</u> is a material breach of this Agreement. Employee understands that nothing contained in this Agreement is intended to, nor will this Agreement be enforced in a manner so as to infringe upon or restrict any rights (if applicable) afforded to Employee under the National Labor Relations Act, including any rights related to protected concerted activity.

Employee recognizes that the Company has received and in the future will receive confidential or proprietary information from third parties (including without limitation, customers) subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes.  For the avoidance of doubt, Employee agrees that all such confidential or proprietary information shall be included in the definition of Confidential Information and that Employee will hold such information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it

Rev. 8/15                                                     - 2 -

CONFIDENTIAL                                                                                INTREP000084

except as necessary in carrying out Employee's duties for the Company or any subsidiary consistent with the Company's agreement with such third party.

Employee agrees to comply with all of the Company's security and confidentiality procedures including but not limited to, maintaining the secrecy of all Confidential Information. Employee further agrees that Employee will use his/her best efforts to preserve the confidentiality and secrecy of all Confidential Information that comes into Employee's possession, or of which Employee becomes aware.

3.     <u>Inventions and Patents</u>.   Employee agrees, to the fullest extent permitted by applicable law, that all inventions developed by Employee, whether independently or with the assistance of others, during the term of Employee's employment with the Company or any of its subsidiaries, which are developed with the Company's or such subsidiary's equipment, supplies, facilities, trade secrets, or time, or which relate to the business or anticipated business of the Company or such subsidiaries or their respective actual or demonstrably anticipated research or development, or which result from work performed by Employee for the Company or any of its subsidiaries, including but not limited to copyrights (including any and all renewals, extensions or revivals thereof), trademarks and associated goodwill, rights of publicity, inventions, processes, procedures, systems, discoveries, designs, configurations, improvements, patents, potentially patentable materials, technology, trade secrets and any other intellectual property (whether or not patentable and whether or not such works or products are made, conceived or reduced to practice during working hours or using the Company's time or facilities) (collectively "Intellectual Property") are the sole property of the Company or such subsidiary, as the case may be, and Employee hereby expressly assigns, transfers and conveys and agrees to assign, transfer and convey, in perpetuity, exclusively and irrevocably, free and clear or any lien or obligation all of Employee's right, title and/or interest in and to such inventions to the Company or a subsidiary designated by the Company or its licensees or assigns and, upon request, will assist the Company and its subsidiaries in any manner whatsoever in obtaining patents for such inventions.

Without limiting the foregoing, Employee is aware and hereby acknowledges that new rights to the results and proceeds of Employee's services hereunder may come into being and/or may be recognized in the future, under law and/or in equity (collectively the "New Exploitation Rights") and Employee intends to and does hereby assign, grant and convey to the Company and its successors, licensees and assigns any and all such New Exploitation Rights in and to such results and proceeds. Employee is also aware and does hereby acknowledge that new (and/or changed) technology, uses, media, formats, modes of transmission, and methods of distribution, dissemination, exhibition or performance (collective the "New Exploitation Methods") are being and will inevitably continue to be developed in the future, which would offer new opportunities for exploiting such results and proceeds. Employee intends to and does hereby assign, grant and convey to the

CONFIDENTIAL                                                                          INTREP000085

Company and its successors, licensees and assigns any and all rights to such New Exploitation Methods with respect to such results and proceeds.

The Company and its successors, licensees and assigns shall have the right, but not the obligation, to use, adapt, change or revise any work or product to which this Agreement applies, or any part thereof, and to combine the same with other material or works and Employee hereby expressly waives any so-called "moral rights" of authors in any such works or products which are now or hereafter may be recognized by custom, usage or law.

To the extent that any Intellectual Property constitutes copyrightable subject matter, Employee hereby understands and agrees that such work product are works made for hire within the definition of the Copyright Act, 17 U.S.C. §§ 101 et seq. and, as such, the Company is automatically deemed to be the author of such work product and is the owner of all rights, title and interest in and to such work product as a work made for hire.

3.1     Inventions Retained and Licensed.   Employee has attached hereto, as <u>Exhibit A</u>, a list describing all inventions, original works of authorship, developments, improvements, and trade secrets which were made by Employee prior to Employee's employment with the Company (collectively referred to as "Prior Inventions"), which belong to Employee, which relate to the Company's business or proposed business, services or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, Employee represents that no such Prior Inventions exist.   If in the course of Employee's employment with the Company, Employee incorporates into a Company product, process or machine a Prior Invention owned by Employee or in which Employee has an interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such Prior Invention as part of or in connection with such product, process or machine.

