HUNTON ANDREWS KURTH LLP
EMILY BURKHARDT VICENTE (SBN 263990)
ebvicente@HuntonAK.com
ROLAND M. JUAREZ (SBN 160793)
rjuarez@HuntonAK.com
D. ANDREW QUIGLEY (SBN 280986)
aquigley@HuntonAK.com
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627
Telephone: 213 • 532 • 2000
Facsimile: 213 • 532 • 2020

Attorneys for Plaintiff,
3D SYSTEMS, INC.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 3D SYSTEMS, INC., a California Corporation;<br>        Plaintiff,<br>    v.<br>BEN WYNNE, an individual; CHRIS TANNER, an individual; JAMIE ETCHESON, an individual; ROBERT MUELLER, an individual; IVAN CHOUSAL, an individual; INTREPID AUTOMATION, a California Corporation; and DOES 1 through 20, inclusive,<br>        Defendants. | Case No.: 3:21-cv-01141-LAB-DDL<br><br>**3D SYSTEMS, INC. MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 37(E) AND THE COURT'S INHERENT POWERS**<br><br>**ORAL ARGUMENT REQUESTED** |

INTREPID AUTOMATION,

           Counter-Claimant,

      v.

3D SYSTEMS, and DOES 1-50, inclusive,

           Counter-Defendant.

INTREPID AUTOMATION,

           Third Party Claimant,

      v.

EVAN KEUSTER, and ROES 1-50, inclusive,

           Third Party Defendant.

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on November 6, 2023, at 11:15 a.m. or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Larry Alan Burns at the United States District Court for the Southern District of California, Plaintiff 3D Systems, Inc. ("3DS") moves this Court, under the Court's inherent authority and Federal Rule of Civil Procedure 37(e) to issue sanctions against Defendants Ben Wynne, Chris Tanner, Jamie Etcheson, Robert Mueller, Ivan Chousal, and Intrepid Automation ("Defendants"), based on recently discovered evidence that specific information directly relevant to 3D Systems, Inc.'s ("3DS") claims in this lawsuit was spoliated shortly after Intrepid, Wynne, Chousal and Etcheson were served with this Lawsuit.

3DS requests that the Court enter the following sanctions, pursuant to Federal Rules of Civil Procedure 37(e) and the Court's inherent powers:

- An order striking the answers of all Defendants and entering a default judgment against them.

Alternatively, if the Court is not inclined to strike Defendants' answers and enter a default judgement, 3DS seeks mandatory jury instructions as to the following:

- Defendants Wynne and Tanner intentionally deleted documents directly related to this lawsuit within 24 hours of the date Intrepid, Wynne, Chousal and Etcheson were served with this lawsuit in an effort to conceal their misappropriation of 3DS's trade secrets.

- The deleted documents establish that, unbeknownst to 3DS, Defendants Wynne and Tanner had possession of 3DS's trade secret documents and confidential information after they left their employment at 3DS.

- Defendants Wynne and Tanner then shared those documents containing 3DS trade secrets and confidential information with Defendants Intrepid, Chousal, Mueller and Etcheson, and all Defendants used those documents to develop the products and technology for Intrepid that are at issue in this Lawsuit.

- Defendants did not independently develop any products or technology for Intrepid that are at issue in this Lawsuit, but instead all such Intrepid products and technology were developed using 3DS's trade secrets and confidential information.

In addition, 3DS seeks an order that Defendants shall be precluded from introducing any testimony, documents or other evidence or making any argument contrary to any of the above instructions in any motion, at any hearing, or at trial.

Irrespective of the above, 3DS also seeks monetary sanctions against Defendants in the amount of $81,500, associated with the expense of chasing down evidence Defendants knew they had intentionally spoliated, briefing motions and discovery disputes concerning this evidence, and of uncovering Defendants' spoliation.

This Motion is based upon this Notice, the attached Memorandum of Points and Authorities, the Declaration of D. Andrew Quigley and exhibits thereto (including the testimony of third-party PTC, Inc.), the Declaration of Emily Burkhardt Vicente, the Declaration of Scott Turner, the files and records in this case, and any argument which may be presented at the hearing on this Motion.

DATED:  October 7, 2023

**HUNTON ANDREWS KURTH LLP**

By: */s/ D. Andrew Quigley*
    Emily Burkhardt Vicente
    Roland M. Juarez
    D. Andrew Quigley
Attorneys for Plaintiff 3D SYSTEMS, INC.

# TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................................... 1

II.   RELEVANT FACTUAL BACKGROUND ................................................. 3

    A.    3DS Files Suit Against Defendants For Misappropriation ............................ 3

    B.    3DS Discovers Defendants' Surreptitious Use Of An OnShape
        Account.......................................................................................................... 4

    C.    The First OnShape Subpoena Shows Defendants Imported 3DS CAD
        And Created Intrepid Automation Designs While Working for 3DS ........... 5

    D.    Documents and Elements Were Deleted By Wynne And Tanner
        Immediately After The Lawsuit Was Served .................................................. 6

    E.    Deleting Documents on OnShape Requires An Intentional Act ................... 9

    F.    3DS Cannot Obtain The Deleted Information From Other Sources ............. 10

    G.    Defendants Have Obstructed Discovery Into Their Misappropriation ......... 11

III.  DEFENDANTS' CONDUCT WARRANTS TERMINATING
      SANCTIONS ............................................................................................... 12

    A.    Terminating Sanctions Are Appropriate Pursuant To Rule 37(e)(2) ............ 13

    B.    Terminating Sanctions Are Proper Under The Court's Inherent Power ....... 16

        1.    Defendants Intentionally/Willfully Spoliated Relevant Evidence ...... 16

        2.    Defendants' Conduct Easily Meets The First Two Leon Factors ...... 19

        3.    3DS Is Severely Prejudiced, Meeting The Third Leon Factor .......... 20

        4.    The Fourth Leon Factor Favors Dismissal ......................................... 22

        5.    The Last Leon Factor Also Favors Dismissal..................................... 23

IV.   IN THE ALTERNATIVE, EVIDENTIARY AND PRECLUSIVE
      SANCTIONS ARE APPROPRIATE............................................................ 24

V.    3DS SHOULD BE AWARDED ITS ATTORNEYS' FEES AND COSTS .......... 25

VI.   CONCLUSION............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anheuser-Busch, Inc. v. Natural Beverage Dist.*,
   69 F. 3d 337 (9th Cir. 1995) ...............................................................................22

*Aramark Mgmt., LLC v. Borgquist*,
   2021 WL 864067 (C.D. Cal. Jan. 27, 2021).......................................................12

*Columbia Pictures v Bunnell*,
   2007 WL 4877701 (C.D.Cal Dec. 13, 2007).................................................19, 23

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*,
   482 F.3d 1091 (9th Cir. 2007) ........................................................................20, 23

*CrossFit, Inc. v. National Strength and Conditioning Assoc.*,
   2017 WL 2298473 (SD Cal. May 26, 2017) ...................................................22, 24

*Dong Ah Tire & Rubber Co. v. Glasforms, Inc.*,
   2009 WL 1949124 (N.D. Cal. July 2, 2009) ........................................................25

*Frank Bruckhorst, LLC v. Ihm*,
   2013 WL 12094880 (S.D. Cal. Sept. 30, 2013)....................................................19

*Hester v. Vision Airlines, Inc.*,
   687 F.3d 1162 (9th Cir. 2012) ..............................................................................19

*In re Hitachi Television Optical Block Cases*,
   2011 WL 3563781 (S.D. Cal. Aug. 12, 2011)......................................................16

*Inland Concrete Enterprises, Inc. v. Kraft Americas LP*,
   2011 WL 13209166 (C.D. Cal. Mar. 9, 2011)......................................................24

*Leon v. IDX Sys. Corp.*,
   464 F.3d 951 (9th Cir.2006) ...........................................................................*passim*

