HUNTON ANDREWS KURTH LLP
EMILY BURKHARDT VICENTE (SBN 263990)
ebvicente@HuntonAK.com
ROLAND M. JUAREZ (SBN 160793)
rjuarez@HuntonAK.com
D. ANDREW QUIGLEY (SBN 280986)
aquigley@HuntonAK.com
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627
Telephone: 213 • 532 • 2000
Facsimile: 213 • 532 • 2020

Attorneys for Plaintiff/Counter-Defendant,
3D SYSTEMS INC. and Third Party Defendant
EVAN KUESTER

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 3D SYSTEMS, INC., a California Corporation;<br><br>Plaintiff,<br>v.<br><br>BEN WYNNE, an individual; CHRIS TANNER, an individual; JAMIE ETCHESON, an individual; ROBERT MUELLER, an individual; IVAN CHOUSAL, an individual; INTREPID AUTOMATION, a California Corporation; and DOES 1 through 20, inclusive,<br><br>Defendants,<br><br>INTREPID AUTOMATION,<br><br>Counter-Claimant,<br>v.<br><br>3D SYSTEMS, and DOES 1-50, inclusive, | Case No.: 3:21-cv-01141-AGS-DDL<br><br>**DECLARATION OF EMILY BURKHARDT VICENTE IN SUPPORT OF PLAINTIFF 3D SYSTEMS, INC.'S PETITION FOR ATTORNEY'S FEES AND COSTS AGAINST DEFENDANTS CHRIS TANNER AND BEN WYNNE** |

| | |
|---|---|
| 1 | Counter-Defendants, |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | INTREPID AUTOMATION, |
| 7 | Third Party Claimant, |
| 8 | v. |
| 9 | EVAN KEUSTER, and ROES 1-50, inclusive, |
| 10 | |
| 11 | Third Party Defendants. |

# DECLARATION OF EMILY BURKHARDT VICENTE

I, Emily Burkhardt Vicente, declare:

1. I am an attorney at law, licensed to practice in the State of California. I am an attorney with the law firm of Hunton Andrews Kurth LLP ("Hunton"), counsel of record for Plaintiff 3D Systems Inc. ("3DS") in the above-captioned matter. As to the matters alleged herein, I have personal knowledge of such facts except as to those matters stated upon information and belief and, as to such matters, I have a reasonable belief that they are true.

2. As counsel of record for 3DS in this matter, I am one of the persons responsible for maintaining the official case files for the instant action. In that role, I have access to and can readily access the case files, including all pleadings and correspondence. I also carefully review Hunton's bills before they are submitted to 3DS each month in connection with this litigation, and I have carefully reviewed those bills again in preparation of this Declaration and the accompanying Petition for Attorney's Fees. In addition, I have practiced with the attorneys at Hunton working on this case and am familiar with their background and credentials.

## Attorney & Paralegal Rates and Biographies

3. The current hourly rates of the attorneys from Hunton who billed time related to 3DS's Motion for Sanctions are as follows:

| Timekeeper | Position | Law School Graduation Year | Hourly Rate For This Matter |
|---|---|---|---|
| Roland M. Juarez | Partner | 1992 | $830 |
| Emily Burkhardt Vicente | Partner | 1999 | $830 |
| D. Andrew Quigley | Counsel | 2011 | $685 |
| Richard Cortez. Jr. | Associate | 1998 | $505 |
| Michael A. Pearlson | Associate | 2019 | $475 |
| Jesse D. Borja | Associate | 2020 | $475 |
| Brian Moon | Paralegal | N/A | $315 |

4. The rates charged by Hunton in the representation of 3DS are discounted off each lawyer's standard rates, are commensurate with each attorney's seniority and experience and well within the range of the rates charged by similarly qualified and experienced attorneys in other large firms in Southern California, including San Diego. In my experience and as evidenced herein, as an AmLaw 100 firm, Hunton's rates are competitive with the market rates charged by comparable firms. In my experience having worked at an AmLaw 100 firm for nearly 24 years and being familiar with industry statistics on lawyer billing rates, rates at law firms have risen since the time many of the cases cited in 3DS's Fee Petition were decided, so while the total hours awarded as reasonable by these courts are instructive, in some instances the total fee amounts awarded are calculated at lower rates than those that would be found reasonable today. Because the work related to the Motion stretched over seven months, the rates for some of the attorneys changed during that period. Accordingly, the fees requested are calculated at the actual rate and amount 3DS incurred for the work performed based on contemporaneous records for each timekeeper as detailed below and in the attachments.

