# NOT FOR PUBLICATION

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 3D SYSTEMS, INC.,<br><br>                              Plaintiff,<br><br>v.<br><br>Ben WYNNE, et al.,<br><br>                              Defendants. | Case No.: 21-cv-1141-AGS-DDL<br><br>**ORDER GRANTING IN PART PLAINTIFF'S SUMMARY-JUDGMENT MOTION (ECF 484), DENYING KUESTER'S SUMMARY-JUDGMENT MOTION (ECF 489), GRANTING IN PART DEFENSE'S AMENDED SUMMARY-JUDGMENT MOTION (ECF 531), DENYING MOTIONS TO STRIKE (ECF 527, 574), AND DENYING MOTIONS TO EXCLUDE EXPERTS (ECF 506, 509, 513, 514, 515)** |

In this trade-secret case, the Court considers the parties' various pretrial motions, including dispositive motions to strike and for summary judgment.

## **BACKGROUND**

The parties tell dueling narratives of corporate espionage within the 3D-printing industry. According to plaintiff 3D Systems, Inc., five of its (now-former) employees—the individual defendants here—stole its trade secrets and used them to build a rival 3D-printing company, defendant Intrepid Automation. (ECF 6, at 3.) Among other claims, 3D Systems alleges trade-secret misappropriation and breach of its employee confidentiality agreements.

Intrepid responds that it is the actual victim. It claims 3D Systems sent one of its employees to steal Intrepid's trade secrets under the guise of seeking employment—or improperly persuaded the employee to reveal those secrets after his job interview. That employee—third-party defendant Evan Kuester—in fact interviewed with Intrepid and,

after signing a non-disclosure agreement, toured Intrepid's facilities and learned certain confidential information. (ECF 545-2, at 2; ECF 565, at 4.) Intrepid offered Kuester a job, but he instead opted to stay at 3D Systems for "additional compensation." (ECF 565, at 4–5.) In its counterclaim and third-party claim, Intrepid alleges that 3D Systems and Kuester colluded to misappropriate Intrepid's trade secrets and that Kuester disclosed at least some of the protected information he learned. (*See* ECF 199, at 23, 31–32.)

## DISCUSSION

### MOTIONS FOR SUMMARY JUDGMENT

Courts grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat a summary-judgment motion, the nonmoving party "need only present evidence from which a jury might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### A.    Trade-Secret Misappropriation

The parties move for summary judgment on the trade-secret-misappropriation claims, which are centered on the federal Defense of Trade Secrets Act and the California Uniform Trade Secrets Act. (ECF 484, 489, 531.) This Court analyzes the federal and California counts "together because the elements are substantially similar." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). To succeed on a claim of trade-secret misappropriation, plaintiffs must prove: (1) "that the plaintiff possessed a trade secret," (2) "that the defendant misappropriated the trade secret," and (3) "that the misappropriation caused or threatened damage to the plaintiff." *Id.* at 657–58 (citing 18 U.S.C. § 1839(5)).

#### 1.   *3D Systems' Trade-Secret-Misappropriation Allegations*

Intrepid argues that 3D Systems' misappropriation claim falters on the first

2

element—that 3D Systems "possessed a trade secret." *See InteliClear*, 978 F.3d at 657. "To prove ownership of a trade secret, plaintiffs must identify the trade secrets and carry the burden of showing they exist." *Id.* at 658 (cleaned up). Plaintiffs "should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade." *Id.* (cleaned up).

Once parties complete the "dialectic discovery process," as here, the "level of specificity required" to satisfy this particularity requirement is more stringent. *See InteliClear*, 978 F.3d at 663. And when the trade secrets involve "a sophisticated and highly complex" system, like the 3D printers at issue, plaintiffs may even have to specify "precise numerical dimensions and tolerances." *See Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998). At a minimum, they must do more than "rely upon 'catchall' phrases or identify categories of trade secrets they intend to pursue at trial." *InteliClear*, 978 F.3d at 658. Nor may plaintiffs simply reference "[l]ong lists of general areas of information containing unidentified trade secrets," or merely "identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition." *Id.* at 658, 660. Yet 3D Systems' trade-secret descriptions depend on exactly this type of forbidden generality, as discussed below.

a. *Interrogatory Responses*

In responding to Intrepid's interrogatories, 3D Systems "identified 12 trade secrets related to its 3DS printing process that it contends Defendants misappropriated." (ECF 549, at 26; *see also id.* at 28–34; ECF 531-3, at 82–84.) Each alleged secret is numbered below, followed by its quoted description and an explanation of its deficiencies.

### 3D Systems' Alleged Trade Secret 1

"3DS's [digital-light-processing] multi-projector system, including the particular detail at issue therein—the edge blending and calibrating techniques developed by 3DS, which is a unique technique for varying energy when transitioning from one projector to another." (ECF 531-3, at 82.)

This description identifies a "system" and "techniques." (*Id.*) Rather than identify a particularized trade secret, 3D Systems has merely described some of the technologies that underlie 3D printing. Such abstract technological descriptions fail to "separate[e] the trade secrets from other information that goes into any" 3D-printing apparatus. *See InteliClear*, 978 F.3d at 660. For such a "sophisticated and highly complex" system, 3D Systems likely must specify "precise numerical dimensions and tolerances" to pass muster. *See Imax*, 152 F.3d at 1167. Yet the above description does not even approach that standard.

### 3D Systems' Alleged Trade Secret 2

"3DS's laser and vat base photopolymer printer material handling technology utilized with open vats and recoating layers in large scale photopolymer printers." (ECF 531-3, at 82.)

This describes a type of technology and one way it is "utilized." It suffers from the same fatal flaws as Alleged Trade Secret 1.

### 3D Systems' Alleged Trade Secret 3

Enso Figure 4 print engine, including the particular detail at issue therein from 3DS CAD files:

[C]onfidential designs of the spine for supporting components, elevator mounted to spine, projector mounted to spine, and bracket on the projector including pneumatic clamping mechanisms.

CAD data containing mechanical assembly information, dimensioning and tolerance data in order to optimize cost and assembly, and to ensure reliable and repeatable manufacturing.

The control system for Enso, which is unconventional and represented a very different approach to 3D printers, as the printer itself was a server that could draw data from sources other than the printer itself, including spooling data from the internet.

Note: the Enso CAD drawings, Enso CAD data, and the initial Enso patent filings were not published at the time Intrepid filed its patent application for Patent Number 10,780,640. (ECF 531-3, at 82–83.)