3.2     Patent and Copyright Registrations.   Employee will promptly disclose to the Company all such Intellectual Property and will assist the Company in obtaining and enforcing for its own benefit applicable registrations or patents on such inventions in any country.   Upon request, Employee will execute all applications, assignments, oaths, instruments and papers, and perform all acts necessary or desired by the Company to assign, transfer and convey all such Intellectual Property, and the rights, titles and interests thereto, fully and completely to the Company and to enable the Company to secure and enjoy full benefits and advantages thereof.   The Company shall have the full right to assign any and all of the rights, titles or interests that the Company acquires pursuant to this Agreement and Employee hereby consents to such assignment.   Employee will perform all lawful acts reasonably necessary to secure, maintain and enforce worldwide protection for all such Intellectual Property and for vesting in the Company, or any of its successors, licensees, and assigns, the rights, titles, and interests conveyed herein.

CONFIDENTIAL                                                                                      INTREP000086

Employee hereby appoints the Company as Employee's attorney-in-fact (which appointment is irrevocable and coupled with an interest), with full power of substitution and delegation, to execute any and all such documents and do any and all such other acts consistent herewith that Employee fail or am unable to do promptly after request thereof.

Employee understands that Employee's obligations under this <u>Section 3</u> will continue after the termination of Employee's employment with the Company and that Employee will perform such obligations without further consideration except for reimbursement of expenses incurred at the request of the Company. Employee also understands that the termination, completion or breach of this Agreement or any employment agreement with the Company or Employee's separation of employment from the Company and/or its successors, licensees and assigns for any reasons whatsoever shall not affect the Company's ownership of the Intellectual Property or any rights thereto.

3.3    Notice of Provisions of Section 2870. Employee hereby acknowledges receipt of notice from the Company pursuant to Section 2870 of the California Labor Code (attached hereto as <u>Exhibit B</u>). Employee understands that the Company agrees that notwithstanding anything to the contrary in this <u>Section 3</u>, nothing in this Agreement shall apply to any Intellectual Property that qualifies fully under the provisions of Section 2870 of the California Labor Code.

4.    <u>Solicitation or Interference of Customers</u>. Employee agrees that, during the term of Employee's employment with the Company and its subsidiaries and for a period of eighteen (18) months following separation of Employee's employment with Company, including termination by the Company for cause or without cause, Employee will not, directly or indirectly, either for Employee's own use or for the benefit of any other person, firm or corporation, use any trade secrets (as such term is defined under California law) to: (i) divert or take away the business of, or attempt to divert or take away the business of any of the Company's or its subsidiaries' customers; (ii) call on or solicit the business of, or attempt to call on or solicit the business of any of the Company's or its subsidiaries' customers; (iii) induce or attempt to induce any customer, supplier, vendor or other trade related business relation of the Company or any subsidiary to cease doing business with the Company or any subsidiary; (iv) interfere with the relationship between any customer, investor, supplier, vendor or other trade related business relation and the Company or any subsidiary (including, but not limited to, making any disparaging statements or communications about the Company or any subsidiary or any of their current or former officers, directors or employees thereof); and/or (v) usurp any opportunity of the Company or any subsidiary of which Employee became aware during Employee's employment with the Company or which is made available to Employee on the basis of the belief that Employee is still employed by the Company. For purposes of this Agreement, customers shall include any of the

CONFIDENTIAL                                                                    INTREP000087

Company's or its subsidiaries' customers, including, but not limited to, such customers as to whom Employee had called on, solicited, serviced or became acquainted with while in the employ of the Company or its subsidiaries.

5.     <u>Solicitation of Employees</u>.  Employee agrees that during the term of Employee's employment with the Company and for a period of eighteen (18) months following separation of Employee's employment with Company, including termination by the Company for cause or without cause, Employee will not, directly or indirectly, either alone or in concert with others, solicit, induce, or entice any employee of or consultant to the Company or its subsidiaries to leave the Company or its subsidiaries for any reason whatsoever, or to work for anyone in competition with the Company or its subsidiaries.

6.     <u>Non-Competition</u>.   The parties understand and agree that the purpose of the restrictions contained in this <u>Section 6</u> is to protect the goodwill and other legitimate business interests of the Company.

6.1     Except as provided in <u>Section 6.2</u> below, Employee agrees that, during the term of Employee's employment with the Company Employee will not, directly or indirectly, own any interest in, develop, manage, control, participate in, consult, render services, organize, or in any manner engage (whether as an officer, director, employee, independent contractor, partner, member, joint venturer, agent, representative, or otherwise, but in each instance, in a role similar to or the same as, or with any of the same or similar duties and responsibilities as, any position or services held or rendered by Employee on behalf of Company during Employee's employment with the Company) in any activity or enterprise providing 3D or additive manufacturing content-to-print solutions, including 3D printers, print materials, on-demand custom parts services and 3D authoring solutions for professionals and consumers (the "Business of Company") anywhere in the United States.  .

6.2     Notwithstanding the terms of this <u>Section 6</u> Employee shall not be prohibited from (i) being a beneficial owner of not more than five percent (5%) of the outstanding stock of any class of stock which is publicly traded and which enterprise is competitive with the Business of the Company, so long as Employee has no active participation in the business of such person or (ii) serving as a director or advisor to any non-profit organization or governmental entity.