*MGA Ent., Inc. v. Harris*,
   No. 220CV11548JVSAGR, 2023 WL 2628225 (C.D. Cal. Jan. 5, 2023) .........12

*Padgett v. City of Monte Sereno*,
   2007 WL 878575 (N.D. Cal. Mar. 20, 2007) .......................................................16

*Porter v. City & Cty. of San Francisco*,
    2018 WL 4215602 (N.D. Cal. Sept. 5, 2018)................................................13, 14

*Pringle v. Adams*,
    2012 WL 1103939 (C.D. Cal. Mar. 30, 2012)....................................................23

*The Sunrider Corp v. Bountiful Biotech Corp.*,
    2010 WL 4589156 (CD Cal. Nov. 3, 2010) ................................................16, 19

*Valley Engr's Inc. v. Electric Eng'g Co.*,
    158 F.3d 1051 (9th Cir. 1998) ...................................................................*passim*

*WeRide Corp. v. Kun Huang*,
    2020 WL 1967209 (N.D.Cal. Apr. 24, 2020)..................................12, 13, 22, 24

*Youngevity Int'l Corp. v. Smith*,
    2017 WL 11700187 (S.D. Cal. Dec. 4, 2017) ...................................................12

**Other Authorities**

Fed. R. Civ. P. 37(e)...........................................................................12, 13, 15

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiff 3D Systems, Inc. ("3DS") seeks terminating sanctions (default judgment) against Defendants Ben Wynne, Chris Tanner, Ivan Chousal, Robert Mueller, Jamie Etcheson (the "Individual Defendants"), and Intrepid Automation (collectively "Defendants") based on Defendants Wynne's and Tanner's intentional spoliation of evidence directly relevant to 3DS's claims in the 24 hours after Intrepid, Wynne, Chousal, and Etcheson were served with this lawsuit.

The Complaint, which was served on Defendants Wynne, Chousal, Etcheson, and Intrepid on May 25, 2021, specifically alleges that, while employed by 3DS, the Individual Defendants secretly took 3DS's confidential and trade secret information (including that contained in CAD files) and used them to design products for Intrepid, which they jointly own and founded within days of resigning from their employment with 3DS. Dkt. No. 1, Ex. A ("Lawsuit"). Specifically, the Lawsuit alleges Defendants "stole and incorporated Enso CAD drawings" (Dkt. 1, Ex. A ¶ 44) and the Intrepid patents included "trade secret and proprietary elements directly from 3D Systems Enso 'Figure 4' print engine design, including elements from the Enso CAD drawings" (Dkt. 1, Ex. A ¶ 48).

Within 24 hours of the May 25 service, Wynne and Tanner accessed on-line accounts (an OnShape CAD platform) and intentionally and permanently deleted 10 "documents" and 43 "elements" from OnShape that would have allowed 3DS to conclusively prove its claims against Defendants using direct evidence.[1] Defendants then willfully hid this information in discovery in this case, only to be uncovered nearly two years after the Lawsuit was served by a third party subpoena to OnShape, which Defendants' objected to, the reasons for which are now obvious.

---

[1] A "document" on OnShape is a container that can contain all of the data for an engineering project, including completely assembled products, subassemblies, parts, and imported data. Each form of data is stored in a tab within a document. An "element" can be anything from a single part to a complete assembly of parts. Quigley Decl., Ex. 8 (PTC Dep. 64:18-65:6).

The OnShape discovery shows that the deleted files included CAD files related to 3DS's Enso print engine and Figure 4 technology as referenced in 3DS's Complaint as well as other files related to products developed by Defendants that 3DS believes incorporated 3DS's trade secrets. Had they not been deleted, the documents on the OnShape platform would have shown Defendants' theft and use of this 3DS confidential and trade secret information to build products for Intrepid. 3DS does not have access to this direct evidence of misappropriation, however, because Defendants deleted this information once they learned of the lawsuit and it cannot be recovered according to OnShape.

Defendants' deletions were intentional. To delete a document from OnShape, Defendants had to click through several warnings informing them that the document would be "deleted forever" and that the deletion could not be undone. The deletions were not part of a routine or customary practice of Defendants. Wynne and Tanner did not delete any documents from the OnShape CAD platform in 2021 except within the 24 hours after Intrepid, Wynne, Chousal, and Etcheson were served with the Lawsuit, and Tanner (who deleted the 43 elements from OnShape) did not delete elements on any other day in 2021.

Defendants' intentional spoliation threatens the just resolution of this lawsuit and has severely prejudiced 3DS. Defendants are free to say whatever they want about the deleted documents and elements because they destroyed the truth when they were served with this Lawsuit. There is simply no credible reason Defendants would have scrambled to delete documents and elements within 24 hour of service, unless they were damning to their defense. As the Ninth Circuit has recognized, "[t]here is no point to a lawsuit, if it merely applies law to lies." *Valley Engr's Inc. v. Electric Eng'g Co.*, 158 F.3d 1051, 1058 (9th Cir. 1998). The only appropriate remedy for Defendants' willful, bad faith conduct is to grant terminating sanctions (default judgment) against Defendants in favor of 3DS. Defendants' actions since learning 3DS would be bringing this motion highlight why terminating sanctions are the only viable remedy. Specifically, despite refusing to produce documents from OnShape throughout this case and obfuscating their existence through sworn misrepresentations, yesterday Defendants produced eight documents for the first

time that they claim to have miraculously discovered and which they contend include five of the documents deleted from OnShape. As discussed, however, we know this cannot be true because once documents are deleted from OnShape they are "delete[d] forever." Defendants claim the documents they found do not contain 3DS information and will no doubt argue their deletion was no harm no foul. But this is precisely the problem. There is no way to confirm those documents are in fact the same documents deleted from OnShape.

3DS also seeks an order for monetary sanctions against Defendants in the amount of $81,500 representing the amount 3DS incurred in chasing down evidence Defendants knew they had intentionally spoliated and ultimately uncovering Defendants' spoliation.

## II. RELEVANT FACTUAL BACKGROUND

### A. 3DS Files Suit Against Defendants For Misappropriation

3DS filed the Lawsuit on May 19, 2021. Dkt. 1, Ex. A. Defendants Wynne, Chousal, Etcheson, and Intrepid were served with the lawsuit on May 25, 2021. Quigley Decl., Ex. 1. Mueller was served on May 26, 2021 and Tanner was served on June 2, 2021. *Id*. 3DS filed a First Amended Complaint ("FAC") on July 19, 2021. Dkt. 6.

3DS is a leading provider of 3D printers, print materials, software, and custom parts for professionals and consumers. FAC ¶ 1. Wynne, Tanner, Etcheson, Mueller, and Chousal were five employees in 3DS's San Diego office. *Id*. Prior to joining 3DS, each had experience as engineers, but had little or no 3D-printing experience. 3DS trained and provided them with several decades'-worth of the company's 3D-printing know-how and trade secrets to quickly bring them up to speed. *Id*. ¶ 27-28; Turner Decl. ¶ 4.

3DS relied on Defendants to redesign and commercialize its Figure 4 line of 3D-printers, including 3DS's "Enso" print engine, the Probot, "Aurora" projector, and "Halo" electronics board used in the Figure 4 print engine. FAC ¶ 3; Turner Decl. ¶ 4. 3DS provided the Defendants with access to its proprietary information and trade secrets to do their jobs. FAC ¶ 25; Turner Decl. ¶ 4. After only a year with 3DS, however, Defendants resigned in unison in August 2017. *Id*. ¶ 31. Unbeknownst to 3DS, while employed, Wynne and Tanner secretly uploaded 3DS's confidential information to a third-party

hosted cloud-based platform called OnShape and then forensically wiped their 3DS hard drives to avoid detection once they left employment.  Quigley Decl., Ex. 10; FAC ¶ 42. 3DS has learned in this litigation that, with the help of 3DS's trade secrets, within just two months of leaving 3DS, Defendants had a finished 3D-printer that they were showing to potential investors.  Quigley Decl., Ex. 6.  This is a remarkable timeline for five engineers who had little 3D-printing experience just a year earlier. The finished printer, called the "Atom," was almost a direct copy of 3DS's Enso Figure 4 print engine that Defendants worked on for 3DS, and they used the Atom to secure venture capital funding within eight months of leaving 3DS.  *Id.* ¶ 8.