5. A true and correct copy of the Laffey Matrix, which is available on the Laffey Matrix website (http://www.laffeymatrix.com/see.html), is attached hereto as **Exhibit 1**. The rates of each of Hunton's lawyers and paralegals is well within the range of reasonable rates set forth in the Laffey Matrix and those found reasonable in other cases.

6. Roland M. Juarez is a partner at Hunton Andrews Kurth LLP, an American Lawyer 100 firm. He graduated from Columbia Law School in 1992 and has been practicing for 32 years. His experience includes class action and collective actions, PAGA, non-compete, non-solicitation and employee raiding cases, trade secret cases, discrimination, harassment, disability, and wage and hour cases. Mr. Juarez was recently recognized by the Los Angeles Business Journal (LABJ) as a Leader of Influence: Labor & Employment Attorney. He has been recognized on numerous lists for litigation and labor and employment by the Daily Journal, LA Business Journal and The Los Angeles Times, as well as being ranked by legal directories including Benchmark Litigation and Legal 500.

Mr. Juarez is intimately familiar with the relevant facts and legal issues in this case, having served as co-lead counsel since the inception of this matter and arguing 3DS's Motion for Sanctions at the January 11, 2024 hearing before this Court. His work related to the Motion included legal analysis of the spoliation issues, revising the Motion and Reply, reviewing and analyzing the opposing papers, arguing the motion at the January 11, 2024 Motion hearing, substantively participating in the March 27, 2024 evidentiary hearing, and revising the post-hearing briefing.

7. I am a partner and co-head of the national labor and employment practice at Hunton. I graduated from the University of North Carolina Chapel Hill School of Law in 1999, with honors, *Order of the Coif and Order of the Barristers,* and have been practicing for 25 years. I am an accomplished trial lawyer and have defended some of the largest Fortune 100 companies in high-stakes employment and wage-hour litigation, I am experienced in taking hybrid class and collective action cases to jury trial, and I have worked on numerous complex trade secrets cases like the instant matter. I am ranked by Chambers USA and was recently honored by being included on the LA Business Journal's 2023 Women of Influence: Attorneys list. I have been recognized on numerous lists for litigation and labor and employment by the Daily Journal, LA Business Journal, The National Law Review and The Los Angeles Times, and have been ranked by legal directories including Benchmark Litigation, Legal 500 and Lawdragon 500. I also am a Fellow of the American Bar Foundation and a member of the American Employment Law Council, both invite-only organizations. I am intimately familiar with the relevant facts and legal issues in this case, having served as co-lead counsel since the inception of this matter and having been intimately involved with the issues raised in the Motion. My work related to the Motion included legal analysis of the spoliation issues, participation in the deposition of PTC, Inc., revising the Motion and Reply, reviewing and analyzing the opposing papers, participating in the March 27, 2024 evidentiary hearing, revising the post-hearing briefing and working on the fee petition.

8. D. Andrew Quigley is Counsel at Hunton. He graduated from the University of Southern California Gould School of Law in 2011, where he was Editor in Chief, Southern California Review of Law and Social Justice, and has been practicing for 13 years. He has experience in all aspects of state and federal court employment litigation involving contract disputes, trade secrets, and other employment matters and has handled a number of complex misappropriation of trade secrets cases. Mr. Quigley recently was named "One to Watch in Labor and Employment Law – Management" by The Best Lawyers in America. Mr. Quigley is intimately familiar with the relevant facts and legal issues in this case, having served a counsel for 3DS since the inception of this case. His work related to the Motion included legal research and analysis, deposing third-party OnShape, revising the Motion and Reply, reviewing and analyzing the opposing papers, participating in the January 11, 2024 Motion hearing and March 27, 2024 evidentiary hearing, drafting the post-hearing briefing and working on the fee petition.