This alleged secret purports to describe some "particular detail" about its "designs," "mechanisms," "dimensioning and tolerance data," and "approach to 3D printers." But such "catchall" phrases do not suffice when they merely refer to a patented "system which

4

*potentially* qualifies for trade secret protection." *Imax*, 152 F.3d at 1167. For example, the *Imax* court ruled a trade-secret identification deficient when it used the "catchall phrase 'including every dimension and tolerance that defines or reflects that design,'" and the description otherwise referred only to "a patented projector system," which did not necessarily qualify "for trade secret protection." *Id.* That is, the patented apparatus in *Imax* would have had trade-secret protection only to the extent that it contained valuable, secret features not disclosed in the patent. *Id.* On the other hand, in *Forro Precision, Inc. v. International Bus. Machines*, 673 F.2d 1045 (9th Cir. 1982), IBM's identification of its trade secrets was "sufficient," despite the same catchall reference to "dimensions and tolerances," because it otherwise identified those secrets as "engineering drawings and blueprints" of new IBM devices that were somehow in Forro's possession before "IBM's first shipment to customers." *Id.* at 1057. In other words, that description "clearly referred to trade secret material" physically before the court in that case. *Imax*, 152 F.3d at 1167 (discussing *Forro*).

3D Systems suggests that its generic reference to "CAD files and data Defendants stole from 3DS (which they still possess)" is just like the identification of the "engineering drawing and blueprints in *Forro*." (ECF 549, at 30.) Not so. In *Forro*, the judge and jury could examine, for example, a *specific* drawing of a device part that was "dated prior to the time" that part could have been acquired legally. *Forro*, 673 F.2d at 1057. If such a concrete document exists in this case, 3D Systems has utterly failed in its burden to adequately identify it to the Court and defense.

Without a physical document or precise description, a lay factfinder would be hard-pressed to discern "exactly which" of Alleged Trade Secret 3's "many 'dimensions and tolerances' were trade secrets." *See Imax*, 152 F.3d at 1167. In addition, the description is "too broad to enforce because it does not differentiate between truly secret information (such as formulas and product design) and new product information which has been publicly disclosed." *See Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1454 (2002) (cleaned up).

### 3D Systems' Alleged Trade Secret 4

"3DS's proprietary additive manufacturing system, and in particular that part comprised of an image projection system made up of a plurality of image projectors and a display subsystem that controls the image projection system and each of the image projectors including its use over conventional vat based photopolymer 3D printing systems." (ECF 531-3, at 83.)

This alleged trade secret provides no "precise numerical dimensions." *See Imax*, 152 F.3d at 1167. A "plurality," for example, is not "precise"—it does not indicate how many image projectors there are nor the direction of those projectors. And its descriptions of a "manufacturing system" composed of this non-specified "plurality of image projectors" that controls another "system" "use[d] over" another "conventional" "system" fails to "separate[e] the trade secrets from other information that goes into any" 3D-printing apparatus. *See InteliClear*, 978 F.3d at 660. For the same reasons as Alleged Trade Secret 3, it's "too broad to enforce." *See Whyte*, 101 Cal. App. 4th at 1454.

### 3D Systems' Alleged Trade Secret 5

"3DS's design updating print platform motion parameters, and in particular that part based upon resin pool temperature, which was used to develop a unique printer with active temperature control that improves the print process. This design was based on 3DS's study of the effects of heating polymer to print at a higher speed with better results." (ECF 531-3, at 83.)

The first sentence describes a technology with "platform motion parameters" and a "part based upon resin pool temperature," but it makes no distinction between the trade secret and "other information that goes into any" 3D-printing apparatus. *See InteliClear*, 978 F.3d at 660. Nor does it supply "precise numeral dimensions" or "tolerances." *See Imax*, 152 F.3d at 1167. And the "incantation" of a "catchall" word like *unique*—without saying what makes it unique or "*clearly refer*[*ring*] to tangible trade secret material"—does not move the needle either. *See id.* As for the second sentence, it is insufficient to state that the "design was based on" a "study," without specifying the design or study. From this language, neither the defense nor the factfinder could divine the protected trade secret.

6

### 3D Systems' Alleged Trade Secret 6

"3DS diagrams and schematic diagram information for Halo, LabDental, and ProBot equipment, as well as the layout for 'stack light,' 'Janbot' printer, and pump equipment in 3DS's lab." (ECF 531-3, at 83.)

As explained earlier with Alleged Trade Secret 3, generic references—whether to CAD files or to "diagrams" and "layout[s]" (*id.*)—do not meet the trade-secret particularity requirement, unless the description "clearly refer[s] to trade secret material" that a factfinder may examine, such as a specific document in the record. *See Imax*, 152 F.3d at 1167. 3D Systems has now had years to provide that type of specificity, even in a filing "under seal to protect [its] proprietary information," if necessary. *See InteliClear*, 978 F.3d at 659. But it has not. Nor does its description "separate" its alleged "trade secrets from information known in the industry" or from "information that goes into any [3D-printing] package." *Id.* at 659–60.

### 3D Systems' Alleged Trade Secret 7

"3DS's customer list." (ECF 531-3, at 83.)

To "qualify as a trade secret," a customer list "must (1) furnish a competitor with the previously unknown fact that a potential customer is in the market for the goods or services which the secret-holder offers, thus saving the competitor valuable 'screening' time, or (2) include 'sophisticated information' beyond the mere identity of the customer." *Perrin Bernard Supowitz, LLC v. Morales*, No. 23-55189, 2024 WL 411714, at *1 (9th Cir. Feb. 5, 2024) (quoting *Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1287–88 (1990)). Merely invoking a "customer list"—without mentioning details relevant to either part of this analysis—does not carry plaintiff's identification burden. *Cf. CanWe Studios LLC v. Sinclair*, No. CV 13-6299 PSG (FFMx), 2013 WL 12120437, at *3 (C.D. Cal. Nov. 20, 2013) (finding that plaintiff sufficiently described a customer list when it specified "approximately 10,000 users who have downloaded the [plaintiff's] application, which includes customers' names, contact information, and business affiliations" that plaintiff "developed through its marketing efforts").

7

### 3D Systems' Alleged Trade Secret 8

"3DS's pricing lists and information." (ECF 531-3, at 84.)