6.3     Employee acknowledges and agrees that the Company and its direct and indirect subsidiaries are expressly intended to be third-party beneficiaries of the provisions of this Agreement and that any assignees of

Rev. 8/15                                         - 6 -

CONFIDENTIAL                                         INTREP000088

the Company that are permitted by this Agreement are authorized to enforce the provisions of this Agreement.

7.    <u>Company Property</u>.  Employee acknowledges and agrees not to remove Company property from the Company's or its subsidiaries' premises unless Employee's position specifically requires Employee to do so in connection with Employee's job duties and as long as Employee continues to maintain the confidentiality of any Confidential Information. Upon request by the Company, Employee will immediately deliver to the Company all Company property in Employee's possession or under Employee's control in good condition, ordinary wear and tear excepted.

8.    <u>Ownership of Customer Records</u>.  Employee agrees that Company or subsidiary owned records of the accounts of customers, Company or subsidiary owned route books, and other Company or subsidiary owned records and books specifically relating to customers are the exclusive property of the Company.  Upon request by the Company, Employee will immediately deliver such books and records to the Company.  In the event that Employee individually purchases such original books or records, Employee shall immediately notify the Company, who shall then reimburse Employee for such purchases, and the books or records will become Company property.

9.    <u>Employee's Duties Upon Separation</u>.  In the event that Employee separates from employment with the Company or its subsidiaries, for any reason, Employee agrees to deliver promptly to the Company in good condition, ordinary wear and tear excepted, Company property and customer-related records as set forth in <u>Sections 7</u> and <u>8</u>. The replacement cost for any Company Property which is not returned in accordance with the Company's Offset of Wages Agreement, as applicable and as allowed by law, will be deducted from Employee's final payroll check.  In the event of the termination of Employee's employment, for any reason, Employee agrees to sign and deliver the "Termination Certification" attached hereto as <u>Exhibit C</u>.

10.    <u>Breach of Agreement</u>.

10.1    The Company and Employee recognize and acknowledge that Employee is employed in a position where Employee will be rendering personal services of a special, unique, unusual, extraordinary and intellectual character requiring extraordinary ingenuity and effort by Employee.  Employee agrees that a breach or threatened breach by Employee of this Agreement, including its covenants, could not reasonably or adequately be compensated in damages in an action at law, including but not limited to damages awarded as part of an arbitration proceeding pursuant to <u>Section 13.5</u> of this Agreement.

10.2  Notwithstanding the parties' agreement to arbitrate all matters arising out of or relating to this Agreement as set forth in <u>Section 13.5</u> below, Employee

CONFIDENTIAL

INTREP000089

acknowledges and agrees that Company shall be entitled to initiate legal action in an appropriate state or federal court to pursue and obtain temporary, preliminary, and/or permanent injunctive relief, which may include, but shall not be limited to, restraining Employee from performing any action that would breach this Agreement, for the purpose of preserving the status quo pending the arbitration of the parties' dispute.  The Company acknowledges and agrees that Employee shall be entitled to initiate legal action in an appropriate state or federal court to pursue and obtain temporary, preliminary, and/or permanent injunctive relief as appropriate.  The Parties' election to pursue injunctive relief against each other pursuant to this paragraph shall not operate as a waiver of the right to arbitrate the dispute, and any injunctive relief resulting from such legal proceedings shall remain in full force and effect during the pendency of any related arbitration proceedings. The court ordering such injunctive relief shall retain jurisdiction over the parties for the purpose of enforcing the injunction order, and any decision or award of the arbitrator inconsistent with any injunctive relief ordered by the court shall be void absent a final order of the court modifying or terminating the injunctive relief.

10.3   Nothing herein shall be construed as prohibiting the Company or Employee from pursuing any other remedy available to the Company or Employee at law or in equity as a result of the other Parties' breach or threatened breach of this Agreement, including but not limited to the recovery of damages from the Company or Employee.

10.4   The remedies conferred by the specific provisions of this Agreement, including this Section 10, are not exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise.

11.   Continuing Obligations.   Employee's obligations under this Agreement shall continue in effect beyond Employee's term of employment with the Company and each and every obligation of Employee under this Agreement shall survive any termination, or attempted termination, by Employee of this Agreement.

12.   Employee's Representations.   Employee hereby represents and warrants that Employee is free to enter into this Agreement and to perform each of the terms and covenants contained herein.  Employee further represents and warrants that Employee is not restricted or prohibited, contractually or otherwise, from entering into and performing this Agreement, and that Employee's execution and performance of this

CONFIDENTIAL                                                                    INTREP000090

Agreement is not a violation or breach of any other agreement between Employee and any other person or entity.