In 2021, 3DS discovered Defendants' misappropriation when 3DS employee Scott Turner realized that patents filed by Defendants incorporated 3DS's trade secrets, including images of CAD files of 3DS's Figure 4. FAC ¶¶ 49-57. Promptly after discovering Defendants' theft, 3DS filed this Lawsuit. Dkt. 1, Ex. A.

**B.    3DS Discovers Defendants' Surreptitious Use Of An OnShape Account**

The Court ordered Defendants to produce all documents responsive to certain of 3DS's document requests (Dkt. 100) and, in response, Defendants produced documents, which included text messages that revealed for the first time that Defendants had been using the OnShape CAD platform during their employment with 3DS to create products for their new venture, Intrepid Automation. Quigley Decl., Ex. 3. The OnShape platform— cloud-based software offered by PTC, Inc.—is used for "product designs, 3D modeling design" and allows individuals to create and edit CAD files. *Id.*, Ex. 8 (13:13-18). A CAD file is a digital file format for an object generated using CAD software. Engineers rely on CAD files to design and build products. CAD files may be 2-dimensional or 3-dimensional and generally "contain the … geometric shapes involved with [] physical [product] design." *Id.* (15:19-23).  CAD files are central to the creation of a manufactured product.  In order to build a machine, such as a 3D-printer, one first designs a 3-dimensional model of the machine with a CAD program that will show the precise size and shape of each physical component of the machine. Turner Decl. ¶ 3. A complete CAD assembly will include every

physical component of the machine, which can be taken apart, edited, and reassembled, as well as an immense amount of data about how the machine was designed. *Id*. CAD files are often provided to third-party companies that manufacture the machine according to the specifications in the CAD file.  CAD files are like any other computer file that can be saved, edited, or shared with others.[2]  *Id*. ¶ 3; Dkt. 225-13 ¶ 3.

Once a document is created on OnShape, every action that is taken in that document is logged in a document history.  Quigley Decl. ¶ 10. This allows an OnShape user to see every edit or deletion made to a document (including who did it and when) and allows the OnShape user to "restore" earlier versions of a document (so long as the document itself has not been deleted). *Id*. As relevant to this Motion, the terms "document" and "element" mean specific things on the OnShape CAD platform.  A "document" is a container or bucket that may contain several different types of data which are stored in tabs in the OnShape interface. *Id*. ¶ 9. One tab could contain a fully assembled machine, while another tab could contain parts or a subassembly of parts to that machine, and another tab could contain imported data, and all tabs would exist within a single "document" on OnShape. *Id*. A single "document" on OnShape can contain all of the data related to a particular project.  *Id*. An "element" on OnShape can be anything from a part to a complete assembly of all the assembled parts.  *Id*., Ex 8 (64:18-65:6).

## C.  The First OnShape Subpoena Shows Defendants Imported 3DS CAD And Created Intrepid Automation Designs While Working for 3DS

After receiving Defendants' text messages revealing they had created OnShape accounts and began creating CAD designs related to their new venture while still employed by 3DS, 3DS issued a subpoena for OnShape records for the time period June 1, 2016 to September 1, 2017 (about two weeks after Defendants left employment with 3DS).  In response, PTC produced a spreadsheet on April 13, 2023 that logged all of Defendants' activity on their OnShape account for this time period (the "First OnShape Spreadsheet").

---

[2] 3DS requests to show a CAD file on OnShape during the hearing on this Motion.

Quigley Decl. ¶ 16. The First OnShape Spreadsheet shows that *while employed by 3DS*, the individual Defendants imported to non-3DS OnShape accounts more than 30 different CAD files, including files with the names of 3DS's technology, such as the Enso print engine, the Aurora projector, and the Halo electronics board, or reflecting complete "assemblies" of 3D-printer technology (an assembly, abbreviated below with "assy" or "A-," is generally CAD of a fully assembled machine or an assembled component of a machine). Quigley Decl., Ex. 10. Many of the imported files are .zip files, which is a file format typically used to compress multiple files together in a single location, so the name of the .zip file does not disclose the name of every document within the .zip file. *Id*. ¶ 14. Based on the names of the documents, 3DS believes Defendants imported to OnShape at least four completely assembled 3DS printers, including the then-latest version of 3DS's Enso print engine (files named "shuttle_assy_rear.STEP," "SubChassisAssy3.zip," "A-PCA_HALO.SLDASM," and "A-ENSO_3.0") and five additional .zip files related to 3DS's SLABot2 printer, Aurora projector, Halo electronics board, and Enso print engine (files named "SLABOT2F.zip," "SLABOT2f.zip," "Aurora-20170413.zip," "AY_AURORA_PLUS_HALO.zip," and "enso_051617.zip"). Turner Decl. ¶ 5.

The same PTC spreadsheet of OnShape activity shows that, while still employed by 3DS and while they had access to 3DS's confidential files that they had imported to their OnShape account, the Individual Defendants began using the same OnShape CAD platform to design products for Intrepid Automation, the company they would eventually start to compete with 3DS. Quigley Decl., Ex. 9, 11, 13, 14. For instance, on April 15, 2017, Wynne created a document called "Intrepid Scrachpad," and on May 17, 2017, Tanner created a document called "IA-SKELETON." Text messages between Wynne and Tanner confirm they were using OnShape to develop Intrepid's technology and specifically reference the "skeleton" and the "scratch pad." Quigley Decl., Ex. 3, 9, 11, 13, 14.

### D. Documents and Elements Were Deleted By Wynne And Tanner Immediately After The Lawsuit Was Served

On May 15, 2023, 3DS moved to compel production of documents Defendants (i)

imported to OnShape during their employment with 3DS, (ii) created on OnShape during their employment with 3DS, or (iii) otherwise incorporated 3DS's information. Dkt. 197. Defendants opposed the motion. Defendants' counsel represented the documents specifically called out in 3DS's Motion to Compel were deleted shortly after Defendants left 3DS. Quigley Decl., Ex. 32 (8:23-9:17). Tanner and Wynne also swore they did not have the documents and suggested they did not know what they were or if they ever existed. Dkt. 201-1; 201-2. Based on this, the Court denied 3DS's motion to compel, finding the documents did not exist and were deleted shortly after Defendants left 3DS. Dkt. 218.

3DS served a second subpoena to PTC seeking a log of Defendants' activity from September 2, 2017 to May 24, 2023. Quigley Decl., Ex. 1 (13:14-15). PTC produced Defendants' activity log for this time period on July 12, 2023 ("Second OnShape Spreadsheet").  3DS took the 30(b)(6) deposition of PTC on September 7, 2023. *Id.* ¶ 18.