9. Richard Cortez, Jr. is an attorney with Hunton. He graduated from SMU School of Law in 1998, cum laude and Order of the Coif, and where he served as Comment Editor, of the SMU Law Review Association. He has experience in all aspects of state and federal court employment litigation involving contract disputes, trade secrets, and other employment matters. Mr. Cortez regularly supports Hunton's California team on trade secret litigation and has extensive experience in these types of matters. Mr. Cortez is intimately familiar with the relevant facts and legal issues in this case, having been involved in this matter since its inception. Throughout this case, Mr. Cortez has provided extensive support with research and motion drafting, as well as preparation for depositions and hearings. His work related to the Motion included legal research and analysis, reviewing and analyzing Defendants' opposing papers, drafting and revising the sanctions Reply brief, and drafting the fee petition.

10. Michael Pearlson is an associate with Hunton and graduated from the University of California, Berkeley, School of Law in 2019. Mr. Pearlson has experience in all aspects of state and federal court employment litigation involving contract disputes, trade

4

secrets, and other employment matters. His current hourly billing rate for this matter is $475. Mr. Pearlson is intimately familiar with the relevant facts and legal issues related to the Motion. His work related to the Motion included legal research and analysis, drafting the sanctions Motion, as well as assisting with research in preparation for the January 11 motion hearing and the evidentiary hearing.

11. Jesse D. Borja is an associate with Hunton and graduated from Harvard Law School in 2020. Mr. Borja has experience in all aspects of state and federal court employment litigation involving contract disputes, trade secrets, and other employment matters. His current hourly billing rate for this matter is $475. Mr. Borja is intimately familiar with the relevant facts and legal issues related to the sanctions motion and the instant litigation generally, having worked on the matter since nearly its inception. Throughout the litigation, Mr. Borja has been primarily responsible for reviewing and being familiar with the thousands of documents produced in this case, as well as assisting with deposition and hearing preparation, and motion drafting. Mr. Borja's work related to 3DS's Motion, included developing the documentary evidence in support of the sanctions motion, and assisting with the extensive document preparation for the evidentiary hearing.

12. Brian Moon is a paralegal with Hunton who has been working as a paralegal for approximately seven years. Prior to joining Hunton in 2023, Mr. Moon was an employment and labor paralegal at Ogletree Deakins and prior to that he was a paralegal at Wilson Elser. Mr. Moon's work related to 3DS's Motion included coordinating the evidentiary submissions for the Motion and Reply and preparing the exhibits and evidence used at the evidentiary hearing, as well as the materials used to prepare Mr. Turner for his testimony at the hearing.

### Hours Spent on 3DS's Sanctions Motion

13. Given that the invoices sent by Hunton to 3DS contain privileged/work product information and hundreds of entries not relevant to this Fee Petition, we extracted

the time and cost entries relevant to the Motion and this Fee Petition into a spreadsheet and have attached printouts from that spreadsheet with this Fee Petition. Where the entries would reveal legal strategy or mental impressions that could be relevant to future proceedings in this case, we have redacted that information from the entries. If the Court wishes to review the actual fee invoices sent to 3DS and/or the cost invoices for the expenses, we request permission to submit those invoices (preferably with irrelevant entries redacted) for in camera review by the Court only. Further, by submitting the text of its counsel's time entries, 3DS expressly does not waive attorney-client privilege over its invoices from Hunton or any other time entries unrelated to the at-issue Motion and submits these entries solely to comply with the Court's Order to support its request for fees and costs.

### Deposition of OnShape

14.    After serving a subpoena on PTC, Inc. (OnShape), PTC produced Defendants Ben Wynne's and Chris Tanner's OnShape activity log from September 2, 2017 to May 24, 2023. Upon reviewing these logs, 3DS's counsel believed they showed that Wynne and Tanner had spoliated evidence by deleting files from OnShape within 24 hours of Wynne and Intrepid being served with this lawsuit.  To confirm its suspicions, 3DS took the 30(b)(6) deposition of PTC on September 7, 2023 and, through this deposition, confirmed that Wynne and Tanner intentionally "trashed" and/or deleted 10 documents and 43 elements from the OnShape CAD platform within 24 hours of this lawsuit being served. 3DS would not have taken this deposition had it not needed to do so to establish Wynne and Tanner's misconduct and spoliation of evidence. This is evidenced by the timing of 3DS's decision to depose PTC.  Earlier in the case, 3DS had subpoenaed records from PTC for the time period before September 1, 2017, and received transaction logs for that time period.  3DS did not seek to depose PTC after receiving this production.  Instead, 3DS only sought to depose PTC after reviewing the logs produced in response to 3DS's second subpoena to PTC, which is the production that revealed Wynne's and Tanner's spoliation.