Courts have interpreted references to "pricing and order information" to mean "data reflecting: (1) what items [plaintiff] sold to a customer, (2) when [plaintiff] sold the items, (3) the quantity of each item sold, and (4) the price at which [plaintiff] sold each item." *Perrin Bernard Supowitz, LLC v. Morales*, No. 2:22-cv-02120-ODW (JEMx), 2023 WL 1415572, at *9 (C.D. Cal. Jan. 31, 2023), *aff'd*, No. 23-55189, 2024 WL 411714 (9th Cir. Feb. 5, 2024). But 3D Systems has not provided any specificity regarding those considerations. For example, the Court is left to guess which "pricing," "lists," and "information" 3D Systems is alleging to be a trade secret.

### 3D Systems' Alleged Trade Secret 9

"3DS's supplier lists." (ECF 531-3, at 84.)

This purported "supplier lists" trade secret is expressed at such an abstract level that neither the Court nor a factfinder could determine what is included. Which suppliers? Which "lists"? Exactly how many "supplier lists" fall within this trade secret? Once again, the identification is "too broad to enforce" for the same reasons as Alleged Trade Secret 3. *See Whyte*, 101 Cal. App. 4th at 1454.

### 3D Systems' Alleged Trade Secret 10

"3DS's vendor and supplier contact information." (ECF 531-3, at 84.)

To successfully allege vendor-related trade-secret misappropriation, plaintiffs must "(1) point to a vendor list that has value beyond the mere identity of the vendors and (2) show that Defendants used the valuable part of the vendor list (3) in a way that harmed" plaintiffs. *Perrin*, 2023 WL 1415572, at *12. But 3D Systems supplied no vendor list— nor anything like it—to assess. 3D Systems does not, for instance, offer any specific "vendor" name or "supplier contact information" that it asserts as a trade secret. Although it alleges that Intrepid "used various vendors" that they "also used at 3DS," this argument puts the cart before the horse. (*See* ECF 549, at 32.) 3D Systems must first "point to a

8

vendor list" before the Court engages in any use-based misappropriation analysis. *See Perrin*, 2023 WL 1415572, at *12.

### 3D Systems' Alleged Trade Secret 11

"Information related to materials ordered by 3DS from vendors." (ECF 531-3, at 84.)

This identification of "[i]nformation," "materials," and "vendors" is fatally generic. In its briefing, 3D Systems inches ever so slightly closer to the necessary particularization. Specifically, it charges that Intrepid sources from a vendor that also supplies 3D Systems with "materials" and that 3D Systems' "use of this particular" "material is a trade secret." (ECF 549, at 32.) As with the alleged vendor-list secret, however, 3D Systems argues use-based misappropriation before adequately describing the material misappropriated. 3D Systems does not explain how this material "has value beyond the mere identity" of the material or explain why "[i]nformation related to" that material is valuable. *See Perrin*, 2023 WL 1415572, at *12; (ECF 531-3, at 84). It's also unclear whether the ordered materials are "generally known," which would itself be disqualifying. *See* 18 U.S.C. § 1839(3)(B).

### 3D Systems' Alleged Trade Secret 12

"3DS's marketing strategies and product design information." (ECF 531-3, at 84.)

Finally, 3D Systems' general reference to its "marketing strategies and product design information" is insufficient. The Court is once again left to speculate which "marketing strategies," "product[s]", "design[s]," or "information" 3D Systems considers a trade secret.

b. *Other Sources of Trade-Secret Identification*

In addition to its interrogatory responses, 3D Systems urges the Court to look at various additional documents to flesh out its generic trade secrets: (1) its "30(b)(6) representative[s']" depositions, (2) information from "seven other 3DS employees who [Intrepid] questioned (or could have questioned)," (3) expert reports, and

9

(4) expert depositions. (ECF 549, at 26.) These papers total more than 250 pages, yet—as best the Court can tell—none of them contain a more specific accounting of 3D Systems' trade secrets. (*See, e.g.*, ECF 519-5; ECF 545-3; ECF 551-5; ECF 551-9; ECF 583-1; ECF 583-2; ECF 583-3; ECF 583-4.) Even if further identifying information lurks somewhere in this substantial record, 3D Systems must do more than "invite the court to hunt through the details in search of items meeting the statutory definition." *InteliClear*, 978 F.3d at 660; *see id*. at 658 ("It is inadequate for plaintiffs to 'cite and incorporate by reference hundreds of documents that purportedly reference or reflect the trade secret information.'").

### c. *Remaining Identification-Related Arguments*

3D Systems raises two final points: (1) the Court "already found 3DS properly identified its trade secrets," and (2) defendants "do not challenge 3DS's description of 10 of its trade secrets." (ECF 549, at 22.) Both arguments are meritless.

First, far from blessing the specificity of 3D Systems' trade-secret identifications, the Court has repeatedly hinted that they might be wanting. For instance, the Court noted that the amended complaint's "description of these techniques is not laden with every detail of these technologies," but "there is no such requirement *at this stage in the litigation*." (ECF 16, at 7 (emphasis added).) Similarly, the magistrate judge concluded that 3D Systems' interrogatory response was adequate for "both the parties and the Court *to understand the relevant scope of discovery*." (ECF 102, at 5 (emphasis added).) But, almost in the same breath, that judge warned that if 3D Systems stood on its current interrogatory response, Intrepid might be able to show that 3D Systems "has not adequately established the existence of a trade secret." (*Id.* at 6.) If anything, these judicial pronouncements suggest that 3D Systems "knowingly incurred the risk that its [trade-secret identifications] would not meet the 'reasonable particularity' requirement." *See InteliClear*, 978 F.3d at 663 (emphasis removed).

Next, there is no support for the claim that defendants failed to contest any of 3D Systems' trade-secret identifications. In Intrepid's summary-judgment briefs, it

challenges all 12 alleged secrets from 3D Systems' interrogatory response. (*See* ECF 531, at 13–17; ECF 562, at 6–11.) Any confusion on this score must be laid at the feet of 3D Systems, which has given contradictory guidance on where to hunt down its illusive trade secrets. At a deposition, 3D Systems' attorney said that "what the company has identified as its trade secrets" may be found "in the interrogatory responses." (ECF 519-5, at 12.) Yet, more recently, 3D Systems claims that those identifications must be pieced together from "depositions," other "interrogatory responses," and "documents cited therein." (ECF 549, at 24.) It is no wonder that the magistrate judge understood "the Defendants' concern" that these trade secrets were, as he put it, "a moving target." (ECF 102, at 6.)