13.    General Provisions.

13.1    Notices.  All notices or other written communications required or permitted to be given by this Agreement shall be deemed given when personally delivered or two (2) days after it has been sent (the date of posting shall be considered as the first day and any Sundays, legal holidays or other days upon which the local mail generally is not delivered shall not be counted in determining this period) by registered or certified mail, postage prepaid, properly addressed to the party to receive the notice at the following address or at any other address given to the other party in the manner provided by this Section 13.1:

If to the Company:    3D Systems Corporation
                      333 Three D Systems Circle
                      Rock Hill, SC 29730
                      Attn:  Executive Vice President, Chief Legal Officer
                      and Secretary

If to the Employee:   (Employee's address as specified on the signature
                      page of this Agreement.)

Nothing contained herein shall justify or excuse failure to give oral notice for the purpose of informing the parties hereto when prompt notification is required, however, it shall be understood that such oral notice shall in no way satisfy the requirement of written notice.

13.2    Severability.  If any provision of this Agreement is determined to be invalid or unenforceable, the provision shall be deemed to be severable from the remainder of this Agreement and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

13.3    Successors and Assigns.   The parties acknowledge that this Agreement constitutes a personal contract with Employee.  Employee may not transfer or assign this Agreement or any part thereof without the Company's prior written approval. This Agreement shall be binding upon and shall inure to the benefit of the Company and its successors and assigns, and shall be binding upon Employee and Employee's assignees, heirs, successors, executors, administrators and other legal representatives.

CONFIDENTIAL                                                      INTREP000091

13.4   No Implied Waivers.   The failure of either party at any time to require performance by the other party of any provision hereof shall not affect in any way the right to require such performance at any later time nor shall the waiver by either party of a breach of any provision hereof be taken or held to be a waiver of such provision.

13.5   Arbitration. The Parties agree that any and all controversies, claims, disputes, and matters in question arising out of, or relating to, Employee's employment with the Company or arising out of, or relating to this Agreement (or the breach thereof), shall be decided by arbitration, subject to the terms, provisions, and exceptions set forth in a separate agreement attached hereto as Exhibit D.

13.6   Governing Law.  This Agreement and all questions with respect to the construction of this Agreement and the rights and liabilities of the parties shall be governed by the laws of the State of California without regard to its laws relating to choice of law or conflict of laws.

13.7   Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13.8   Section References.  Any reference in the Agreement to a section or subsection shall be deemed to include a reference to any subsidiary sections whenever the context requires.

13.9   Captions.   The captions of the sections and subsections of this Agreement are included for reference purposes only and are not intended to be a part of the Agreement or in any way to define, limit or describe the scope or intent of the particular provision to which they refer.

13.10 Entire Agreement; Amendment.   This Agreement contains the entire understanding between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous written or oral negotiations and agreements between them regarding the subject matter hereof. This Agreement may be amended only in a writing signed by each of the parties.

CONFIDENTIAL                                                                  INTREP000092

13.11 <u>Prior Agreements</u>.  This Agreement replaces and supersedes any prior Employee Confidentiality and Non-solicitation Agreements between Employee and Company.    Further, this Agreement replaces and supersedes any prior Agreement for At-Will Employment and Binding Arbitration between Employee and Company.

13.12 <u>Notice to New Employers</u>.  The Company may notify anyone hereafter employing Employee of the existence and provisions of this Agreement.

13.13 <u>Effective Date</u>.  This Agreement will become effective on the commencement of Employee's employment with the Company.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above mentioned.

3D SYSTEMS CORPORATION

By _____
Andrew M.  Johnson
Executive Vice President, Chief Legal
Officer and Secretary

Date: _____

EMPLOYEE

_____
Signature of Employee

9665 GALATEA LN
Street Address

Escondido, CA, 92026
City, State and Zip Code

8th Jun 2016
Date

BEN WYNNE
Employee's Printed Name

CONFIDENTIAL

INTREP000093

## EXHIBIT A

### LIST OF PRIOR INVENTIONS AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
|---|---|---|
| | | |

_____ No inventions or improvements

__✓__ Additional Sheets Attached

**Signature of Employee:** _____

**Print Name of Employee:** _____

**Date:** _8th June 2016_

Rev. 8/15                                    - 12 -

CONFIDENTIAL

## EXHIBIT B

### CALIFORNIA LABOR CODE SECTION 2870
### EMPLOYMENT AGREEMENTS; ASSIGNMENT OF RIGHTS

(a)     Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

    (1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

    (2)    Result from any work performed by the employee for the employer.

(b)     To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

CONFIDENTIAL                                                              INTREP000095

## <u>EXHIBIT C</u>

**3D SYSTEMS CORPORATION TERMINATION CERTIFICATION**

This is to certify that I have returned to 3D Systems Corporation (the "Company") and do not have in my possession any Confidential Information (as such term is defined in the California Employee Confidentiality, Non-Compete, Non-Solicitation and Arbitration Agreement), intellectual property, devices, records, data, notes, reports, proposals, lists, correspondence, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its parent, subsidiaries, affiliates, licensees, successors or assigns.

I further certify that I have complied with all the terms of the Company's California Employee Confidentiality, Non-Compete, Non-Solicitation and Arbitration Agreement signed by me. I further agree that, in compliance with the California Employee Confidentiality, Non-Compete, Non-Solicitation and Arbitration Agreement, I will preserve as confidential all Confidential Information.