As confirmed by OnShape during the deposition, the Second OnShape Spreadsheet shows, that within 24 hours of being served with this lawsuit, Wynne and Tanner intentionally "trashed" and/or deleted 10 documents and 43 elements from the OnShape CAD platform.  Quigley Decl., Ex. 8 (102:3-22; 122:11-23); Ex. 17. Based on the file names and information 3DS has obtained through its own investigation, 3DS has evidence that at least three of the documents were imported to OnShape while the Individual Defendants were still employed by 3DS and were deleted and/or trashed by Wynne and Tanner within 24 hours of service of the lawsuit:

| email | event_name | event_date | document_name |
|---|---|---|---|
| ben@benwynne.com | Trash Document | 5/26/2021 | AY_AURORA_PLUS_HALO.zip |
| ben@benwynne.com | Delete document | 5/26/2021 | AY_AURORA_PLUS_HALO.zip |
| ben@benwynne.com | Trash Document | 5/26/2021 | shuttle_assy_rear.STEP |
| ben@benwynne.com | Delete document | 5/26/2021 | shuttle_assy_rear.STEP |
| ben@benwynne.com | Trash Document | 5/26/2021 | SubChassisAssy3.zip |
| ben@benwynne.com | Delete document | 5/26/2021 | SubChassisAssy3.zip |

Quigley Decl., Ex. 10, 17.  On its face, the AY_AURORA_PLUS_HALO.zip document, which Wynne imported to OnShape a little less than a month before he left 3DS, appears to be a CAD file of 3DS's "Aurora" projector and "Halo" electronics board. Turner Decl.

¶ 5-6, Ex. 3. 3DS located a document on its system with a similar file name, "AY_AURORA_PLUS_HALO.SLDASM," (but not a .zip file) which is a complete CAD assembly of 3DS's Aurora projector with its Halo electronics board attached, which are critical components of 3DS's Enso 3.0 print engine and which CAD files 3DS considers highly confidential and trade secret information. *Id*.

The other two trashed and deleted documents, that were previously uploaded by Wynne and Tanner during their employment with 3DS ("SubChassisAssy3 and shuttle_assy_rear.STEP), also appear to be CAD assemblies of 3DS printers. *Id*. ¶ 5-6. 3DS believes these contain its confidential information because a CAD file with the same name ("SubChassisAssy3") located on 3DS's system is the full CAD assembly of the "Figure 4 Testbed," an early prototype of 3DS's Figure 4 3D-printer that contains 3DS's confidential and trade secret information that would allow Defendants to manufacture the complete Figure 4 Testbed machine or take parts of the design to incorporate into machines for Intrepid. *Id*., Ex. 4. Similarly, a CAD file named "shuttle_assy_rear.STEP" located on 3DS's system is an assembled platform dispenser for 3DS's SLAbot3 and JanBot systems, which were two of 3DS's most advanced applications of its Figure 4 technology at the time Defendants left their employment with 3DS. *Id*., Ex. 5.

The trashed and deleted documents also include two other documents (named _LWL15R71_6BS1_6TrackRail_2.step and _MLL15Slide_4.step) that were imported to OnShape by Tanner, just days after Tanner's last day with 3DS and then deleted and trashed on May 25 and 26, 2021. Quigley Decl., Ex. 10, 17. The remaining five documents that were deleted or trashed by Wynne and Tanner are documents the Defendants created on OnShape between September 2017 and December 2017. *Id*., Ex. 33. Those documents are named BRANE FRAME MOD, A-PROTO FRAME.step, JIG MEMBRANE 70 um, Print Test Fixture, and "DELETED." *Id*., Ex. 17, 21, 33. 3DS has not been able to locate these exact file names on its system but believes the "FRAME" and "MEMBRANE" files relate to 3DS's proprietary membrane technology for 3DS's printers and later used in Intrepid's printers. Turner Decl. ¶ 7. It took 3DS significant time and expenditure to perfect the

specifications for the membranes, which it considers to be its confidential and trade secret information, (*id*.), but 3DS believes Defendants were able to quickly copy 3DS's membranes using information they had access to during their employment with 3DS and then spoliated these documents to hide their misappropriation once the lawsuit was filed. Defendants purport to have produced yesterday the first three of these files, but it is not possible these are the same files that were deleted from OnShape since those were permanently deleted and, according to non-party PTC, deleted files cannot be recovered. Quigley Decl., Ex. 8 (67:11-17), ¶ 42. Even if the produced documents are a version of the deleted documents from some point in time, they do not contain Onshape metadata.

In addition to the documents discussed above, the 43 elements Tanner deleted pertain to nine different documents, including the "Intrepid Scrachpad," which Defendants created while working for 3DS, "dino test," which 3DS believes is an early prototype of Intrepid's Atom print engine (which copied 3DS's Enso print engine), and other documents which were permanently deleted during this 24-hour period. Quigley Decl., Ex. 18.

### E.   Deleting Documents on OnShape Requires An Intentional Act

The OnShape platform makes it very difficult to inadvertently delete a document. In order to delete a document, the user must first move the document into the trash by selecting the document and then selecting the "trash" action. Quigley Decl. ¶ 11. At that point, a pop-up window asks the user to confirm they want to move the document to the trash, and the user has to click "Send to trash." *Id*. ¶ 11. Once the document is moved to the trash, it will automatically delete within 30 days, or, as Defendants did here, the user can immediately delete the document by going into the trashcan. To do this, the user must select the trashcan, select the trashed document, and click the trashcan symbol again. When the cursor hovers over the trashcan symbol this time, a label says "Delete forever." *Id*.

When the user clicks the trashcan, another pop-up states that the document "will be permanently deleted from your trash; you can't undo this action." To complete the deletion, the user must click "Delete forever." *Id*.

At that point, the document is permanently deleted and cannot be recovered through OnShape. *Id*., Ex. 8 (67:11-17). The process for deleting an element may have fewer steps, depending on the element (*Id*. ¶ 12) but the deletion of 43 elements from nine different documents during a 24-hour period after service could not be inadvertent.

Importantly, the OnShape records show Defendants' deletions were not part of a regular or customary practice of deleting documents and elements from OnShape. Neither Wynne nor Tanner deleted documents on any other day in 2021 except within the 24 hours after this lawsuit was served. *Id*., Ex. 19. Similarly, Tanner, who deleted the 43 elements, did not delete elements on any other day in 2021 except within the 24 hours after the lawsuit was served. *Id*., Ex. 22. Importantly, Tanner testified that he developed the Enso print engine while working for 3DS and he used CAD software to do it (*id*., Ex. 7 (108:18-23, 109:22-110:3, 122:8-18, 124:17-22)), so he knew exactly what he was deleting and its relevance to the lawsuit.

## F.    3DS Cannot Obtain The Deleted Information From Other Sources

As noted above, 3DS was able to locate only three files on its system that appear to match the names of documents deleted by Defendants on the date the lawsuit was served (SubChassisAssy3, AY_AURORA_PLUS_HALO, and shuttle_assy_rear.STEP), and each file includes (or is a component of) 3DS's confidential and trade secret information. Turner Decl. ¶ 6. Based on this, the SubChassisAssy3 deleted from OnShape appears to be a full CAD assembly of an early Figure 4 printer prototype, the AY_AURORA_PLUS_HALO appears to be 3DS's Aurora projector combined with

3DS's Halo electronics board, and the shuttle_assy_rear.STEP appears to be an assembled component of 3DS's SLABot3 and JanBot printers. *Id.* However, 3DS has no way to confirm with certainty that these were the files uploaded by Defendants, or whether the .zip files included other documents.

Nor can 3DS obtain the deleted documents from OnShape, because once a document is deleted from OnShape it is permanently deleted forever. Quigley Decl., Ex. 8 (67:11-17). Thus, because of their spoliation, 3DS has no way to confirm specifically which documents/elements Wynne and Tanner deleted on the day the lawsuit was served, but they likely were 3DS documents or documents that incorporated 3DS information.

## G. Defendants Have Obstructed Discovery Into Their Misappropriation

Starting with their departure from 3DS when they professionally wiped their hard drives, Defendants have gone to great lengths to hide their misappropriation of 3DS trade secrets. 3DS propounded Interrogatory Nos. 20 and 21, asking Defendants to identify (1) documents in their possession when they left 3DS that concerned 3DS's identified trade secrets or 3DS's business and (2) provide the bates number for each document or, if not produced, the reason they had not been produced, including whether they had been destroyed. *Id.*, Ex. 4, 5, 28. None of the Defendants identified the documents Wynne and Tanner intentionally deleted within 24 hours of this lawsuit being served. *Id.*, ¶ 6, Ex. 5.