15. Throughout this case, Mr. Quigley has spent considerable time becoming familiar with the OnShape platform and with reviewing information produced from PTC Inc. related to the OnShape platform. I am aware of this based on my own observations and discussions with Mr. Quigley. Because of his familiarity with these issues, me and my team decided that Mr. Quigley was the most qualified of 3DS's attorneys to take the deposition of PTC Inc., the provider of the OnShape platform, which he did.

16. In preparing for and taking this deposition, Mr. Quigley expended 12.4 hours for a total of $7,750.00. Given the potential importance of the deposition, as lead counsel, I expended 3.4 hours ($2,822.00), assisting Mr. Quigley with preparation for and taking the deposition. Throughout this case, Defendants also have had multiple lawyers attend important depositions. For example, I defended the 30(b)(6) deposition of 3DS and the deposition of Scott Turner taken by Defendants. At least two to three of Defendants' lawyers attended both the 30(b)(6) deposition of 3DS and Scott Turner.

17. 3DS therefore seeks to recover $10,572.00 in attorney's fees related to the deposition of PTC, Inc. A true and correct copy of excerpted records detailing the time billed in connection with the PTC, Inc. deposition is attached hereto as **Exhibit 2**. Given that the testimony of PTC, Inc. regarding Wynne's and Tanner's spoliation of evidence formed the foundation for 3DS's Motion, all of this work resulted directly from Wynne's and Tanner's spoliation of evidence and was necessary to prevail on Plaintiff's Motion. The fees Plaintiff incurred are reasonable both in terms of hours worked and the applicable hourly rates. Accordingly, the Court should award Plaintiff $10,572.00 in attorneys' fees, without reduction, for preparing for and taking this deposition.

18. 3DS has not sought to recover the time spent reviewing PTC's production of the OnShape spreadsheets or the numerous meet and confer discussions with Defendants' counsel regarding OnShape-related issues.

### Research, Drafting, and Revising 3DS's Opening Motion

19. 3DS's Motion for Sanctions was factually intensive, involved highly technical subject matter, and required 3DS to address a variety of excuses offered by Wynne and Tanner regarding whether the OnShape documents were deleted, whether they were relevant, whether they could be replaced, and whether 3DS was prejudiced.  In addition, the day before 3DS filed its Motion, Defendants produced several new documents, which my team and I had to review and adjust 3DS's filing to account for since Defendants claimed (erroneously) that these documents either were the missing OnShape documents or were sufficient to replace the missing documents.

20. Given the complex issues, the Motion was substantively dense and required 3DS's counsel to analyze a considerable number of cases to determine the appropriate standard, how each Rule 37 factor applied to the present circumstances and what type of Rule 37 sanctions would be appropriately requested.  Given that 3DS moved for the serious relief of terminating sanctions, which my colleagues and I did not take lightly, we worked diligently to prepare a well-reasoned (and ultimately successful) motion.  3DS's opening Motion included two supporting declarations and 41 exhibits, a number of which were filed under seal and required preparation of a separate motion.  Mr. Pearlson, who is a junior associate with a lower billing rate, researched and drafted the Motion, spending 17.8 hours for a total of $7,120.00 in attorneys' fees.  Mr. Juarez, Mr. Quigley and I efficiently revised the Motion, collectively spending 72.3 hours for a total of $52,444.50 in attorneys' fees.  The input of Mr. Quigley was essential to the Motion because of his familiarity with the OnShape issues and the deposition of PTC, Inc.  Mr. Juarez's and my input also was necessary given the serious relief sought through the Motion and our involvement in these issues throughout this case.