In short, this scavenger hunt must end. We have now reached the summary-judgment stage—the "'put up or shut up' moment in a lawsuit." *See Nelson v. Guardian Towing, Inc.*, No. 22-CV-0306-AGS-BLM, 2024 WL 1421967, at *4 (S.D. Cal. Mar. 30, 2024). A plaintiff alleging trade-secret misappropriation must describe its trade secrets with the requisite particularity. Intrepid did so. (*See* ECF 302 (sealed filing).) 3D Systems did not. And it had ample opportunities. (*See, e.g.*, ECF 102, at 5–6 (magistrate judge commenting that "Plaintiff's initial response" to the trade-secret-identification interrogatory "was to refuse to respond at all" until "a response was compelled"); ECF 519-5, at 31 (asking 3D Systems' corporate representative: "Is there like a list somewhere that lists all the trade secrets that 3DS has?" Answer: "Not that I'm aware of.").) On 3D Systems' trade-secret claims, the Court grants summary judgment for Intrepid.

## 2. *Intrepid's Trade-Secret-Misappropriation Allegations*

Next, 3D Systems and Kuester move for summary judgment on Intrepid's claim of trade-secret misappropriation. Intrepid alleges that 3D Systems either sent Kuester to steal Intrepid's trade secrets "under the deceptive guise of seeking" employment or persuaded Kuester to reveal "the confidential information he obtained" after a legitimate job interview and tour of Intrepid's facilities. (ECF 199, at 31–32.) 3D Systems and Kuester do not challenge the specificity of Intrepid's trade secrets. Instead, they move for summary

judgment on the trade-secret-misappropriation test's other two prongs: misappropriation and damages. (ECF 484, at 15; ECF 489, at 12.)

a. *Misappropriation*

Misappropriation involves "either (1) the acquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means; or (2) the disclosure or use of a trade secret of another without express or implied consent." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018) (cleaned up) (citing 18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b)). "Improper means" includes "misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Cal. Civ. Code. § 3426.1(a). And "use" of a trade secret includes employing the information "in manufacturing, production, research or development, marketing goods that embody the trade secret, or soliciting customers through the use of trade secret information[.]" *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1383 (2000), *as modified on denial of reh'g* (Apr. 7, 2000).

The Ninth Circuit has found that "disclosure of the [trade] secret to the defendant, followed by manufacture of a closely similar device by the defendant, shifts to the defendant the burden of going forward with evidence to prove, if it can, that it arrived at the process by independent invention." *Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790, 793 (9th Cir. 1976). So it is here.

Kuester, while working at 3D Systems, undisputedly acquired Intrepid's trade secrets during a tour of Intrepid's facilities. (ECF 542-5, at 9.) During that recruitment tour, Intrepid showed Kuester "part of the multi-projector test bed" (ECF 542-4, at 7) for its in-development "[digital-light-processing]-based large-format machine," (ECF 542-5, at 9). That machine had "projectors *on top*" that were "*facing down*." (ECF 542-5, at 9, 12 (emphasis added).) The "moment [Intrepid] showed [Kuester] it had projectors on top," Kuester "believe[d] that Intrepid's [digital-light-processing]-based large-format machine was superior to the SLA 750," 3D Systems' newest "large-frame" printer. (ECF 542-5, at 8–9.) Then, less than three years after Kuester's recruitment tour, 3D Systems announced

12

that it would "preview" its "PSLA 270, a new projector-based polymer 3D printing platform," at an industry conference. (ECF 542-18, at 2, 5.) Its display model for this "new" machine showed that it uses "two [digital-light-processing] projectors" that "*project*[] *downwards*." (ECF 542-35, at 5 (emphasis added).)

In other words, we have "disclosure" to the defendant and its subsequent "manufacture of a closely similar device." *See Droeger*, 541 F.2d at 793; (ECF 542-5, at 8–9). 3D Systems and Kuester thus have the burden to "prove, if [they] can, that [they] arrived at the process by independent invention." *See Droeger*, 541 F.2d at 793. That, alone, is likely enough for Intrepid to defeat 3D Systems' and Kuester's summary-judgment motion on this claim.

Intrepid's additional circumstantial evidence of misappropriation bolsters this conclusion. Reliance upon "[c]ircumstantial evidence is particularly appropriate in trade secret cases." *UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007). In *UniRAM*, the inventor shared trade secrets with defendant TSMC. *Id.* at 940. The two defendants, TSMC and MoSys, then met separately to "find a solution" to a shared financial problem. *Id.* at 944 After that meeting and "after TSMC became privy to [the allegedly misappropriated] invention," the two defendants started "working" "to develop" a technology "that mirrored" the allegedly misappropriated invention. *Id.* Taken together, TSMC's meeting with the plaintiff, TSMC's meeting with MoSys, the suspicious timing, and the mirrored technology combined to create sufficient circumstantial evidence of misappropriation to survive summary judgment. *Id.*

Kuester represents that, in 2020, he "was very ready" "to get out of 3D [Systems]." (ECF 489-4, at 13.) He contacted "over a hundred, maybe 150 different companies" about employment opportunities—including an informal attempt "to set up a meeting" with defendants Ben Wynne and Chris Tanner at Intrepid. (*Id.* at 12–13.) But "[n]ot a single person" initially "responded" to him. (*Id.*) As discussed, Intrepid eventually responded and gave Kuester a tour in early 2021—preceded by the signing of a non-disclosure agreement. (ECF 484-16, at 19, 22; ECF 545, at 8; ECF 545-2, at 2; ECF 558, at 3.) The agreement

imposed upon Kuester a "duty to hold confidential information in confidence" "for so long as" Intrepid "treats the information as confidential," or until the agreement's two-year period ended. (ECF 545-2, at 2.) That "confidential information" included "[p]roduct concepts, design information, trade secrets, development schedules, financial data, marketing and customer data, and other information." (*Id.*)

During the tour, in addition to the downward-shooting projectors that Kuester saw, Tanner told Kuester that Intrepid was working with a "large aerospace company." (ECF 542-4, at 12.) The parties dispute whether this constituted a communication that Intrepid was working with AeroCo,[1] a large aerospace company that was also 3D Systems' client. Tanner did not disclose that AeroCo had paid Intrepid "up front to develop a system for them," but Kuester "saw test patterns" at Intrepid that he had seen before. (*Id.*) Tanner alleges that Kuester "obviously saw" those patterns at AeroCo, which were identifiable by the "color of [Intrepid's] resin," and this fueled Kuester's conclusion that AeroCo was working with Intrepid. (*Id.*)

Kuester thus acquired trade-secret information during his tour—all parties agree that is the case, though they disagree about the extent of the trade secrets acquired. (*See* ECF 542-5, at 9.) But Kuester acquired them through appropriate means, so his liability hinges on whether he "disclose[d]" or "use[d]" them improperly. *See Alta Devices*, 343 F. Supp. 3d at 877. Intrepid has introduced sufficient circumstantial evidence of such improper use or disclosure.