I acknowledge that I have received a copy of my signed California Employee Confidentiality, Non-Compete, Non-Solicitation and Arbitration Agreement and that I will continue to comply with my continuing obligations as set forth therein, including but not limited to, the provisions regarding confidentiality, assigning inventions, non-solicitation and non-interference.

_____
Employee's Signature

_____
Employee's Printed Name

_____
Date

Rev. 8/15

- 14 -

CONFIDENTIAL

INTREP000096

## EXHIBIT D

### AGREEMENT TO MEDIATE AND/OR ARBITRATE

This Agreement to Mediate and/or Arbitrate is made by and between: _Ben Wirght_ ("Employee") whose principal residence is located at: _1415 Bachela Ln_ and 3D Systems Corporation ("Employer"), a Delaware corporation, whose main office is located at 333 Three D Systems Circle, Rock Hill, South Carolina 29730.

WHEREAS Employer provides advanced and comprehensive 3D digital design and fabrication solutions, including 3D printers, print materials, custom parts, software and digital content.

WHEREAS Employer and Employee want to provide for the expeditious cost-effective resolution of any and all Disputes (as defined below) of any kind and nature which may now, or in the past or in the future exist between them;

WHEREAS Employer and Employee want to use an expeditious cost-effective means to avoid the delays and uncertainties of resolving Disputes through the courts; and

WHEREAS Employer and Employee want to enter into an agreement for final and binding resolution of any Disputes.

NOW THEREFORE, in consideration of Employee being employed by the Company, Employer and Employee agree to final and binding resolution of any Disputes as follows:

1.  <u>Scope of the Agreement to Mediate and/or Arbitrate</u>.  Employer and Employee mutually agree to submit to mediation and/or final and binding arbitration of all controversies, claims, disputes, and matters in question ("Disputes") arising out of, or relating to this Agreement, or breach thereof, or out of Employee's employment with Employer or seeking employment with Employer or Employee's termination of employment with Employer or any claims whatsoever between them related to Employee's employment.  Employer and Employee knowingly understand and agree that they are waiving the right to bring any Disputes to court, including the right to a jury trial, and that they agree to have any and all Disputes between them decided by an arbitrator.  Disputes shall include but not be limited to the following:

- Claims arising under the Federal and California anti-discrimination statutes, including but not limited to Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act, and the California Fair Employment and Housing Act;

- Claims for wrongful termination, claims for violation of any agreements;

Rev. 8/15                                                      - 15 -

CONFIDENTIAL                                                      INTREP000097

- Contract claims;

- Wage and hour claims under the California Labor Code or the Federal Fair Labor Standards Act;

- Actions for breach of implied contract, including actions for breach of the covenant of good faith and fair dealing; and

- Common law tort claims.

Disputes shall not include claims for unemployment benefits or workers' compensation benefits (other than a workers' compensation claim for discrimination and/or serious or willful misconduct claims).

However, Employee and Employer understand and agree that Disputes arising under any law that permits resort to an administrative agency notwithstanding an agreement to arbitrate those claims may be brought before that agency as permitted by that law, including without limitation claims or charges brought before the National Labor Relations Board, the Equal Employment Opportunity Commission, the United States Department of Labor, the California Workers' Compensation Appeals Board, the California Employment Development Department and the California Division of Labor Standards Enforcement.  Employee and Employer also understand and agree that after exhaustion of administrative remedies through the Department of Fair Employment and Housing and/or the Equal Employment Opportunity Commission or the administrative agency under a statute that requires exhaustion of administrative remedies through the agency before seeking relief, the parties must pursue any such claims through this binding arbitration procedure.  Nothing in this Agreement shall deprive any administrative agency or Board of the right to engage in litigation on behalf of Employee to secure remedies under California law before an administrative body or in a Court. Employee understands and agrees that Employee cannot obtain any monetary relief or recovery from any such a proceeding except as otherwise allowed by law.

2.    <u>Definition of the Term "Employer"</u>.  The term "Employer" includes, but is not limited to, any present or former employee, officer, director, manager and/or supervisor, benefit plan administrator, sponsor, and/or fiduciary in their capacity as benefit plan administrators or as individuals acting on behalf of Employer and/or any other authorized agent of Employer.  The term "Employer" shall be further defined to include any parent, subsidiary, affiliated and/or successor company and/or any employee, officer, director manager and/or supervisor of any parent, subsidiary, affiliated and/or successor companies that are part of, related to and/or associated with Employer.

CONFIDENTIAL                                                                                INTREP000098

3.    <u>Agreement to Cover All Past, Present and Future Disputes</u>.  This Agreement to Mediate and/or Arbitrate shall cover all Disputes between Employer and Employee that may have arisen prior to and after the date of execution of this Agreement to Mediate and/or Arbitrate.