Defendants also have taken inconsistent positions about the OnShape documents. For instance, 3DS sought production of documents on OnShape containing 3DS's identified trade secrets or created while Defendants worked for 3DS, including the Intrepid Scrachpad, which Defendants created during their employment with 3DS. When 3DS filed a motion to compel, the Court focused on particular documents (including the Intrepid Scrachpad), and Defendants' counsel represented those documents were deleted shortly after Defendants left 3DS. *Id.*, Ex. 32 (8:23-9:17). Wynne and Tanner also swore the Intrepid Scrachpad no longer existed. Dkt. 201-1; 201-2. However, after a witness from PTC testified the Intrepid Scrachpad still existed on OnShape, Defendants produced a purported screenshot of the Intrepid Scrachpad, which they claim shows an empty file.

Quigley Decl., Ex. 23.  Shifting stories again when 3DS pressed, Defendants subsequently claimed they were able to "restore" part of the Intrepid Scrachpad and produced a file this week (without history or metadata), although it still appears significant portions of the document have been deleted. *Id.*, Ex. 24.  Defendants have refused to produce the Intrepid Scrachpad in a format that would allow 3DS to verify the history, contents and metadata of the document. *Id.* Defendants also have refused to produce other OnShape documents ordered by the Court in a native format that would allow 3DS to see the history, versions and metadata, including other key documents on Onshape they claim are empty. *Id.* ¶ 33. 3DS believes this is an attempt to further hide Defendants' spoliation.

After 3DS met and conferred with Defendants' counsel about this Motion, Defendants sent Plaintiff an email claiming "good news," and suddenly claimed they were able to locate and produce five files that the OnShape records indicate were deleted, and three files from which elements were deleted. *Id.* ¶ 30. Notably, 3DS has no evidence these files are the same ones that were deleted from OnShape.  Also, 3DS cannot independently verify the documents because they were originally created on OnShape and 3DS does not have copies on its system. Notably, Defendants did not produce the Shuttle_assy_rear, AY_AURORA_PLUS_HALO, or SubChassyAssy3 documents that would conclusively show Defendants took and imported 3DS documents onto OnShape. The selective locating of documents raises significant concerns and underscores the prejudice discussed below.

## III.   DEFENDANTS' CONDUCT WARRANTS TERMINATING SANCTIONS

The Court may remedy spoliation of evidence with terminating sanctions under (1) FRCP Rule 37(e), which permits sanctions for spoliation of electronic evidence; and (2) the Court's inherent authority to sanction abusive litigation practices.[3] *Leon v. IDX Sys.*

---

[3] Courts are split as to whether Rule 37(e) provides the exclusive remedy for spoliation of ESI, or whether courts may also impose such sanctions pursuant to their inherent authority. *See Aramark Mgmt., LLC v. Borgquist*, 2021 WL 864067, at *4 (C.D. Cal. Jan. 27, 2021) (noting split and collecting cases); *Youngevity Int'l Corp. v. Smith*, 2017 WL 11700187, at *2 (S.D. Cal. Dec. 4, 2017). *MGA Ent., Inc. v. Harris*, No. 220CV11548JVSAGR, 2023 WL 2628225, at *3 (C.D. Cal. Jan. 5, 2023).

1   *Corp.*, 464 F.3d 951, 958 (9th Cir.2006);*WeRide Corp. v. Kun Huang*, 2020 WL 1967209,

2   at *9(N.D.Cal. Apr. 24, 2020). A party moving for sanctions need only demonstrate by a

3   preponderance of evidence that spoliation has occurred. *WeRide*, 2020 WL 1967209, at *9.

4       Defendants have undermined the truth-seeking process by destroying obviously

5   relevant documents on the date this lawsuit was served. *Valley Engr's Inc. v. Electric Eng'g*

6   *Co.*, 158 F.3d 1051, 1058 (9th Cir. 1998) Dismissal is the appropriate sanction for

7   Defendants' wrongful conduct under both Rule 37(e) and the Court's inherent power.

8       **A.    Terminating Sanctions Are Appropriate Pursuant To Rule 37(e)(2)**

9       "Rule 37(e) sets forth three criteria to determine whether spoliation of ESI has

10  occurred: (1) the ESI should have been preserved in the anticipation or conduct of

11  litigation; (2) the ESI is lost because a party failed to take reasonable steps to preserve it;

12  and (3) the ESI cannot be restored or replaced through additional discovery." *Porter v.*

13  *San Francisco*, 2018 WL 4215602, at *3 (N.D. Cal. Sept. 5, 2018). For dispositive

14  sanctions, there must also be a "finding that the [spoliating] party acted with the intent to

15  deprive another party of the information's use in the litigation[.]" Fed. R. Civ. P. 37(e)(2).

16  However, there is no requirement that the court find prejudice to the non-spoliating party

17  under Rule 37(e)(2). "This is because the finding of intent required by the subdivision can

18  support not only an inference that the lost information was unfavorable to the party that

19  intentionally destroyed it, but also an inference that the opposing party was prejudiced by

20  the loss of information that would have favored its position."  2015 Advisory Comm.

21  Notes.  3DS easily meets all of these criteria.

22      First, Defendants had notice of pending litigation, and its detailed allegations no later

23  than May 25, 2021, because that is the day Defendants Intrepid, Wynne, Chousal, and

24  Etcheson were served with the lawsuit.  Quigley Decl., Ex. 1. Defendants clearly knew this

25  information was relevant to the claims against them, because 3DS's original Complaint

26  specifically alleged that Defendants had misappropriated and used 3DS's CAD files (Dkt.

27  1, Ex. A ¶¶ 42, 44, 48), and this is precisely what was deleted. 3DS specifically alleges in

28  its original Complaint served on May 25, 2021, that five patents filed by Intrepid "contain

trade secret and confidential drawing details of Enso [the Figure 4 print engine], which the Architects could only have learned about while working at 3D Systems." (*Id*. ¶ 42.)  The Complaint states, "Intrepid also stole and incorporated Enso CAD drawings" (*id*. ¶ 44) and that the Intrepid patents included "trade secret and proprietary elements directly from 3D Systems Enso 'Figure 4' print engine design, including elements from the Enso CAD drawings" (*id*. ¶ 48). However, as discussed above, Defendants intentionally deleted a document called AY_AURORA_PLUS_HALO.zip, which very likely included a CAD file of 3DS's "Aurora" projector and "Halo" electronics board (components of 3DS's Enso), SubChassisAssy3 which is believed to be the full CAD assembly of the "Figure 4 Testbed," and shuttle_assy_rear.STEP which appears to be an assembled platform dispenser related to 3DS's Figure 4 technology.  It is inconceivable that Defendants could have read the Complaint and not known these files were relevant to the claims asserted against them and should not be deleted. *See also* § III.B.1 below.

Wynne and Tanner deliberately destroyed 10 documents and 43 elements from OnShape within 24 hours of when Wynne, Chousal, Etcheson, and Intrepid were served with the lawsuit.  Quigley Decl., Ex. 17, 18, ¶ 11; *See* § II.E.  "[C]ourts have found that a party's conduct satisfies Rule 37(e)(2)'s intent requirement when the evidence shows or it is reasonable to infer, that a party purposefully destroyed evidence to avoid its litigation obligations." *Porter*, 2018 WL 4215602 at *3.  Here, Wynne and Tanner took affirmative steps to intentionally delete 10 documents and 43 elements on the day the lawsuit was served.  The deletions clearly were not accidental, because a user must take four actions and receives two warnings before the user can delete a document on OnShape, and the 43 deleted elements were on nine different documents. Quigley Decl. ¶ 11.  Nor were the deletions routine, because neither Wynne nor Tanner deleted documents on any other date in 2021, and Tanner (who deleted all of the elements) did not delete elements on any other date in 2021.  *Id*. ¶ 19, 22.  Defendants clearly intended to destroy evidence.