21. All of this work resulted directly from Wynne's and Tanner's spoliation of evidence and was necessary to prevail on Plaintiff's Motion.  The fees Plaintiff incurred are reasonable both in terms of hours worked and the applicable hourly rates.  A true and correct copy of excerpted records detailing the time billed in connection with researching, drafting, and revising the opening Motion is attached hereto as **Exhibit 3**.  Accordingly,

the Court should award Plaintiff $60,090.50 in attorneys' fees, without reduction, for the preparation of the Motion, its exhibits and accompanying motion to seal.

### Researching, Drafting, and Revising the Reply Brief

22.  My team and I carefully analyzed Defendants' opposition brief, which included three supporting declarations and 29 exhibits, and thoroughly responded to Defendants' arguments in 3DS's Reply brief. Defendants' opposition necessitated further research to assess and distinguish the case law cited by Defendants. Mr. Cortez, an associate attorney with a lower billing rate, researched and drafted the Reply spending 20.2 hours for a total of $9,090.00 in attorneys' fees. Mr. Juarez, Mr. Quigley and I efficiently revised the Reply, spending 20.4 hours for a total of $13,200.50 in attorneys' fees. The input of Mr. Quigley was essential to the Reply brief because of his familiarity with the OnShape platform to assess Defendants' technical arguments, his familiarity with the deposition of PTC, Inc., his prior review of the additional documents produced by Defendants and the responses necessary in light of those documents to be included in the reply briefing. Mr. Juarez's and my input also was necessary given our role as co-lead counsel, the serious relief sought through the Motion, and our involvement in these issues throughout this case.

23.  All of this work resulted directly from Wynne's and Tanner's spoliation of evidence and was necessary to prevail on Plaintiff's Motion. The fees Plaintiff incurred are reasonable both in terms of hours worked and the applicable hourly rates. A true and correct copy of excerpted records detailing the time billed in connection with researching, drafting, and revising the reply is attached hereto as **Exhibit 4**. Accordingly, the Court should award Plaintiff $24,128.00 in attorneys' fees, without reduction, for the preparation of the Reply, its exhibits and accompanying motion to seal.

### Preparing for and Participating in the January 11, 2024 Motion Hearing

24.  I personally attended the hearing held by the Court on January 11, 2024, where argument was heard on 3DS's Motion for Sanctions. Based on my recollection and according to the hearing transcript, the hearing on January 11, 2024 before this Court went

9

from 2:05 p.m. to 5:20 p.m. (a total of 3 hours and 15 minutes). Based on my recollection and a review of the transcript, approximately one-third of that time was spent on 3DS's Motion for Sanctions. Notably, the transcript for the hearing spans 140 pages and the argument for the Motion for sanctions begins at page 97, about 2/3 of the way through the transcript pages. Given the complexity of the Motion, and the various technical issues involving the OnShape platform, Mr. Juarez argued the Motion but required significant assistance from Mr. Quigley on the technical issues. As the transcript demonstrates, Mr. Quigley substantively assisted Mr. Juarez during the hearing. Both Mr. Juarez and Mr. Quigley had interacted with Defendants' counsel at various points regarding the spoliation issues, were involved in drafting the motion papers, and it was critical for both attorneys to be present at the evidentiary hearing given the factual disputes at the hearing concerning Wynne's and Tanner's spoliation of evidence and counsel's interactions as to these issues. Mr. Borja provided support with documents needed for the Motion hearing, given his familiarity with the documents in the case file and produced by both sides, and Mr. Pearlson provided research support to assist Mr. Juarez with preparation for the hearing given Mr. Pearlson researched and drafted the original motion. In preparing for and attending this January hearing on the Motion, Mr. Juarez spent 22.6 hours and Mr. Quigley spent 8.1 hours. Mr. Pearlson spent 5.1 hours on research for Mr. Juarez and Mr. Borja spent 6.7 hours assisting with documents for the hearing. I also attended this hearing and assisted with the argument on this Motion. However, since my attendance was primarily related to the handling of other motions being heard at this same hearing, 3DS has not sought to recover for the fees incurred by my attendance at this hearing. 3DS therefore seeks to recover $28,824.00 in attorney's fees related to its preparation for and attendance at this important hearing. A true and correct copy of excerpted records detailing the time billed in connection with the January 11, 2024 hearing is attached hereto as **Exhibit 5**.