Shortly after Kuester's Intrepid tour, 3D Systems employee Stacie Hoch knew Kuester "had signed an NDA," but still asked: "How about I tell you what I think their business model is and you can let me know" "if I'm correct or not." (ECF 484-22, at 10–11.) She then "described" what she believed might be Intrepid's business model: "a

---

[1] To avoid the need to "seal their briefs," the parties agreed to refer to the aerospace company as "AeroCo" and to a separate dental company as "DentalCo." (*See* ECF 484, at 19 n.4, 20 n.5.)

customer gets to pick and choose what" "they want, and then [Intrepid] will customize and build them a solution." (*Id.* at 11.) Kuester confirmed she was "generally accurate." (*Id.*) Within one month of that conversation, Hoche responded to an email from 3D Systems colleagues about the "situation described at" AeroCo, expressing her belief that "Intrepid is build-to-order products." (ECF 484-26, at 2.) Intrepid posits that this shows both that (1) Kuester disclosed Intrepid's business-model-related trade secrets and (2) Kuester told his colleagues about Intrepid's AeroCo business. (ECF 542, at 18, 22.)

All the while, Kuester continued to ask Intrepid about its system specifications, including whether Intrepid could "generate a rough build for that large format machine" and for "an approximate mm per hour build speed." (ECF 484-16, at 19.) Then Kuester decided not to work for Intrepid and stayed at 3D Systems in exchange for increased compensation. (ECF 489-4, at 23.) Intrepid suggests that this compensation was in exchange for Kuester's revelations about Intrepid's trade secrets. (ECF 199, at 31–32.) Meanwhile, 3D Systems contends it was "to keep him from leaving his employment with 3DS," and Kuester says it was based on multiple factors. (ECF 484, at 17; ECF 484-15, at 17.)

Intrepid also sees evidence of misappropriation in a 2022 conversation Kuester had with 3D Systems' Scott Turner. (ECF 542, at 14.) During that talk, Kuester proposed that 3D Systems "buy[] Intrepid Automation" to "get[] a machine that would actually make us money." (ECF 542-5, at 31.) Turner rejected the idea, saying, "Let's see what happens as funding gets harder and the legal fees grow." (ECF 542-13, at 19; ECF 542-4, at 12.) Intrepid suggests that Turner's failure to "ask for clarification regarding" which "Intrepid 'machine' Kuester was" referencing indicates Kuester "must already have" inappropriately shared information about Intrepid's 3D printers with Turner. (ECF 542-4, at 12.)

Intrepid's evidence, at a minimum, "construct[s] a web of perhaps ambiguous circumstantial evidence from which the trier of fact may" infer "that it is more probable than not that what" Intrepid alleges "did in fact take place." *See M.A. Mobile Ltd. v. Indian Inst. of Tech. Kharagpur*, 400 F. Supp. 3d 867, 893 (N.D. Cal. 2019). In a matter of months,

Kuester went from being an engineer that 0 out of 100 companies wanted to hire to one worthy of a $25,000 pay increase and title upgrade. (*See* ECF 489-4, at 23.) A trial must determine whether this was because of his merit, an organized scheme to spy on Intrepid, or an after-tour disclosure of Intrepid's trade secrets.

### b. *Damages*

3D Systems and Kuester assert there is no evidence that they harmed Intrepid. (ECF 484, at 25; ECF 489, at 22.) Intrepid disagrees, contending there are "triable issues of fact as to how 3DS's conduct damaged Intrepid." (ECF 542, at 21.) Specifically, Intrepid asserts it "lost profits" "based on the loss of existing business" and alleges that Kuester's and 3D Systems' misappropriation "unjustly enrich[ed]" 3D Systems. (*Id.* at 23.)

In trade-secret-misappropriation cases, courts may award damages for (1) "actual loss caused by the misappropriation of the trade secret," (2) "any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss," or, "in lieu of damages measured by any other methods," (3) "damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret." 18 U.S.C. § 1836(b)(3)(B); *see also* Cal. Civ. Code § 3426.3(a), (b). So even when "neither actual damages to the holder of the trade secret nor unjust enrichment to the user is provable," "the trial court may order a reasonable royalty." *Ajaxo Inc. v. E\*Trade Fin. Corp.*, 187 Cal. App. 4th 1295, 1308 (2010); *see also O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1077 (N.D. Cal. 2005) (granting plaintiff a royalty when it established the defendant misappropriated some of its secrets but proved "[n]either unjust enrichment nor damages"), *amended* 420 F. Supp. 2d 1070 (N.D. Cal. 2006).

Intrepid asserts that it lost existing business contracts, including its previously existing "contract with AeroCo for four" devices and its "contract with DentalCo for several" others. (ECF 542, at 22.) Intrepid draws a straight line of causation from Kuester's revelations to Hoche to her later email discussions with other 3D Systems colleagues about AeroCo. (ECF 484-22, at 11.) According to Intrepid, after Hoche discussed with these

16

colleagues "details about Intrepid's product design and business plans for which there was no public source," the colleagues "caus[ed] Intrepid to lose its contract with AeroCo." (ECF 542, at 13, 18, 22.)

3D Systems responds that Intrepid is to blame for its losses because it "had not fulfilled its contractual obligation." (ECF 484, at 26.) But nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Applying that principle here, a reasonable factfinder could find that Kuester's and 3D Systems' behavior damaged Intrepid.

Additionally, Intrepid alleges damages for unjust enrichment. That is, it claims that 3D Systems unfairly profited by developing a competing device using the trade secrets it and Kuester misappropriated. (*See* ECF 565, at 4; ECF 542-18, at 2, 5.) As previously discussed, there is a triable issue of fact on misappropriation based on the potentially suspicious timing of Kuester's tour, promotion, conversation with Hoche, and 3D Systems' later launch of a device with downward-facing projectors like Intrepid's model. *See UniRAM*, 617 F. Supp. 2d at 944. A reasonable jury could believe Intrepid's allegations, so it has sufficiently demonstrated harm.