4.    <u>Mediation</u>.  Any Dispute between Employer and Employee shall first be submitted to mediation unless either party does not desire to mediate and would rather go directly to arbitration.  The parties agree to utilize mediation in good faith with the goal of resolving any Disputes.

a.    <u>Selection of a Mediator</u>.  The mediation will be conducted by Judicial Arbitration Mediation Services ("JAMS") or some other mutually agreed upon dispute resolution agency.  If the parties cannot agree upon a mediator, they shall submit the Disputes to JAMS or some other mutually agreed upon dispute resolution agency, as he case may be, and utilize the rules and procedures of JAMS or some other mutually agreed upon dispute resolution agency, as the case may be, to choose a mediator.

b.    <u>Notice of Intent to Arbitrate</u>.  If the mediation does not result in a resolution of the Dispute(s) or the parties do not use mediation, either party must serve written notice to the other party of its intention to proceed to arbitration in accordance with Paragraph 5a below.

5.    <u>Arbitration</u>.  Any Disputes between Employer and Employee which has not been resolved by mediation as set forth above, will be resolved by submission to final and binding arbitration.  Employee and the Employer agree that the arbitration and this Agreement shall be controlled by the Federal Arbitration Act and acknowledge that Employer's business and the nature of Employee's employment affect interstate commerce.

a.    <u>Exercising the Right to Arbitrate - Notice to Arbitrate</u>.  Either of the parties may exercise the right to arbitrate any Disputes against the other by sending a written notice to arbitrate to the other party by via mail (preferably using a service with delivery confirmation) of any action which gives rise to the Dispute or when the party knew or reasonably should have known of the existence of any Disputes.  The written notice shall identify and describe the nature of all Disputes asserted and the facts upon which such Disputes are based.  The notice must be sent within the applicable statute of limitations under California law or applicable federal law.  Failure to file a notice to arbitrate within the applicable time limits prescribed by California and/or applicable federal law for each claim alleged shall constitute a waiver of any and all claims (both to arbitrate and to file such claims in any court).

CONFIDENTIAL                                                                          INTREP000099

    b.    <u>Arbitration Agency and Procedures</u>.  The arbitration shall be conducted in accordance with the American Arbitration Association ("AAA") and governed by the Model Rules for Arbitration of Employment Disputes of the AAA then in effect (attached hereto).  The Arbitrator shall follow such rules or if those rules are found invalid, then the California Arbitration Act.

    c.    <u>Selection of the Arbitrator</u>. The arbitration will be conducted by one neutral arbitrator affiliated with AAA.  Employee and Employer shall participate jointly in the selection of the AAA arbitrator.  If the parties cannot agree upon an arbitrator, they shall use the rules and procedures of AAA to select the arbitrator.

    d.    <u>Venue; Consent to Jurisdiction</u>. The arbitration shall be filed and heard in Los Angeles County, California, and all parties hereby consent to the personal jurisdiction of same.  If AAA determines that it is unreasonable for Employee to attend arbitration at such location, at the AAA's office located within the county in which the Employee was most recently employed by Employer.

    e.    <u>Payment of the Arbitrator's Fees and Costs and Setting the Date, Time and Place of the Arbitration</u>.  The payment of arbitration filing fees and fees of the arbitrator shall be paid consistent with California law governing arbitration agreements.  Each party shall bear his/her/its own attorneys' fees, witness fees and costs not unique to arbitration.  The parties shall mutually agree with the arbitrator on the date, time and place of the arbitration.  In the event that the parties are unable to mutually agree to the date, time, and place for the arbitration to be conducted, the selected arbitrator shall determine the date, time, and place of the arbitration.

    f.    <u>Authority of the Arbitrator; Arbitration Procedures</u>.  The Arbitrator shall be vested with exclusive authority to determine any and all issues pertaining to the Dispute raised (not including, however, any disputes concerning the validity or enforceability of this Agreement).  The Arbitrator shall apply the substantive law (and the law of remedies, if applicable) of California, of federal law, or both, as applicable to the claim(s) asserted.  The rules of evidence shall apply to the arbitration.  The Arbitrator shall have the authority to entertain a motion to dismiss and/or a motion for summary judgment/ adjudication by any party and shall apply the standards governing such motions under the California Code of Civil Procedure.  In addition, the Arbitrator shall have authority to grant injunctive relief and/or damages, which shall be based solely upon the law governing the claims and defenses pleaded.  The parties shall have the same rights to discovery as would be available in a proceeding in California Superior Court, as provided for in Section 1283.05 of the California Code of Civil Procedure.  Either party shall be allowed to file a post-hearing brief.  The Arbitrator shall render an award and opinion that includes the factual and legal basis for any decision and award.   The Arbitrator's remedial authority shall be no greater than that which is available under the statutory or common law theory

CONFIDENTIAL    INTREP000100

asserted.  Any award issued by an arbitrator pursuant to this Agreement shall be final and binding and enforceable in a court of competent jurisdiction.  Judgment may be entered on the arbitrator's decision in any court having jurisdiction.