Third, the deleted documents cannot be recovered.  PTC, Inc.'s 30(b)(6) witness confirmed that documents deleted from OnShape cannot be recovered. *Id*., Ex. 8 (67:11-

17). Even though 3DS has been able to locate three of its own files with the same names as documents Wynne and Tanner imported to OnShape, it is not possible for 3DS to confirm if these are exactly what was imported to OnShape or how that information was used on OnShape before it was deleted, including whether it was edited or incorporated into other documents that also have been deleted. This is true for each of the documents that Defendants deleted from OnShape. At the time Intrepid Automation, Wynne, and other individual Defendants were served with this lawsuit, OnShape included a complete record of every action that Defendants had taken on all of the documents at issue in this Motion, but Wynne and Tanner permanently deleted this information and it is gone forever.

Finally, although Rule 37(e)(2) affords the Court flexibility in designating the appropriate sanction, dispositive sanctions are appropriate here. Lesser sanctions are inappropriate in the face of intentional spoliation of key evidence, because it is "futile" to exclude spoliated evidence, and an adverse inference is not sufficient if the plaintiff is helpless to rebut evidence that may overcome the inference. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 960 (9th Cir. 2006).

Defendants may try to claim there is no harm because they produced five of the deleted documents at issue. This is not true. In fact, their production underscores the problem highlighted by the Court in *Leon*. First, Defendants produced what they claim are five of the 10 documents implicated by their spoliation, but there is no way 3DS can discern whether these documents are the ones Defendants actually deleted two years ago. There is no way to know whether the documents being produced are complete or if they are missing the key elements deleted the day the lawsuit was filed. Also, any incinuation that Defendants recovered the documents (without any sworn statements), is in direct conflict with OnShape's testimony because OnShape (a third party with no interest in this case) conclusively testified that once documents are deleted from OnShape, they cannot be restored. *Id.*, Ex. 8 (67:11-17).

The sudden alleged resurrection of some of these documents and Defendants attempted explanations are exactly what the Court in *Leon* found justified terminating

sanctions. 464 F.3d at 960. Because Defendants deleted the documents, they can now say whatever they want about these documents and the evidence to refute their assertions has been destroyed.  It is simply not credible that the 43 elements and 10 documents Defendants deleted within 24 hours of this lawsuit being served were not incriminating. The prejudice to 3DS simply cannot be remedied except through terminating sanctions.

### B. Terminating Sanctions Are Proper Under The Court's Inherent Power

Courts consider six factors before imposing terminating sanctions pursuant to their inherent power: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions"; and (6) "a finding of 'willfulness, fault, or bad faith'" *See Leon*, 464 F.3d at 958.  Because the first two factors almost always weigh in favor of granting default judgment and the fourth factor typically weighs against default judgment, the key factors in determining whether a default judgment should be entered are "willfulness, fault or bad faith", the risk of prejudice and the availability of less drastic sanctions. *The Sunrider Corp v. Bountiful Biotech Corp.*, 2010 WL 4589156, at *6 (CD Cal. Nov. 3, 2010) (citing *Valley Eng'rs Inc.*, 158 F.3d at 1057).

### 1. Defendants Intentionally/Willfully Spoliated Relevant Evidence

A finding of willfulness, fault, or bad faith is required to dismiss an action based on spoliation under the court's inherent authority. *Leon*, 464 F.3d at 959.  In the Ninth Circuit, "[a] party's destruction of evidence qualifies as willful spoliation if the party has some notice that the documents were potentially relevant to the litigation before they were destroyed." *Leon*, 464 F.3d at 959.  Similarly, destroying evidence specifically identified as relevant prior to its destruction "whether characterized as willful or negligent . . . constitutes the kind of 'fault' sufficient to warrant sanctions, including dismissal, under the Court's inherent powers." *Padgett v. Monte Sereno*, 2007 WL 878575, at *3 (N.D. Cal. Mar. 20, 2007).  Bad faith exists when the spoliating party acted with intent to deprive the other side of evidence. *In re Hitachi Tel. Optical Block Cases*, 2011 WL 3563781, at *13

(S.D. Cal. Aug. 12, 2011). Although 3DS need only show willfulness, fault, *or* bad faith, the facts here support all three.

There is no question that, as of May 25, 2021, Defendants clearly knew 3DS had accused them of taking its DLP multi-projector system, its SLABot system, and its Enso Figure 4 print engine, including 3DS's CAD data. Dkt. 1, Ex. A ¶¶ 42, 44, 48. The OnShape data demonstrates Wynne and Tanner imported 3DS's CAD files onto OnShape during their employment with 3DS, including CAD files of 3DS's Enso print engine and components of the print engine, such as the Aurora projector and Halo electronics board. Quigley Decl., Ex. 10. Defendants also imported CAD files likely containing complete assemblies of 3DS's printers, and then, while still employed by 3DS, began creating CAD designs for their future company, Intrepid Automation, in documents named IA-SKELETON and Intrepid Scrachpad. *Id*. OnShape data also shows within 24 hours of being served with this lawsuit accusing Defendants of misappropriating 3DS's trade secrets—and specifically 3DS's CAD files—Defendants Wynne and Tanner deleted or trashed 10 documents—including three of the 3DS files they had uploaded during their employment with 3DS—and deleted 43 elements, including from the Intrepid Scrachpad, which the Individual Defendants used to design products for Intrepid Automation while still employed by 3DS, and "dino test," which 3DS believes is an early prototype of the first Intrepid printer that heavily copies 3DS's Enso print engine. *Id.* Ex. 17, 18; Turner ¶ 8.

These deleted documents and elements clearly were relevant to 3DS's claims in this lawsuit because they could have included CAD files with complete assemblies and components of 3DS's confidential and trade secret designs of its 3D-printers and CAD files were specifically identified in 3DS's lawsuit as information Defendants wrongfully misappropriated. *See* Dkt. 1, Ex. A ¶¶ 42, 44, 48. The only conclusion is that Wynne and Tanner destroyed documents and elements, while knowing they were directly relevant to the lawsuit against them, to deprive 3DS of direct evidence of their theft and use of 3DS's confidential and trade secret information.

The destruction of these documents and elements could only have been deliberate

and willful.  Wynne and Tanner went through the process to delete documents eight times with eight different documents within approximately 24 hours of when this lawsuit was served. *Id*. ¶ 17.  Wynne and Tanner also moved two documents to the trash, where they were automatically deleted 30 days later. *Id*.  Neither Wynne nor Tanner deleted documents on any other day in 2021 except within the 24 hours after the lawsuit was served.  *Id*., Ex. 19, 22.   The effort taken and the timing of these deletions supports the conclusion that the destruction was willful and deliberate.

Notably, when 3DS moved to compel production of many of these documents that were deleted, Wynne and Tanner submitted declarations implying the documents never existed on OnShape and they did not know where they came from. Tanner testified he had "determined that the following documents/files no longer exist (or were never there in the [sic] place): "aurora_chassis," "AY_AURORA_PLUS_HALO.zip," "SubChassisAssy3.zip," "IA-SKELETON," and "Intrepid Scrachpad." Dkt. 201-1 ¶ 2. Tanner also stated he did not have copies of these documents and did "not recall what these documents/files from 2017 (six year ago) were, or where they may have come from."[4]  Dkt. 201-1 ¶ 2. Similarly, Wynne testified he had reviewed his OnShape account and "determined that the following documents no longer exist: 'aurora_chassis,' 'AY_AURORA_PLUS_HALO.zip,' 'SubChassisAssy3.zip,' 'IA-SKELETON,' and 'Intrepid Scrachpad.'" Dkt. 201-2 ¶ 2.  Defendants' counsel also represented to the Court that the documents sought were deleted before Defendants left their employment with 3DS or shortly thereafter.  Quigley Decl., Ex. 32 (8:23-9:17).