25. All of this work resulted directly from Wynne's and Tanner's spoliation of evidence and was necessary to prevail on Plaintiff's Motion. The fees Plaintiff incurred are reasonable both in terms of hours worked and the applicable hourly rates. Accordingly,

the Court should award Plaintiff $28,824.00 in attorneys' fees, without reduction, for the preparation for and attendance at this Motion hearing.

### **Preparing for and Participating in the Evidentiary Hearing**

26.  The evidentiary hearing on Plaintiff's Motion was conducted on March 27, 2024 and, according to the transcript started at 9:01 a.m. and ended at 2:06 p.m., with only two short breaks, for a total of about 5 hours.  Three witnesses were called, and they were each divided amongst Mr. Juarez, Mr. Quigley, and me.  In addition to each handling a separate and distinct witness at the hearing, all three (Mr. Juarez, Mr. Quigley, and I) had interacted with Defendants' counsel at various points regarding the spoliation issues, were involved in drafting the motion papers, and it was critical for all three attorneys to be present at the evidentiary hearing, especially as there were factual disputes at the hearing concerning Wynne and Tanner's spoliation of evidence and counsel's interactions as to these issues.  Notably, Defendants had four attorneys at the evidentiary hearing – Mr. Catalano, Mr. Fogel, Mr. Stearns and Ms. Potiker.

27.  Mr. Juarez, Mr. Quigley, and I spent time preparing our coordinated strategy for the hearing, as well as our individual examinations of the witnesses that would be called at the hearing.  Significant time was spent culling through the documents produced in the case to identify the necessary exhibits for the hearing, particularly since the Court denied 3DS's request at the Status Conference to limit the exhibits at the hearing to those already in the record with the Motion papers.  Ultimately, the evidentiary hearing exhibits consisted of approximately 200 exhibits, between those identified by Plaintiff and those identified by Defendants, many of which were lengthy spreadsheets of transaction history from the OnShape platform.  Hunton's paralegal Brian Moon also spent time finding, coordinating the assembly of, and coordinating the printing of these exhibits for the hearing.  Mr. Borja provided research and evidentiary support related to the evidentiary hearing, particularly related to the identification and gathering of documents and identification of hearing exhibits given his familiarity with case documents.

28. Mr. Quigley and I also spent time meeting and conferring with Defendants' counsel over the exhibits and logistics for the hearing to try to streamline the proceedings and since Mr. Juarez, Mr. Quigley and I all intended to participate in the evidentiary hearing, we each attended the status conference with the Court on March 14, 2024, to discuss logistics and procedures for the hearing. Mr. Juarez and I also spent time reviewing the prior testimony of Ben Wynne and Chris Tanner, both of whom had been deposed multiple times in the case, to prepare for their cross-examinations.

29. Mr. Juarez, Mr. Quigley, and I also spent necessary time with 3DS's in-house counsel and Scott Turner, 3DS's witness at the hearing, to prepare for the hearing. In particular, we met via Zoom early in March and again in person on March 25 and 26 before the evidentiary hearing.

30. Defendants produced a significant number of brand new exhibits a few days before the evidentiary hearing, which counsel for 3DS had to review and assess to prepare for the hearing and had to adjust their planned examinations of witnesses based on these newly produced documents. We all also had to review and be familiar with the roughly 200 exhibits identified for the hearing.

31. In preparing for and attending the evidentiary hearing on the Motion, Mr. Juarez spent 36.2 hours, I spent 88.4 hours and Mr. Quigley spent 80.1 hours. 3DS therefore seeks to recover $173,333.00 in attorney's fees related to this factually and legally complex hearing. A true and correct copy of excerpted records detailing the time billed in connection with the evidentiary hearing is attached hereto as **Exhibit 6**. All of this work resulted directly from Wynne's and Tanner's spoliation of evidence and was necessary to prevail on Plaintiff's Motion. The fees Plaintiff incurred are reasonable both in terms of hours worked and the applicable hourly rates. Accordingly, the Court should award Plaintiff $173,333.00 in attorneys' fees, without reduction, for the preparation for and attendance at the evidentiary hearing.