Even if Intrepid is unable to specifically prove the sum total of its lost profits—or 3D Systems' and Kuester's unjust enrichment—there remains a material issue as to whether the circumstances warrant a reasonable royalty. *See O2 Micro*, 399 F. Supp. 2d at 1077. So, 3D Systems' and Kuester's summary-judgment motions on Intrepid's trade-secret claim are denied.

**B.     Breach of Employee Confidentiality Agreements**

3D Systems moves for partial summary judgment on its breach-of-contract claims against individual defendants Wynne and Tanner. (ECF 484, at 33.) It alleges that these defendants "breached their agreements with 3D Systems by, at a minimum, using 3D Systems' trade secret, confidential, proprietary, and/or nonpublic information." (ECF 6, at 18.) As relevant here, Intrepid asks for summary judgment on its request for a declaration that this contract "unlawfully restrains competition in violation" of California's

17

non-compete ban. (ECF 531, at 32.) The defense has the better argument.

In California, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600(a). This statute "shall be read broadly" "to void the application of" "any noncompete clause in an employment contract, no matter how narrowly tailored." *Id.* § 16600(b)(1). It prohibits "restrict[ing]" employees' "ability to practice" their profession. *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 948 (2008). And it applies "even if such an employee uses information that is confidential," so long as it is "not a trade secret." *AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal. App. 5th 923, 940 (2018); *see also Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 758 (9th Cir. 2008) ("[N]on-competition agreements are unenforceable unless necessary to protect an employer's trade secret.").

Under 3D Systems' agreement, its employees cannot "directly or indirectly use" or "disclose" to anyone "confidential information belonging to the Company." (ECF 531-2, at 3.) It argues that the agreement "seeks only to protect 3DS's confidential information and trade secrets." (ECF 549, at 9.) Legally, 3D Systems may not preclude its ex-employees from using "information that is confidential but not a trade secret." *See AMN*, 28 Cal. App. 5th at 940. Yet, as to the confidential information, 3D Systems' agreement unlawfully applies "*subsequent* to the term of Employee's employment by the Company." (ECF 531-2, at 3 (emphasis added).)

In addition, 3D Systems' "confidential information" definition sweeps far too broadly. For example, it prohibits "use" of the "type" "of materials and/or supplies ordered by the Company." (ECF 531-2, at 3.) Put another way, defendants and all other ex-employees—for the rest of their careers—cannot "use" the "type" of materials used in 3D Systems' 3D printers. It's hard to imagine how a professional could work in the 3D printing industry without using the "type" of materials other 3D printers use.

The agreement also prohibits "use" of both the "current" and "potential" "resellers" and "suppliers." (ECF 531-2, at 3.) In essence, 3D Systems could foreclose its ex-

18

employees' ability to use the entire universe of 3D-printing resellers and suppliers because it either currently or "potential[ly]" would use them. (*See id*.) This, at a minimum, "restrict[s]" ex-employees' "ability to practice" their profession. *See Edwards*, 44 Cal. 4th at 948.

Further, the agreement prohibits ex-employees' "use" of "pending patent applications." (ECF 531-2, at 3.) But patent applications are publicly "published" no more than "18 months" after filing. 35 U.S.C. § 122(b)(1)(A). And an "inventor actively practicing in the field and prosecuting his own patent application must be deemed to be on constructive notice of published patent applications in the same field." *Wang v. Palo Alto Networks, Inc.*, No. C 12–05579 WHA, 2014 WL 1410346, at *6 (N.D. Cal. Apr. 11, 2014). Thus, 3D Systems prohibits "use" of information that a 3D-printing competitor is expected by courts to have knowledge of and therefore "use." Ex-employees would thus have to choose between violating their 3D Systems employment agreement or the law's expectations.

The contract does, however, include a severability clause. (ECF 531-2, at 10.) And California law voids contracts that "restrain[]" workers from "engaging in a lawful profession" only "to that extent." Cal. Bus. & Prof. Code § 16600(a). This statute's plain language evinces a legislative "intent to sever invalid portions of contracts." *VibrantCare Rehab., Inc. v. Deol*, No. 2:20-CV-00791-MCE-AC, 2021 WL 1614692, at *5 (E.D. Cal. Apr. 26, 2021). And such a violation "does not automatically invalidate the underlying contract when the alleged breach is the misappropriation of trade secrets." *Id.* "Under California law, a court has discretion to either sever an unconscionable provision from an agreement, or refuse to enforce the agreement in its entirety." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 1005 (9th Cir. 2010); *see also* Cal. Civ. Code § 1599 ("Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest.").

Even if the Court were to sever the agreement's invalid portions and only leave the trade-secret-protecting provisions, 3D Systems' claim still fails. No reasonable jury could

find that defendants "breached their agreements with 3D Systems by" "using 3D Systems' trade secret[s]" (*see* ECF 6, at 18), because, as previously discussed, 3D Systems alleged no proper trade secrets in this case.

Thus, Intrepid's summary-judgment motion regarding the employment agreement is granted in part. Because a person cannot work in the 3D Printing industry without running afoul of this agreement, it is at least partially void. To the extent that any of its provisions survive severability, 3D Systems' trade-secret-breach claim fails. 3D Systems' partial summary-judgment motion for breach of contract is correspondingly denied.

## MOTIONS TO EXCLUDE EXPERTS

The parties move to exclude evidence from seven expert witnesses. The "proponent of . . . expert testimony" shoulders "the burden to establish its admissibility." *United States v. 87.98 Acres of Land More or Less in the Cnty. of Merced*, 530 F.3d 899, 904 (9th Cir. 2008). An expert must be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The opinion of such a qualified expert is admissible when:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

*Id.*

The Court's inquiry is "flexible," with a "liberal thrust favoring admission." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017). The proffered testimony need only "logically advance[] a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995). And "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564

(9th Cir. 2010), *as amended* (Apr. 27, 2010). The Court must "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

## A.    William Allen

3D Systems and Kuester move to exclude William Allen's expert testimony on the ground that he lacks "specialized knowledge in the relevant technology at issue," that is, "3D printing with DLP [digital-light-processing] projectors using photopolymers." (ECF 509, at 17.) Typically, a "lack of particularized expertise goes to the weight" of the expert's opinion, not to its "admissibility." *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993). But that forgiving principle gives way when an expert ventures beyond "the reasonable confines of his subject area." *Avila v. Willits Env. Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011). For example, in *Avila* the Ninth Circuit held that the trial court did not abuse its discretion (nor clearly err) in excluding a proffered "Physician/Scientist/Attorney" expert because he lacked "any special training or knowledge regarding metal working industries such that he could reliably opine that activities at [a machine shop] 'must' have created dioxins." *Id.*