g.     <u>Class Action/Collective/Representative Claims.</u>  Except if otherwise required by applicable law, Employee and Employer expressly intend and agree that (1) no claims may be arbitrated on a class, collective or representative basis; (2) Employee and Employer will not assert and each hereby waive class action and collective claims against the other in arbitration, court or otherwise (including but not limited as a plaintiff, claimant and/or member); and (3) all individual claims against each other must be asserted in arbitration.  If at any time allowable by applicable law, the parties further intend and agree that each will not assert and each hereby waive any representative claims.  If representative claims cannot be waived, Employee and Employer agree that:  (a) they will not be brought or pursued in arbitration; and (b) to the full extent allowed by applicable law, should any representative claims be brought in court, Employer and Employee shall request that the court enter a stay with respect to such claims pending the outcome of any arbitration of individual claims between Employee and Employer.

h.     <u>Right to Representation</u>.  Each party may be represented throughout the mediation and/or arbitration proceedings by counsel of his/her/its own choosing.  Each party shall pay its own attorneys' fees.  However, in arbitration, if any party prevails on a statutory claim which affords the prevailing party attorneys' fees, the arbitrator may award reasonable attorneys' fees to the prevailing party.

i.     <u>No Retaliation</u>.  No  Employee shall be subject to retaliation if he or she exercises  his or her right to assert claims under this Agreement and any retaliatory act or omission is directly contrary to Company policy.  If any Employee believes that he or she has been retaliated against by anyone at Employer, the Employee should immediately report this to the Human Resources Department.

8.     <u>Right to Injunction</u>.  Notwithstanding any other provision herein and in accordance with <u>Section 10</u> of the California Employee Confidentiality, Non-Compete, Non-Solicitation and Arbitration Agreement, Employee and Employer acknowledge and agree that both Employee and Employer shall be entitled to initiate legal action in an appropriate state or federal court to pursue and obtain temporary, preliminary, and/or permanent injunctive relief for the purpose of preserving the status quo pending the arbitration of the parties' dispute and as may be necessary to protect their respective rights and interests pending mediation and/or arbitration, particularly if necessary, to avoid irreparable harm.  The Parties' election to pursue injunctive relief against each other pursuant to this paragraph shall not operate as a waiver of the right to arbitrate the dispute, and any injunctive relief resulting from such legal proceedings shall remain in

Rev. 8/15                                    - 19 -

CONFIDENTIAL                                                                          INTREP000101

full force and effect during the pendency of any related arbitration proceedings. The
court ordering such injunctive relief shall retain jurisdiction over the parties for the
purpose of enforcing the injunction order, and any decision or award of the arbitrator
inconsistent with any injunctive relief ordered by the court shall be void absent a final
order of the court modifying or terminating the injunctive relief.

9.    <u>Opportunity to Have this Agreement Reviewed by an Attorney</u>.  Employer
and Employee agree that they have had an opportunity to review this agreement and its
legal implications with an attorney.  Employer and Employee represent to each other
that each understands the legal effect of entering into this Agreement to Mediate and/or
Arbitrate all past, present, and future disputes that they may have with each other.

10.    <u>Entire Agreement</u>.  This Agreement supersedes any and all other
agreements, both oral and written, between the parties as to matters stated herein,
unless specifically stated to the contrary in a written agreement between the parties,
and constitutes the sole, entire, and complete agreement between the parties.

11.    <u>Not an Employment Agreement</u>.  This Agreement is not, and shall not be
construed to create any contract of employment, express or implied.  Nor does this
Agreement in any way alter the "at-will" status of Employee's employment.

12.    <u>Partial Invalidity, Captions, and Paragraph Headings</u>.  If any provision of
this Agreement is held to be invalid, void or unenforceable by a court of competent
jurisdiction, the remaining provisions of the agreement shall, nevertheless, continue in
full force and effect without being impaired or invalidated in any way so as to enforce
the parties' intent to mediate and/or arbitrate any and all Disputes between them.
Moreover, if any one or more of the provisions of this Agreement shall be held to be
excessively overbroad, such provision shall be construed by limiting and reducing
it/them so as to be enforceable to the maximum extent allowed by applicable law.  The
captions and paragraph headings used herein are for convenience only, are not a part
of this Agreement, and shall not be used in interpreting and/or construing this
Agreement.

13.    <u>Notices Given by a Party</u>.  Written notices to be given under this agreement
shall be sent by Mail (preferably with a service that provides delivery confirmation) to
Employee and Employer at the addresses listed above.

14.    <u>Governing Law; Modifications</u>.  This Agreement shall be governed by and
shall be interpreted in accordance with the laws of the State of California.  This Agreement
can be modified only by a written document signed by the Chief Legal Officer of Employer
and the Employee.  The terms of this Agreement cannot be modified orally.