These representations by Wynne and Tanner, which were at best misleading, show an intent to hide their deliberate acts of spoliation. They carefully worded their declarations to mislead the Court into believing the documents were not relevant to this case (*e.g.*, they

---

[4] Tanner testified the Intrepid Scrachpad no longer existed, but the OnShape records show Tanner interacted with the Intrepid Scrachpad more than 100 times in 2023, including on the same day he signed his declaration claiming the Intrepid Scrachpad did not exist.  After 3DS filed its motion for reconsideration, Defendants produced the Intrepid Scrachpad they previously swore under oath did not exist.  Quigley Decl. ¶ 24-26, 33, Ex. 14-16, 23-24.

did not know what they were or where they came from) and by saying they did not exist or possibly never existed.  What Defendants carefully avoided saying is that the documents did in fact exist up to 24 hours after the lawsuit was served, at which time they were intentionally deleted.  Under these circumstances, this omission by Tanner and Wynne is further evidence of attempts to cover-up destruction of evidence. The misdirection was compounded by statements (which the Court relied on) that the documents were deleted soon after Defendants left 3DS. *Id*.; Dkt 218. Defendants have had many opportunities to correct this record, even after receiving the OnShape spreadsheets that were subpoenaed and discussed above but have not done so. Their conduct shows willfulness, fault, and bad faith, and warrants terminating sanctions.

### 2. Defendants' Conduct Easily Meets The First Two *Leon* Factors

The first and second *Leon* factors (expeditious resolution of litigation and management of the court's docket) favor terminating sanctions, because they immediately dispose of the case and clear it from the court's docket.  *The Sunrider Corp.*, 2010 WL 4589156, at *7.  Courts have also found these factors weigh in favor of dismissal where the spoliating party's conduct has delayed resolution of the case and required significant expenditure of resources by the Court and the parties.  *E.g.*, *Frank Bruckhorst, LLC v. Ihm*, 2013 WL 12094880 (S.D. Cal. Sept. 30, 2013) (first two factors weigh in favor of dismissal where defendant increased cost of discovery by misleading court and providing incomplete discovery responses); *Columbia Pic. v Bunnell*, 2007 WL 4877701, at *6 (C.D.Cal Dec. 13, 2007) (discovery conduct unnecessarily drew out discovery); *The Sunrider Corp.*, 2010 WL 4589156, at *6 ("multitude" of motions frustrated Court's and parties' ability to resolve litigation); *see also Hester v. Vision Airlines, Inc.*, 687 F.3d 1162, 1169-70 (9th Cir. 2012) ("intentional, bad faith conduct" led to multiple hearing and motions unrelated to the merits of the case, but were "necessary due to Vision's misconduct").

Here, 3DS issued two subpoenas, extensively met and conferred with Defendants about the existence of OnShape documents (Quigley Decl., ¶ 15, 17, 35-41), requested and attended multiple informal discovery conferences regarding OnShape documents (*Id*., Ex.

32), moved to compel production of OnShape documents (Dkt. 197), was sanctioned for seeking to compel documents that Defendants represented did not exist (and supposedly were deleted before the lawsuit was filed but clearly were not) (Dkt. 238), propounded discovery related to deleted documents (Quigley Decl., Ex. 2, 5), took the third-party deposition of PTC, Inc. (which owns the OnShape platform) *id.* ¶ 18, moved for reconsideration of prior orders (Dkt. 325), and then had to file the instant motion once it discovered the documents it sought all along had been spoliated by Defendants.  This has caused an unnecessary drain on 3DS's and the Court's resources that would have been avoided had Defendants not attempted to hide their spoliation.  Thus, the first two factors weigh in favor of dismissal.

### 3.   3DS Is Severely Prejudiced, Meeting The Third *Leon* Factor

The third *Leon* factor (risk of prejudice to the party seeking sanctions) is the "most critical factor to be considered in case-dispositive sanctions." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007).  Dispositive sanctions may be awarded on a strong enough showing of prejudice alone regardless of the other factors. *Valley Engineers*, 158 F.3d at 1058.  "The prejudice inquiry looks to whether the spoiling party's actions impaired the non-spoiling party's ability to go to trial or threatened to interfere with the rightful decision of the case." *Leon*, 464 F.3d at 959.

*Leon* is instructive.  In *Leon*, a former employee sued his ex-employer for a series of Labor Code violations, alleging retaliation and ADA violations. 464 F.3d at 955. The former employee then wiped files from his laptop computer.  *Id.* at 956.  The defendant pointed out that several of the files appeared to constitute violations of company policies (*e.g.*, they contained pornography), and thus could have demonstrated that the former employee was properly discharged.  *Id.* at 956-67.  The former employee objected, stating he would testify that the files were irrelevant to the litigation. *Id.* at 959. The Court granted terminating sanctions, concluding the employer was "severely prejudiced" because it had no way of knowing what information had been deleted and no reliable way of recreating the deleted files.  *Id.* at 956.

Here, the third factor weighs overwhelmingly in 3DS's favor. The prejudice to 3DS cannot be overstated: Defendants intentionally spoliated the most critical "smoking gun" evidence of their theft and use of 3DS's confidential and trade secret information. As detailed, Defendants secretly imported more than 30 CAD files to their non-3DS OnShape accounts while still employed by 3DS, including what appear to be complete CAD sets of 3DS's Enso print engine, as well as complete assemblies of 3D-printers.  Quigley Decl., Ex. 10. While accessing these 3DS CAD files on their OnShape accounts, Defendants began simultaneously developing CAD designs of products for their new, competing venture Intrepid Automation, using those same OnShape accounts.  For example, the First OnShape Spreadsheet shows Wynne regularly edited the "Intrepid Scrachpad" document while also accessing the SubChassisAssy3 CAD file, which is the complete assembly of 3DS's Figure 4 Test Bed printer. *Id*., Ex. 13. These imported documents and the documents the Defendants created while accessing them were most likely direct evidence of the Defendants' misappropriation and use of 3DS's trade secrets and confidential information. This conclusion is bolstered by their deletion as soon as the lawsuit was served. This direct evidence no longer exists, however, because Wynne and Tanner intentionally destroyed the 10 documents and 43 elements on the date the lawsuit was served.

While 3DS has been able to identify what it believes to be three of the deleted documents on its own system based solely on the file names, there is no way 3DS can show conclusively that these are the exact files that were deleted. Further, 3DS has only been able to find three documents out of the 10 documents and 43 elements that were deleted. While some of these other deleted document names indicate they likely contain 3DS information and other naming conventions suggest the files' contents (e.g., an "assembly" or "assy" indicates that the file includes a CAD assembly in which multiple parts are combined to form a complete machine or subassembly), 3DS (and the Court and jury) cannot know for sure because of Defendants' spoliation. So, while the three documents 3DS located, and the naming conventions of others, create the *inference* that the 10 documents and 43 elements Defendants deleted within 24 hours of the lawsuit being served

contained 3DS's confidential information, 3DS has been deprived of the *direct* evidence of misappropriation that would conclusively prove its case because of Defendants' spoliation. *See Anheuser-Busch, Inc. v. Natural Beverage Dist.*, 69 F. 3d 337, 354 (9th Cir. 1995) (terminating sanctions appropriate where party's conduct forced plaintiff to rely on incomplete and spotty evidence at trial). As in *Leon*, if Defendants claim the deleted documents and elements are irrelevant (which they do), 3DS has no way to confirm the contents of those deleted documents/elements because 3DS does not have the deleted documents or elements and has no reliable way of recreating them. 464 F.3d at 956 (affirming terminating sanctions where employer was "severely prejudiced" because it had no way of knowing what information had been deleted and no reliable way of recreating the deleted files). This extreme prejudice warrants terminating sanctions.