**Post-Evidentiary Hearing Briefing**

32. 3DS filed a post-evidentiary hearing brief and chart to further assist the Court in its ruling given the complex nature of the testimony and the length of the hearing. Given his participation in the evidentiary hearing and intimate knowledge of the facts related to Defendants Wynne's and Tanner's spoliation, Mr. Quigley prepared the post-evidentiary hearing brief, and Mr. Juarez and I efficiently revised the brief, primarily as it related to the documents and elements that we each cross-examined Mr. Tanner and Mr. Wynne on. Much of the testimony of Mr. Wynne and Mr. Tanner relating to the documents produced by Defendants days before the hearing was new information to us that had not previously been put forth by Defendant, which required significant new analysis not previously performed in order to effectively respond to this evidence in the post-hearing briefing. In preparing the post-hearing brief, Mr. Quigley was required to review the testimony from the evidentiary hearing, assess additional research in support of the Motion, and review the 72 exhibits that were admitted into evidence during the hearing. He then prepared a 10-page brief and a 29-page chart that painstakingly analyzed the parties' positions as to each of the 10 documents and 43 elements at issue, which Mr. Juarez and I commented on given our involvement in the evidentiary hearing and related issues. Mr. Borja provided support relating to Defendants' documentary evidence given his familiarity with case documents, and Mr. Pearlson provided research support related to the post-hearing briefing since he researched and drafted the original motion.

33. In preparing 3DS's post-evidentiary brief, Mr. Quigley expended 73.2 hours drafting and revising the brief and chart. I spent 15.3 hour and Mr. Juarez spent 8.1 hours revising the brief and chart. Mr. Borja spent 7.5 hours on document-related matters and Mr. Pearlson spent 2.9 on research. 3DS therefore seeks to recover $74,975.00 in attorney's fees related to this brief. A true and correct copy of excerpted records detailing the time billed in connection with the post-hearing brief is attached hereto as **Exhibit 7**.

34. All of this work resulted directly from Wynne's and Tanner's spoliation of evidence and was necessary to prevail on Plaintiff's Motion. The fees Plaintiff incurred

13

are reasonable both in terms of hours worked and the applicable hourly rates. Accordingly, the Court should award Plaintiff $74,975.00 in attorneys' fees, without reduction, for the post- hearing brief.

### Fee Petition

35. Given my familiarity with the billings in this matter, I reviewed the seven (7) months of invoices Hunton submitted to 3DS from September 2023 when the deposition of PTC, Inc. was taken through April 2024, when the post-hearing brief was drafted, to identify the time entries and costs for which 3DS would seek recovery related to the Motion. I also reviewed the time entries related to this Fee Petition. Mr. Cortez, with his lower billing rate, prepared the initial draft of the Fee Petition, which Mr. Quigley and I efficiently revised based on our familiarity with the work done and billed in this matter. Hunton expended 41.7 hours in preparing this Fee Petition and 3DS therefore seeks to recover $27,941.00 for the time spent preparing the Fee Petition. A true and correct copy of excerpted records detailing the time billed in connection with 3DS's Fee Petition is attached hereto as **Exhibit 8**.

36. Hunton's hours are reasonable because Mr. Quigley and I had to review and assess hundreds of billing entries spanning seven months in a heavily litigated case, to determine which entries are connected to Wynne's and Tanner's spoliation. Processing that material required considerable time. In addition, a reasonable amount of time was spent on researching and drafting the Fee Petition. Although Magistrate Judge Leshner's Order did not specify the format or detail required, based on fee petitions filed in other cases in the Southern District of California and the substantial amount of fees at issue, we believed that a full brief, declaration, and supporting time entries were necessary to comply with the Court's Order concerning this Fee Petition.

37. All of the work on this Fee Petition resulted directly from Wynne's and Tanner's spoliation of evidence and was necessary to recover fees expended on Plaintiff's Motion. The fees Plaintiff incurred are reasonable both in terms of hours worked and the

applicable hourly rates. Accordingly, the Court should award Plaintiff $27,941.00 in attorneys' fees, without reduction, for the preparation of this Fee Petition.