Unlike the *Avila* expert, Allen has not strayed from his area of expertise. He served as "Chief Technologist for Hewlett-Packard's Digital Projection Display business" and was "the first technologist promoted to HP Fellow in HP's printing business." (ECF 509-4, at 2.) In 2020, Allen helped found the Hewlett-Packard/Nanyang Technological University Digital Manufacturing Corporate Lab, and he "led two 3D-printing-related research projects" there. (*Id.*) Also, he is the "named inventor on over 90 United States patents and patent applications," including patents related specifically to "digital projection," "digital imaging," and "3D printing." (*Id.*) In particular, he is the "primary inventor of wobulation," which is a "fundamental technology" in many projectors, including "the Young Optics projectors used by Intrepid" in two 3D printers at issue here. (*Id.* at 2–3.)

This background and experience qualify Allen to offer the opinions proffered in his

21

initial expert report. For example, he opines that an alleged trade secret that Intrepid disclosed to Kuester—a "multi-projection test bed" for a 3D printer system—"was not disclosed in Intrepid's patent applications," nor was Intrepid's development of "a large-format vat-based multi-projection system apparent from those published patent filings." (ECF 509-4, at 3.) Similarly, in Allen's expert opinion, "this information would have independent economic value to Intrepid derived from its secrecy." (*Id.* at 4.)

3D Systems and Kuester complain that Allen has no meaningful experience with the exact type of 3D printers here: "photopolymer-based" 3D printers. (ECF 603, at 4.) Yet it is unclear why Allen would need such pinpoint-specific experience to give helpful opinions on the topics mentioned: whether this new technology was revealed in patent applications and whether this information's secrecy had economic value. By analogy, if all-time basketball great Michael Jordan gave expert testimony that a groundbreaking basketball strategy had economic value, it's unlikely that he would be deemed unqualified just because he never used that strategy himself. Likewise, Allen is competent to offer opinions in his field of expertise, even pertaining to new innovations in that field.

By contrast, each of the cases that 3D Systems and Kuester rely upon involve experts stepping outside their fields—much like, to build on our analogy, a basketball expert commenting on hockey. *See, e.g.*, *Pooshs v. Phillip Morris USA, Inc*., 904 F. Supp. 2d 1009, 1019 (N.D. Cal. 2012) (admitting epidemiologist's expert opinion about "the addictive properties of nicotine," but excluding his testimony about "cigarette design," as the expert "conceded that he has no training in cigarette design and that he has never designed a cigarette or a cigarette filter"); *Diviero v. Uniroyal Goodrich Tire Co*., 919 F. Supp. 1353, 1357–58 (D. Ariz. 1996) (excluding as unqualified an engineering expert who lacked the chemistry background and "knowledge, understanding or experience" regarding the "chemical makeup of [the] steel belted radial tires" at issue "to render a valid scientific opinion concerning whether these tires are defective"); *Sedlik v. Drachenberg*, No. CV 21-1102 DSF (MRWx), 2022 WL 17886029, at *2–3 (C.D. Cal. June 27, 2022) (excluding a tattoo expert as unqualified because she lacked "specialized

22

knowledge" in the relevant expert topics—"photographs" or "comparative analysis" of the art forms of "photographs and tattoos").

Finally, Intrepid points out that 3D Systems' own hiring practices contradict the claim that these printers inhabit a unique field or some inaccessible subspecialty. After all, when 3D Systems began developing its 3D printer here, it did not seek workers "with extensive experience with photopolymer-based 3D printing." (ECF 584, at 8.) Rather, it hired the individual defendants, who had experience in many of the same technologies in which Allen specializes. 3D Systems responds that the defendants later "received ample and thorough training to get up to speed on such printers." (ECF 603, at 4 n.1.) Even so, this history strengthens the Court's conclusion that Allen is opining about a technological advance in his own field, not about a field that is foreign to his training and experience.

Allen may testify on the topics in his initial expert report. The motion to exclude those opinions is denied.

## B.   Paul Zimmer

3D Systems and Kuester also move to exclude Paul Zimmer's expert report and opinions about Intrepid's alleged damages. They challenge his causation assumptions, projected revenue basis, and cost-to-develop calculations. (ECF 515, at 8.)

First, 3D Systems and Kuester fault Zimmer for assuming that they caused the AeroCo- and DentalCo-related damages, while ignoring "possible alternative explanations." (ECF 515, at 8–9.) But it is "perfectly permissible for an expert to assume liability (of which causation is an element) and simply focus on the issue of damages." *BladeRoom Grp. Ltd. v. Facebook, Inc.*, No. 5:15-cv-01370-EJD, 2018 WL 1611835, at *6 (N.D. Cal. Apr. 3, 2018). Zimmer's causation assumptions can be made plain to the jury. If the jury finds those assumptions unjustified, it will also disregard the resulting damages opinion.

Second, 3D Systems' and Kuester's criticisms of Zimmer's projected revenue analysis go to weight, not admissibility. "[N]ew businesses often cannot offer reliable proof of prospective profits." *Humetrix, Inc., v. Gemplus S.C.A.*, 268 F.3d 910, 920 (9th Cir.

23

2001). And "lost profits are necessarily an estimate," so their "amount cannot be shown with mathematical precision." *Id.* at 919 (cleaned up). "[P]rospective profits may nevertheless be recovered if the evidence shows with reasonable certainty both their occurrence and the extent thereof." *Id.* at 920.

In calculating Intrepid's lost profits, Zimmer relied upon a "10-year projection for revenue and direct expenses" prepared by defendant Mueller, Intrepid's CFO. (ECF 515-4, at 4.) Zimmer independently "review[ed]" those projections, which were premised upon Intrepid's "purchase order and contracts" with AeroCo. (ECF 588-4, at 4.) He even used a "discount rate" to account for market uncertainty. (ECF 588-2, at 6.) Thus, the purchase order and contracts "show[]" those "prospective profits" with "reasonable certainty." *See Humetrix*, 153 F.3d at 920. Zimmer's analysis was not, as 3D Systems and Kuester suggest, "plucked out of thin air" (*see* ECF 515, at 14), and any perceived shortcomings may be fully argued at trial.