**EMPLOYEE HAS  READ, UNDERSTOOD, AND AGREES TO BE LEGALLY BOUND
TO ALL OF THE ABOVE TERMS AND UNDERSTANDS BY AGREEING TO THIS**

CONFIDENTIAL                                                            INTREP000102

**BINDING ARBITRATION AGREEMENT, BOTH EMPLOYEE AND THE COMPANY
GIVE UP RIGHTS TO TRIAL BY JURY.**

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date
below:

EMPLOYEE:                                    EMPLOYER:

_____              _____
                                             By: Andrew M. Johnson
                                             Its: EVP, Chief Legal Officer & Secretary

DATE: _____              DATE: _____


**To access the Employment Arbitration Rules and Mediation Procedures of the
American Arbitration Association, please visit:**

**www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004362**

CONFIDENTIAL                                                    INTREP000103

# EXHIBIT B



## CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

**THIS CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT** (the "Agreement") made on ⟶ 1/24/21 ⟵ (the "Effective Date")
between:    **Intrepid Automation**                    **7867 Dunbrook Ave. Suite A, San Diego, CA 92126**    and
              EVAN KEUSTER

(collectively, the "Parties" and each individually a "Party").

    The Parties are exploring the possibility of engaging in one or more mutually beneficial business relationships (collectively, the "Business Relationship"). The Parties recognize that in the course of their discussions to further the Business Relationship, it will be necessary for each Party to disclose to the other certain Confidential Information (as defined below). Each Party desires to set forth the terms that apply to such Confidential Information. The Parties do hereby agree as follows:

1.  **Description of Confidential Information:** The confidential information disclosed under this Agreement is described as: Product concepts, design information, trade secrets, development schedules, financial data, marketing and customer data, and other information. Both parties agree that the confidential information need only be referred to as confidential when disclosed and that the confidential information is not required to be marked as confidential when in tangible form or documented as confidential when in intangible form.

2.  **Disclosure Period:** This Agreement shall be effective as of the Effective Date and shall continue for a term of **two (2) years** unless otherwise extended in writing signed by both parties. Either party may terminate this Agreement with thirty (30) days prior written notice; however, regardless of the mode of termination, all obligations to protect the disclosed confidential information shall continue during the confidentiality period set forth below.

3.  **Confidentiality Period:** Recipient's duty to hold confidential information in confidence shall continue for so long as the Discloser treats the information as confidential.

4.  **Standard of Care:** Recipient shall protect the disclosed confidential information by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination, or publication of the confidential information as Recipient uses to protect its own confidential information of a like nature. Recipient shall disclose the disclosed confidential information on a need-to-know basis to only its Representatives and Affiliates and shall inform them of their obligations under this Agreement. Recipient shall inform immediately, upon receiving a written request from Discloser, return or destroy all copies of the confidential information and all documents that include or refer to the confidential information.

5.  **Exclusions:** This Agreement imposes no obligation upon Recipient with respect to information that: (a) was available to the public prior to the disclosure by Discloser; (b) becomes available to the public through no act or omission of the Recipient in violation of this Agreement; (c) has been or is given to Recipient by a third party not known by Recipient after due inquiry to be under any obligation of confidentiality to the Discloser; (d) is developed independently by Recipient without

the use or benefit of the confidential information of the Discloser; or (e) is disclosed by Recipient under operation of law, regulation, or legal process only after Recipient has given written notification to Discloser at least thirty (30) days prior to such requested disclosure in order that Discloser and/or Recipient may seek a protective order or other remedy.

6.  **Warranty:** Each Discloser warrants that it has the right to make the disclosures under this Agreement. NO OTHER WARRANTIES ARE MADE BY EITHER PARTY UNDER THIS AGREEMENT. ANY INFORMATION EXCHANGED UNDER THIS AGREEMENT IS PROVIDED "AS IS."

7.  **Rights:** The Recipient acquires no intellectual property rights to the confidential information under this Agreement and shall use the confidential information only in furtherance of Business Relationship. This Agreement shall not restrict reassignment of Recipient's employees.

8.  This Agreement imposes no obligation on either party to disclose information or to purchase, sell, license, transfer, or otherwise dispose of any technology, services, or products.

9.  Both parties shall adhere to all applicable laws, regulations, and rules relating to the export of technical data, and shall not export or re-export any technical data, any products received from Discloser, or the direct product of such technical data to any proscribed country listed in such applicable laws, regulations, and rules unless properly authorized.

10.  Neither party may assign or transfer this Agreement in whole or in part (nor disclose the confidential information) to any other entity without the prior written consent of the other party.

11.  This Agreement does not create any agency or partnership relationship. All additions or modifications to this Agreement must be made in writing and must be signed by both parties. This Agreement may be signed in counterparts. The parties agree that this Agreement shall be governed by and construed in accordance with the laws of the State of **California**, without regard to conflict-of-laws provisions.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed by their duly authorized representatives on the Effective Date first written above:

By: _____    By: _____

Name: CHRIS TANNER    Name: EVAN KEUSTER

Title: VP R&D    Title: Senior Applications engineer