### 4.  The Fourth *Leon* Factor Favors Dismissal

The fourth *Leon* factor, public policy favoring disposition of cases on their merits, also supports terminating sanctions because Defendants' intentional spoliation prevents this Court from deciding this case on its merits. *WeRide Corp.*, 2020 WL 1967209, at \*11. *WeRide* was a trade secret case in which WeRide, an autonomous driving company, accused its former employees of misappropriating its source code and using that source code at their competing company, AllRide. *Id*. at \*1. WeRide argued, in part, that there was no conceivable way AllRide could have developed its own competing autonomous driving technology so quickly after leaving WeRide unless AllRide had used WeRide's source code. *Id*. at \*6. WeRide contended the source code produced by AllRide was a sham, while AllRide maintained the source code was authentic. WeRide lacked critical evidence to test its misappropriation theory because AllRide had deleted critical emails during litigation, including complete email accounts of the principle employees at AllRide. *Id*. at \*3-7. While the Court noted the fourth *Leon* factor usually favored disposition on the merits, AllRide's spoliation of evidence so prejudiced WeRide that the case could not be resolved on its merits, and this factor favored WeRide. *Id*. at \*11; *see also CrossFit, Inc. v. Nat. Strength & Conditioning Assoc.*, 2017 WL 2298473, at \*5 (SD Cal. May 26, 2017).

The same is true here. Wynne and Tanner intentionally purged documents and elements from OnShape within 24 hours of the service of this lawsuit to deprive 3DS of direct evidence of the Defendants' misappropriation of 3DS's trade secrets and use of 3DS's confidential information. Defendants' spoliation has so thoroughly prejudiced 3DS that this case cannot be decided fairly on its merits. This factor weighs in favor of 3DS.

### 5.   The Last *Leon* Factor Also Favors Dismissal

The last *Leon* factor is "the availability of lesser sanctions"; however, "it is not always necessary for the court to impose less serious sanctions first, or to give any explicit warning" prior to issuing a dismissal sanction. *See Valley Engineers*, 158 F.3d at 1057. In fact, the Ninth Circuit has recognized that a district court need not impose lesser sanctions in cases of severe spoliation where "less drastic sanctions are not useful because a ruling excluding evidence would be futile [since the evidence has already been destroyed], and fashioning a jury instruction that creates a presumption in favor of [plaintiff] would leave [plaintiff] equally helpless to rebut any material that [defendant] might use to overcome the presumption." *Leon*, 464 F.3d at 960; *see also Columbia Pic.*, 2007 WL 4877701 at *8 (same); *Pringle v. Adams*, 2012 WL 1103939, at *10 (C.D. Cal. Mar. 30, 2012) (same). "What is most critical for case-dispositive sanctions, regarding risk of prejudice and of less drastic sanctions, is whether the discovery violations 'threaten to interfere with the rightful decision of the case." *Connecticut Gen Life*, 482 F.3d at 1097.

Again, *Leon* is instructive. Because the employee in *Leon* had deleted emails that the employer might have been able to rely on as direct evidence that the employee had violated company policy, a mere "inference" or "presumption" in the employer's favor was an insufficient sanction. 464 F.3d at 959-60. The Court explained, "a ruling excluding evidence would be 'futile,' and fashioning a jury instruction that creates a presumption in favor of [the employer] 'would leave Defendants equally helpless to rebut any material that [the employee] might use to overcome the presumption." *Id*. at 960.

The risks presented to 3DS in this litigation are no less stark. It is evident the spoliated evidence was directly relevant to 3DS's claims. As has been demonstrated,

Defendants will simply claim they did not take 3DS information and the deleted files did not contain 3DS information. As in *Leon*, a presumption in 3DS's favor will not suffice because Defendants destroyed the very evidence 3DS would use to rebut any contention by Defendants that the deleted CAD files were immaterial or irrelevant. Only terminating sanctions can eliminate the threat to the rightful resolution of this case.

## IV. IN THE ALTERNATIVE, EVIDENTIARY AND PRECLUSIVE SANCTIONS ARE APPROPRIATE

The purpose of spoliation sanctions is to "avoid substantial unfairness to the [non-spoliating] party[.]" *Inland Concrete Enter., Inc. v. Kraft Am. LP*, 2011 WL 13209166, at *6 (C.D. Cal. Mar. 9, 2011). Although terminating sanctions are necessary and appropriate here, if the Court finds otherwise 3DS asks the Court to enter evidentiary and issue preclusion sanctions (to take certain facts as conclusively established) since the Defendants have spoliated evidence that likely supported one or more of 3DS's claims. *See id.* at *8 (precluding defendant from introducing contrary evidence); *CrossFit, Inc.*, 2017 WL 2298473 at *6 (entering issue preclusion sanctions taking several facts as conclusively established). Here, merely permissive jury instructions would be "far too mild and vague to sufficiently cure the prejudice to" 3DS caused by Defendants' intentional destruction of evidence. *WeRide Corp.*, 2020 WL 1967209, at *11 (holding permissive jury instruction "far too mild"). Accordingly, if the Court does not grant terminating sanctions, then evidentiary and preclusive sanctions are appropriate. Specifically, 3DS alternatively seeks mandatory jury instructions as to the following: (1) Defendants Wynne and Tanner intentionally deleted documents directly related to this lawsuit on the date Intrepid, Wynne, Chousal and Etcheson were served with this lawsuit in an effort to conceal their misappropriation of 3DS's trade secrets; (2) the deleted documents establish that Defendants Wynne and Tanner took 3DS's trade secret documents and confidential information after they left their employment at 3DS; (3) Defendants Wynne and Tanner then shared those documents containing 3DS trade secrets and confidential information with Defendants Intrepid, Chousal, Mueller and Etcheson, and all Defendants used those

documents to develop the products and technology for Intrepid that are at issue in this Lawsuit; and (4) Defendants did not independently develop any products or technology for Intrepid that are at issue in this Lawsuit, but instead all such Intrepid products and technology were developed using 3DS's trade secrets and confidential information. In addition, 3DS seeks an order that Defendants shall be precluded from introducing any testimony, documents or other evidence or making any argument contrary to any of the above findings in any motion, at any hearing, or at trial.

## V.   3DS SHOULD BE AWARDED ITS ATTORNEYS' FEES AND COSTS

Whether the Court grants terminating or issue preclusive sanctions, attorneys' fees and costs are a necessary additional sanction (though, for the reasons stated above, a fee sanction is not sufficient on its own). 3DS is entitled to its fees and costs for: (i) this motion, (ii) the investigation into this motion, and (iii) 3DS's previous efforts to obtain the CAD files from OnShape that Defendants spoliated. *See, e.g.*, *Leon*, 464 at 961; *Dong Ah Tire & Rubber Co. v. Glasforms, Inc.*, 2009 WL 1949124, at *11 (N.D. Cal. July 2, 2009) (awarding fees in addition to issue sanctions). 3DS has expended significant time on discovery disputes, only to find Defendants deleted crucial evidence and then attempted to hide their misconduct. 3DS should not bear the expense of chasing down evidence Defendants knew they had intentionally spoliated or the expense of uncovering Defendants' spoliation. 3DS requests $81,500 as a monetary sanction. Vicente Decl. ¶ 8.

## VI.   CONCLUSION

3DS respectfully requests that the Court grant 3DS's request for terminating or issue preclusive sanctions and monetary sanctions in the amount of $81,500.

DATED:  October 7, 2023          **HUNTON ANDREWS KURTH LLP**

By: */s/ D. Andrew Quigley*
     Emily Burkhardt Vicente
     Roland M. Juarez
     D. Andrew Quigley
Attorneys for Plaintiff 3D SYSTEMS, INC.