## Costs

38.  3DS incurred $32,405.57 in out-of-pocket costs related to this Motion. Those costs include court reporter, videographer and transcript fees for the deposition of OnShape, fees for the transcripts of the various Court hearings related to this Motion, transportation costs for 3DS's counsel and witnesses, Westlaw/Lexis fees for research related to the Motion, and costs of copying and preparing multiple sets of the binders containing the 200 exhibits for the evidentiary hearing for use by 3DS's counsel, Defendants' counsel and the Court.

39.  3DS seeks recovery of the court reporter fees incurred for having the transcript of the January 11, 2024 Motion hearing, the March Status Conference, and the March Evidentiary Hearing, created by the Court Reporter. The January 11 and March Status Conference transcripts were necessary to 3DS's preparation for the evidentiary hearing because both included valuable questions and insight from the Court related to the process and substance of the evidentiary hearing. The March 27 evidentiary hearing transcript was essential to 3DS's ability to prepare the post-hearing brief and cite evidence and testimony from the hearing for the Court's reference in the post-hearing briefing. The Court Reporter requires payment before he will begin work on a transcript and, therefore, 3DS also incurred costs overnighting the check for the transcription fees to the Court Reporter.

40.  In terms of travel-related costs, 3DS seeks recovery for travel expenses for Mr. Juarez and Mr. Quigley for attendance at the Motion hearing on January 11, 2024. Although I also attended this hearing, 3DS does not seek reimbursement of my travel expenses for this January hearing. 3DS also seeks reimbursement of travel costs for Mr. Juarez, Mr. Quigley and me to San Diego for meeting with 3DS personnel on March 25 and 26, to prepare for the evidentiary hearing and for our attendance at the evidentiary hearing on March 27, which includes two nights of hotel stays, plus incidental expenses related to travel for each of us. In addition, Mr. Roberson, 3DS's in-house counsel, traveled

from his home in South Carolina for the hearing and 3DS seeks reimbursement of his travel expenses for participating in the preparation meetings on March 25 and 26 and his attendance at the evidentiary hearing on March 27. Since Mr. Roberson's travel required travel to and from the east coast, he was not able to return home until March 28, and therefore 3DS seeks recovery for three nights of hotel stays plus other incidental expenses related to his travel. As 3DS's in-house counsel who has been primarily responsible for overseeing this matter, it was necessary for Mr. Roberson to be present and to assist with hearing preparation. Lastly, 3DS seeks travel expenses for Scott Turner, who testified on 3DS's behalf at the evidentiary hearing. Mr. Turner lives and works for 3DS in the Los Angeles area and was required to travel to San Diego for preparation meetings on March 25 and 26 and to appear at the hearing on March 27. Accordingly, 3DS seeks reimbursement for two nights of hotel stays, plus incidental expenses related to travel for Mr. Turner.

41. With respect to the charges for creation and copying of the exhibit binders, Mr. Juarez and I both had working copies of the preliminary exhibits prepared for our review. For the hearing binders, I proposed to Defendants' counsel that each side prepare their own binder sets, but Defendants insisted that 3DS provide a copy of the exhibits it identified to Defendants at the hearing. Accordingly, 3DS had to prepare a set of exhibits for Defendants' counsel, the Court, Mr. Juarez, Mr. Quigley and myself – for a total of five sets. The copy charges for assembling these binders and exhibits was substantial and 3DS seeks reimbursement for these amounts.

42. A true and correct copy of excerpted records detailing the costs incurred in connection with 3DS's Motion for Sanctions is attached hereto as **Exhibit 9**. All of the costs that 3DS seeks to recover for resulted directly from Wynne's and Tanner's spoliation of evidence, were necessary to prevail on Plaintiff's Motion and are reasonable. Accordingly, the Court should award Plaintiff $32,405.57 in costs, without reduction, associated with its Motion.

**Additional Exhibit**

43. Attached hereto as **Exhibit 10** is a true and correct copy obtained from PACER of the Order Imposing Sanctions for Failure to Appear at Deposition in Cabrales, *Cabrales v. BAE Sys. San Diego Ship Repair, Inc.*, No. 21-CV-02122-AJB-DDL (S.D. Cal. May 17, 2023), at ECF 80.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 28th day of August, 2024, at Pasadena, California.

/s/ Emily Burkhardt Vicente
Emily Burkhardt Vicente