Finally, 3D Systems and Kuester argue that Zimmer's cost-to-develop calculations inappropriately rely on Intrepid's costs in "developing all of its technology," rather than "focus[ing] on," or apportioning, the costs associated with developing Intrepid's alleged trade secrets. (ECF 515, at 18.) Generally, "apportionment is required" when "the accused technology does not make up the whole of the accused product." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018). But the "entire market value rule permits recovery of damages based on the value of a [technology owner's] entire apparatus containing several features when the [allegedly misappropriated technology] is the basis for customer demand." *See Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1361 (Fed. Cir. 2001). For example, in *Bose* a speaker company presented evidence that its technology "inextricably worked with other components of loudspeakers as a single functioning unit." *Id*. The *Bose* court applied the entire-market-value rule for damages, because the accused technology "improved the performance of the loudspeakers and contributed substantially to the increased demand for the products in which it was incorporated," making it "integral to the overall performance of [plaintiff's] loudspeakers." *Id.*

24

Similarly, Intrepid's trade-secret technology allegedly "inextricably work[s] with" its other 3D-printer components. *See id.* A reasonable jury could conclude that its trade secrets "improved the performance" of its printers and operate as a "single functioning unit" within the printers. *See id.*; (ECF 302). That technology also "contributed substantially" to the "demand" for its products, including its Valkyrie and Epic 3D-printer systems, as evidenced by AeroCo's and DentalCo's engagements. *See Bose*, 274 F.3d at 1361. Even 3D Systems and Kuester seem to concede that Intrepid's "commercial viability, print platform size, number of projectors, customizable parameters, developmental and market timeline, and price expectations" hinge upon its trade-secret-based technology's success. (*See* ECF 600, at 11.) The fact that there is "more" to Intrepid's 3D printers does not undercut the fact that the alleged trade secrets "inextricably work" together "as a single functioning unit" to form Intrepid's 3D printers. *See Bose*, 274 F.3d at 1361; *cf. Management & Eng'g Techs. Int'l v. Information Sys. Support, Inc.*, 490 F. App'x 30, 34 (9th Cir. 2012) (overturning a jury verdict when an expert witness failed to apportion value between "legally valid" and "legally invalid" alleged trade secrets").

Defendant's motion to exclude Zimmer's expert testimony is thus denied. 3D Systems and Kuester raise reasonable criticisms, but each of these issues should "be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *See Primiano*, 598 F.3d at 564.

## C.    Mooted Exclusion Motions

Because the Court grants Intrepid's summary-judgment motion regarding 3D Systems' alleged trade secrets, all motions to exclude the associated expert testimony are denied as moot. Those include the motions to exclude: (1) Wynne and Tanner as "rebuttal witnesses" to 3D Systems' alleged trade secrets (*see* ECF 506, at 8–9, 16); (2) Iman Sadeghi's testimony "rebut[ting]" a discussion about 3D Systems' "source code" within the context of its alleged trade secrets (*see* ECF 509, at 24; ECF 584, at 24); (3) Robert Zubrickie's testimony regarding 3D Systems' "trade secrets" (ECF 513-2, at 5)

and whether Intrepid's "multi-projector testbed" "relies on or utilizes 3DS's trade secrets" (ECF 513-3, at 8; *see also id.* at 14); (4) Richard Greene as an "expert with respect to three of 3DS's alleged trade secrets" (ECF 514, at 6); and (5) Allen's rebuttal testimony, regarding "certain portions of the reports" of Zubrickie and Greene (ECF 509-6, at 2).

In sum, all the parties' expert-exclusion motions are denied.

## INTREPID'S MOTION TO STRIKE THE ANSWER

Intrepid moves to strike 3D Systems' and Kuester's answer to its counterclaim and third-party claim due to tardiness. (ECF 527, at 7.) Their answer was indeed 13 days late, filed after Intrepid had already requested entry of default (which was inexplicably refused by the Clerk's Office). (*See* ECF 452, at 18; ECF 493; ECF 494; ECF 495; ECF 496); *see also* Fed. R. Civ. P. (4)(a). Courts may strike "an insufficient defense." Fed. R. Civ. P. 12(f). But "[m]otions to strike are disfavored, and the remedy of striking a pleading should generally be granted only to avoid prejudice to the moving party or when it is clear that the matter sought to be stricken could have no possible bearing on the subject matter of the litigation." *Hadley v. Kellogg Sales Co.*, No. 16-CV-04955-LHK, 2018 WL 11341859, at *1 (N.D. Cal. Mar. 7, 2018).

Several factors convince the Court that any prejudice Intrepid suffered "is not significant enough to warrant the drastic remedy of striking the answer." *See id*. First, throughout the answer-delay dispute, 3D Systems and Kuester continued to vigorously argue their claims, as they have throughout these proceedings. (*See generally* ECF 457–491.) Second, Intrepid has long been on notice that 3D Systems and Kuester planned to contest this case, and Intrepid has asserted no cognizable prejudice from the 13-day delay in receiving the answer. Finally, Intrepid failed to meet and confer with opposing counsel before seeking default, as required by this Court's chambers rules.

Especially given the strong "policy that cases should be resolved on the merits," the Court denies Intrepid's request to strike the answer. *See Innospan Corp. v. Shasta Ventures GP LLC*, 582 F. App'x 755, 755 (9th Cir. 2014).

## **CONCLUSION**

Thus, summary judgment is **GRANTED** for defendants on these 3D Systems claims:

1. California Uniform Trade Secrets Act claim (count 1);

2. Defend Trade Secrets Act claim (count 2); and

3. Breach-of-contract claim (count 3).

Summary judgment is **GRANTED IN PART** for 3D Systems on this Intrepid counterclaim:

4. Declaratory-relief counterclaim (count 7), to the extent Intrepid challenges the provisions of 3D Systems' employment contracts that protect 3D Systems' alleged trade secrets.

Otherwise, the Court **DENIES** the pending summary-judgment motions, motions to exclude experts, and motions to strike.[2]

Dated:  March 20, 2025

_____
Hon. Andrew G. Schopler
United States District Judge

---

[2]  The Court did not rely on the evidence submitted with Intrepid's summary-judgment reply, so 3D Systems' motion to strike that evidence is denied as moot. (*See* ECF 574.) The parties' arguments about the statute of limitations and the arbitration clause are also moot.

27